# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **RICHARD MAX STRAHAN** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| | ) | |
| **v.** | ) | **05-10275-NMG** |
| | ) | |
| **DONALD RUMSFELD, *et al.*,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

### OPPOSITION TO PLAINTIFF'S AMENDED APPLICATION FOR TEMPORARY RESTRAINING ORDER AND MOTION FOR PRELIMINARY INJUNCTION

Federal Defendants, Donald Rumsfeld, in his official capacity as Secretary of the Department of Defense, Gordon England, in his official capacity as Secretary of the Department of Navy, and Vern Clark, in his official capacity as Chief of Naval Operations for the United States Navy (collectively "the Navy"), by and through their undersigned attorneys, respectfully submit the following opposition to Plaintiff's amended application for a temporary restraining order and motion for preliminary injunction.[1]

### ARGUMENT

The First Circuit has established that when a plaintiff seeks emergency injunctive relief, the district court must consider: (1) the likelihood of plaintiff's success on the merits of their claim; (2) the potential for irreparable harm if the injunction is denied; (3) the hardship to the

---

[1] Federal Defendants have prepared this opposition on an expedited basis in light of Plaintiff's amended application for a temporary restraining order. If the Court is inclined to grant Plaintiff's request for a TRO, Federal Defendants respectfully request that the Court set a briefing schedule to give the parties the opportunity to more fully brief Plaintiff's preliminary injunction motion.

non-movant if enjoined compared to the hardship to the movant if the injunction is denied; and

(4) the effect of the court's ruling on the public interest.  Water Keeper Alliance v. Dept. of

Defense, 271 F.3d 21, 30 (1st Cir. 2001).  Here, Plaintiff has failed to make *any* showing that

relief should be granted under *any* of these prongs.  To the contrary, the factors clearly weigh in

favor of a denial of injunctive relief.

# I.     PLAINTIFF HAS FAILED TO ESTABLISH ANY LIKELIHOOD OF SUCCESS ON THE MERITS

## A.     Plaintiff Has Failed to Demonstrate that the Court Has Jurisdiction

As a preliminary matter, there are serious questions regarding the Court's jurisdiction

over this matter, which is based upon alleged violations of the Endangered Species Act ("ESA").

See, Water Keeper Alliance, 271 F.3d at 29-30 (noting that in claims brought under the ESA, 60-

day notice requirement is jurisdictional); Maine Audubon Society v. Purslow, 907 F.2d 265 (1st

Cir. 1990) (ESA notice requirement is jurisdictional).  Plaintiff appears to rely upon a 60-day

notice of intent to sue sent in August 1996.  Complaint at ¶ 18; Attachment to Complaint.  Yet,

Plaintiff's Complaint is based upon alleged violations that had not yet occurred at the time of

that 1996 letter.  Complaint at ¶ 19 (referencing November 2004 ship strike).

In addition, Plaintiff's standing to bring the instant lawsuit is questionable. The

Constitution limits the jurisdiction of federal courts to cases or controversies.  U.S. Const. art.

III, § 2.  The irreducible constitutional minimum that a litigant must demonstrate to establish

standing is: (1) an injury-in-fact that is (a) concrete and particularized and (b) actual or

imminent, (2) caused by or fairly traceable to the challenged act, and (3) redressable by the

court. Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). These constitutional

prerequisites must be established for each claim that a litigant brings.  See Allen v. Wright, 468 U.S. 737, 752 (1984); Sierra Club v. Morton, 405 U.S. 727, 734-35 (1972).  Mr. Strahan fails to provide anything more in his Complaint than the general assertion that as an "avid whale watcher" with an "extended history of researching and developing conservation plans for species of [e]ndangered [w]hales" he has standing.  Complaint at ¶ 11.  There is nothing in the Complaint to establish that this San Francisco-based Plaintiff has a particularized personal interest in *these* Atlantic whales that are the subject of this lawsuit.  Complaint at ¶ 6.  Such general claims of injury lack the specificity required to establish injury-in-fact for standing purposes.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 572-78 (1992) (generalized allegations of injury insufficient to establish standing).

### B.    Plaintiff's Claims Are Likely to Fail on the Merits

Jurisdiction aside, Plaintiff has made no showing of any likelihood of success on the merits of his claims.  First, contrary to Plaintiff's allegations, the Navy has initiated consultation with the National Marine Fisheries Service ("NMFS"), pursuant to the requirements of Section 7 of the ESA, 16 U.S.C. § 1536.[2]  See, Declaration of Thomas R. Crabtree ("Crabtree

---

[2] The regulations implementing ESA state that an action agency may meet its procedural obligations under ESA section 7(a)(2) by conducting "informal consultation" or "formal consultation" as appropriate.  The regulations establish the use of "informal consultation" to assist an action agency in determining whether and when further consultation is necessary.  Informal consultation is "an optional process that includes all discussions, correspondence, etc., between the Service and the federal agency . . . designed to assist the [action agency] in determining whether formal consultation is . . . required."  50 C.F.R. § 402.13(a).  "If during informal consultation it is determined by the [action agency] with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary."  Id.  Therefore, even where it is determined that an agency action "may affect" species, thus triggering the need to initiate some form of consultation, but it is determined by the action agency with the concurrence of the Services that the action is "not likely to adversely affect" a listed species, formal consultation is not required.  See Fund for Animals v. Thomas, 127 F.3d 80, 84 (D.C. Cir. 1997).  If an action agency chooses to forego informal consultation or the informal consultation has not resolved the issue, "formal consultation" must be undertaken.  50 C.F.R. § 402.14.  Formal

Declaration") at ¶¶ 7-26.  On May 15, 1997, NMFS issued a biological opinion for Naval

activities in the southeastern United States, and concluded that the Navy's actions were not

likely to jeopardize the continued existence of any listed species, including the Northern right

whales.  Crabtree Declaration at ¶ 10b.  On August 27, 2003, the Navy initiated informal

consultation with NMFS on Navy activities in the Gulf of Maine.  Crabtree Declaration at ¶15.

In the course of this ongoing consultation, the Navy has implemented a number of protective

measures for the benefit of marine mammals, including Northern right whales and humpback

whales.  Crabtree Declaration at ¶¶ 27-29a (protective measures in Northeast operating areas);

see, ¶¶ 30-36 (protective measures in Southeast and Mid-Atlantic operating areas); see also

Declaration of Rear Admiral Donald K. Bullard at ¶¶ 12-14.  In addition, the Navy obtains

concurrences for individual training exercises to ensure that its activities will not adversely affect

listed species in that region.  Crabtree Declaration at ¶¶ 8-10, 13-26.[3]

Setting aside the fact that Plaintiff's assertions regarding Navy's compliance with Section

7 are flawed, Plaintiff has further failed to challenge a discrete agency action, for which he

believes Section 7 consultation is required.  Instead, he seeks a Court order requiring the Navy to

consult "on the impact of their vessel and military training operations on ESA listed species of

whales along the Atlantic coastline of the United States."  Amended Application for TRO at 1.

However, the ESA requires that "[e]ach Federal agency shall, in consultation with and with the

---

consultation procedures require the U.S. Fish & Wildlife Service or NMFS to prepare a
biological opinion including a conclusion as to whether the proposed action is likely to
jeopardize the continued existence of a listed species or result in destruction or adverse
modification of critical habitat.  50 C.F.R. § 402.14.

[3] Furthermore, the Navy has undertaken a number of measures for the benefit of marine
mammals, including the Northern right whale.  Crabtree Declaration at ¶¶ 40-43.

assistance of the Secretary, insure that any **action** authorized, funded, or carried out by such

agency" is not likely to jeopardize the continued existence of any listed species. 16 U.S.C. §

1536(a)(2). Thus, the law is clear that a plaintiff must identify discrete, particularized final

agency action which requires consultation – a sweeping demand for consultation over all "vessel

operations" cannot stand.[4]

Finally, Plaintiff has not established a take is likely to occur without an injunction. The

law is clear that "[m]ere speculation is not sufficient; there must be a definite threat of future

harm to a protected species." National Wildlife Federation v. Burlington Northern Railroad,

Inc., 23 F.3d 1508, 1512 n.8 (9th Cir. 1994)). Indeed, the injunction he seeks would halt Navy

operations within 25 miles of Northern right whale critical habitat, but the incident which

allegedly formed the basis for his claim – the November 2004 ship strike – did not even occur

within this range (assuming, for the sake of argument, that it *was* a Navy vessel that struck the

Northern right whale that washed upon the North Carolina shore). Crabtree Declaration at ¶ 22.

Thus, Plaintiff has failed to establish a likelihood of success on the merits of his claim,

and Plaintiff's requested injunctive relief should be denied.

## II.    THE BALANCE OF HARDSHIPS FAVORS THE NAVY

### A.    Plaintiff Has Failed to Demonstrate Irreparable Harm

In addition to his failure to establish a likelihood of success on the merits, Plaintiff's

demand for injunctive relief should be rejected upon an assessment of the harms. As an initial

---

[4] The Supreme Court recently reaffirmed the principle that the Plaintiff cannot use this Court to pursue wholesale improvement of the Navy's compliance with the ESA. Southern Utah Wilderness Alliance v. Norton 124 S. Ct. 2373, 2379-80 (2004); Lujan v. National Wildlife Federation, 497 U.S. 871, 891 (1990). Rather, a plaintiff "must direct its attack against some particular 'agency action' that causes it harm." Lujan, 497 U.S. at 891. A plaintiff "cannot demand a general judicial review of the [agency]'s day-to-day operations." Id. at 899.

matter, it is important to note that a portion of the relief Plaintiff seeks has no basis anywhere in law.  Specifically, Plaintiff requests, among other things, that the Court "[o]rder the [Navy] to report to the Plaintiff any occurrence of a large whale of any federally protected species within 2000 yards of any vessel operated by the Department of the Navy within 200 miles of the U.S. Atlantic coastline...."  Amended Application for TRO at 2.  Apart from the inherent overbreadth of this request, nothing in the ESA, its implementing regulations, nor any other provision of law affords an individual litigant the authority which Plaintiff seeks here.

These infirmities aside, there is no support for any allegation of widespread harm to Plaintiff.  In WaterKeeper Alliance, the First Circuit upheld a district court's finding that "assertions concerning irreparable harm stemming from the 'death of even a single member of an endangered species' were insufficient to justify granting injunctive relief."  271 F.3d at 34.  That court found that, without "a more concrete showing of probable deaths during the interim period and of how these deaths may impact the species," plaintiff had failed to show irreparable harm that would justify granting injunctive relief.  Id. (emphasis added).  See also Strahan v. Coxe, 127 F.3d 155, 171 (1st Cir. 1997) (upholding denial of PI to halt activity causing take and holding that such an injunction was mandatory only where activity would have caused eradication of entire species).  No such showing has been made here.

**B.     The Balance of Hardships Favors the Navy**

Plaintiff's own delay counsels against a finding of irreparable harm, and is further evidence that there would be no hardship to Plaintiff if injunctive relief is denied.  Based on the statements in Plaintiff's amended application for TRO, the harms of which Plaintiff complains occurred in November 2004, approximately six months ago.  Plaintiff is not entitled to

emergency injunctive relief – certainly not a temporary restraining order – for a wholly past

harm, especially when the Plaintiff has waited many months before seeking relief. "'As a

general proposition, delay in seeking preliminary relief cuts against finding irreparable injury.'"

Kansas Health Care Ass'n v. Kansas Dep't of Social and Rehab. Servs., 31 F.3d 1536, 1543-44

(10th Cir. 1994); Majorica v. RH Macy & Co., 762 F.2d 7, 8 (2nd Cir. 1985) (lack of diligence,

standing alone, may preclude issuance of preliminary injunctive relief); Lydo Enters. v. Las

Vegas, 745 F.2d 1211, 1213 (9th Cir. 1984) (PI should not issue where plaintiffs had delayed

seeking injunctive relief). "Though [plaintiffs' eight-month] delay [in seeking emergency relief]

is not dispositive of the issue, it further militates against a finding of irreparable harm." Mylan

Pharmaceuticals v. Shalala, 81 F.Supp.2d 30, 44 (D.D.C. 2000).

Meanwhile, the harm to the Navy that would result from an injunction would be extreme.

Plaintiff is seeking to enjoin all naval seafaring activities in large sections of the Atlantic

seaboard. See, Amended TRO Application at 2. As set forth in the accompanying Declaration of

Rear Admiral Donald K. Bullard, the potential impact of any restriction on the operation of the

Navy ships and military training operations on the East Coast would have grave consequences to

naval readiness and national security. See, e.g., Bullard Declaration at ¶¶ 6-8; 9-11; 14-17.

Thus, the hardship to the Navy from an injunction significantly outweighs any hardship to the

Plaintiff that would result if the motion were denied. Furthermore, given the national security

concerns, the public interest would be best served if the injunction were denied, thereby allowing

the Navy to continue its vital operations.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Federal Defendants respectfully request that

Plaintiff's amended application for temporary restraining order and motion for preliminary

injunction be denied.

MICHAEL J. SULLIVAN, United States Attorney
ANTON GIEDT, Assistant United States Attorney

KELLY A. JOHNSON, Acting Assistant Attorney General
JEAN E. WILLIAMS, Section Chief
SETH M. BARSKY, Assistant Section Chief

 /s/ S. Jay Govindan
S. JAY GOVINDAN, Trial Attorney (MD Bar # 25946)
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, DC 20044-7369
T: (202) 305-0237
F: (202) 305-0275
E: Jay.Govindan@usdoj.gov

Attorneys for Federal Defendants

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD MAX STRAHAN, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. |
| | ) 05-10275 |
| v. | ) |
| | ) DECLARATION OF |
| | ) RADM Donald K. Bullard, USN |
| DONALD RUMSFELD, et al., | ) |
| | ) |
| Defendants. | ) |

I, Donald K. Bullard, pursuant to 28 U.S.C. 1746, declare:

## PROFESSIONAL BACKGROUND AND RESPONSIBILITIES

1. I am an Officer on active duty in the United States Navy in the grade of Rear Admiral.
I am currently the Director, Fleet Readiness and Training, U.S. Fleet Forces Command
(FFC), located in Norfolk, Virginia. FFC's primary mission is to provide Unified
Commanders (commanders having operational command of forces from two or more
military departments [Army, Navy, or Air Force]), as well as Navy operational
commanders, with fully trained, equipped and combat-ready naval forces.

2. I received my Bachelor of Science Degree from the University of Southern California
and was commissioned through the Naval Reserve Officer Training Corps Program in
June 1973. I was designated a Naval Aviator in March 1975. I received my Masters
Degree with highest distinction from the Naval War College and am a graduate of the
Armed Forces Staff College. I am also a graduate of the Syracuse University Maxwell
School National Security Studies Program and have served on the Staff of the Center for
Naval Warfare Studies.

3. My operational sea tours include flying the A-7E *Corsair* in Attack Squadron One One
Three (VA 113) in *USS Ranger* (CV 61), Attack Squadron One Nine Five (VA 195) in
*USS Kitty Hawk* (CV 63), Carrier Air Wing Fourteen (CVW 14) in *USS Coral Sea* (CV
43), Attack Squadron Two Seven (VA 27) in *USS Carl Vinson* (CVN 70) and flying the
F/A-18 *Hornet* in Strike Fighter Squadron Nine Seven (VFA 97) in *USS Kitty Hawk* (CV
63). My shore assignments include duty with Attack Squadron One Two Two (VA 122),
with Commander, Naval Air Force, U.S. Pacific Fleet and on the Staff of the Deputy
Chief of Naval Operations (Air Warfare). In January 1991, I assumed command of
Strike Fighter Squadron Nine Seven (VFA 97) embarked in *Kitty Hawk*. In July 1995, I
reported as Commanding Officer of the amphibious assault ship *USS New Orleans* (LPH
11). I became the 28th Commanding Officer of the aircraft carrier *USS Constellation*
(CV 64) in January 1998. In October 1999, I reported as Chief of Staff for Commander,

Naval Air Force, U.S. Pacific Fleet. In July 2000, I was assigned to the Joint Staff as Deputy Director for Operations in the National Military Command Center. In September 2002, I assumed command of Carrier Group Six/*John F. Kennedy* Battle Group. I assumed my current duties in October 2004.

4. Currently, in my capacity as the Director, Fleet Readiness and Training, I am the principal advisor to the Commander, U. S. Fleet Forces Command on all matters relating to fleet training and readiness throughout FFC's area of responsibility, which includes the U. S. Atlantic Fleet. I am therefore responsible for, and familiar with, all training and readiness issues associated with the Atlantic Fleet.

U. S. FLEET FORCES COMMAND AND UNITS OF THE U. S. ATLANTIC FLEET ARE ORGANIZED TO SUPPORT THE UNIFIED COMMANDERS AND NATIONAL TASKING

5. The U.S. Atlantic Fleet is comprised of six aircraft carriers, 16 amphibious assault ships, and an additional 105 surface ships, 36 submarines, and 1,130 aircraft. The Force is made up of more than 70 commands. Our 115,239 personnel are stationed both Stateside (from Bath, Maine to Corpus Christi, Texas) and on the high seas (from the Norwegian Sea in the Atlantic Ocean to the Persian Gulf of the Arabian Sea in the Indian Ocean).

5a. The six aircraft carriers are the heart of the forward presence the Navy provides the Nation. The carrier provides a wide range of options to the U.S. government from simply demonstrating a strategic presence worldwide to attacks on airborne, afloat and ashore targets. Because carriers operate in international waters, its aircraft do not need to secure landing rights on foreign soil. These ships also engage in sustained operations in support of other forces. Each carrier is organized in a Carrier Strike Group (CSG) that will include on average: (1) a guided missile cruiser (a multi-mission surface combatant equipped with tomahawk long-range cruise missiles for long-range strike capability); (2) two guided missile destroyers (multi-mission surface combatants, used primarily for anti-air warfare); (3) an attack submarine (operating in a direct support role seeking out and destroying hostile surface ships and submarines); and (4) a combined ammunition, oiler, and supply ship (providing logistic support enabling the Navy's forward presence). Together, the CSG is on station, ready to respond to the orders of the Commander-in-Chief.

5b. The Cruisers, Destroyers, and Frigates maintain constant readiness to engage enemy land targets, aircraft, ships, and submarines. Together with the Amphibious ships, with embarked U.S. Marines, they project Sea Power ashore by maintaining the capability of landing the Marines by helicopters, amphibious track vehicles, air cushion landing craft, and assault craft whenever and wherever the need arises. This unit is an Expeditionary Strike Group (ESG).

5c. The Combat Logistics Force Ships keep the rest of the Navy mobile and independent of United States and foreign support bases by supplying the food, fuel, and equipment

necessary for sustained deployed operations. They also provide essential salvage, diving, towing, and repair services for combat forces and in response to national emergencies. Mine countermeasures ships ensure that transit routes used by U.S. and Allied ships are free from mines, keeping International Sea Lanes open, safe and free. In time of war, they also ensure that coastal areas and restricted passages are free of mines, making possible the use of these areas by other ships of the fleet. The Naval Beach Group, consisting of the Amphibious Seabees, a Beach Master Unit, and Assault Craft Units, provide essential pre- and post-landing support to our Amphibious Forces. Other special function units include Cargo Handlers, Mobile Diving/Salvage Teams, Explosive Ordinance Disposal Teams, Fleet Surgical Teams, and Fleet Introduction Teams.

5d. The CSGs and ESGs along with the support vessels and personnel prepare for operational assignments by following the Fleet Response Training Plan (FRTP). The FRTP begins after ships are made available for maintenance (a period of in port time either at the pier or in dry-dock). They then complete a seven-month basic training phase. Following the basic training phase, there is an intermediate training phase after which units are certified as surge ready – ready to deploy upon short notice if required. At this time, the units can be called upon to respond to an emergent crisis. If the unit has not surged, the training phase continues to the advance phase, which is designed to ensure these forces are prepared for scheduled deployments in support of the Global War on Terrorism or any other operational tasking. Units will then embark on a six-month deployment, after which they begin the FRTP cycle all over again. The goal of this continuous at-sea training cycle is to be prepared to deploy a significant portion of the Fleet at a moment's notice on the orders of the President of the United States and Secretary of Defense to defend the United States and its interests.

## THE NAVY MUST BE ABLE TO OPERATE IN AND AROUND ITS EAST COAST PORTS AND OPERATING AREAS

6. The primary mission of the U.S. Navy is to bring the fight to our enemies. However, the U.S. Navy also has a mission to detect, deter, and defend the nation against homeland maritime threats. To be successful in both of these roles, the Navy must maintain global maritime domain awareness. We have to be aware of the current and potential changes to the operating environment. The increasing dependence of our world on the seas, coupled with growing uncertainty of other nations' ability or desire to impede access in a future conflict, will continue to drive the need for Naval forces and the capability to project decisive joint power from the seas. The increased emphasis on the littorals (shallow water, near shore areas) and the global nature of the terrorist threat will demand the ability to strike where and when required, with the maritime domain serving as the key enabler for U.S. military forces. Anti-Submarine Warfare, Mine Countermeasures, Ship Self-Defense and Naval Surface Fire Support are critical capabilities both for ensuring worldwide access and for successfully executing the Navy's overall strategy. Additionally, we are continuing to execute the Global War on Terrorism while transforming for the future fight. In order to "train as we fight" and deliver the kind of dominant maritime power required by our Commander-in-Chief, the Fleet must train and test its tactics and weapon systems. To accomplish this training and testing at-sea, the

Atlantic Fleet primarily uses at-sea operating areas on the East Coast of the United States. An at-sea operating area (OPAREA) is a designated ocean area for surface, subsurface, or aircraft training and operations. The following OPAREAs primarily support Fleet training, testing, and operations on the East Coast: Boston/Narragansett, Virginia Capes, Cherry Point, and Charleston/Jacksonville. OPAREAs are designated in the locations depicted in Figure 1 in order to support aircraft carrier air wing training. During the basic and intermediate level training, the air wings must be within 120 nautical miles from a land-based airfield in order to safely divert and land if they are unable to do so on the deck of the aircraft carrier.

6a. The Boston and Narragansett OPAREAs are located in waters off the Northeast Coast and include the Gulf of Maine (GoME) and the Great South Channel (GSC). FFC and Naval Sea Systems Command (NAVSEA) undertake regularly occurring Navy training and testing activities in this area. FFC has assets operating out of Naval Air Station Brunswick, ME, Naval Shipyard Portsmouth, NH, Newport Naval Station, RI, Submarine Base, New London/ Groton, CT, and Naval Weapons Station, Earle, NJ. FFC has the following Command forces and their component forces train, test, and operate in the Boston and Narragansett OPAREAs: Submarine Group TWO, Submarine Squadrons (SUBRON) 2 and 4 and Submarine Development Squadron 12; Commander, Naval Air Forces, U. S. Atlantic Fleet (AIRLANT); and 4 Maritime Patrol Squadrons. All of these assets train in the Boston/Narragansett OPAREAs. Naval Sea Systems Command is responsible for ship and weapon development and testing, both of which occur in the Boston and Narragansett OPAREAs. Of significant importance is the torpedo testing conducted in the Great South Channel, since conducting these tests at the same sites, and thus in the same ocean environment, over time is critical to the long-term success of the Navy's torpedo program. See Figure 2.

6b. The Virginia Capes OPAREA is located in the coastal and offshore waters of the western North Atlantic Ocean adjacent to the states of Delaware, Maryland, Virginia, and North Carolina (see Figure 2). FFC has the following Command forces and their component forces training and operating in the Virginia Capes OPAREA: Amphibious Group TWO (Amphibious Squadrons 2, 4, 6, 8 and Naval Beach Group 2); Commander, Naval Air Forces, U.S. Atlantic Fleet, AIRLANT (Carrier Air Wings 1, 3, 7, 8; Helicopter Tactical Wing; Airborne Early Warning Wing; Fighter Wing and Strike Fighter Wing); Commander, Submarine Force, U.S. Atlantic Fleet, SUBLANT (SUBRON 6 and 8); Commander, U.S. SECOND Fleet (Carrier Strike Groups TWO, FOUR, EIGHT, TEN, & TWELVE); Commander, Naval Surface Force, U.S. Atlantic Fleet, SURFLANT (Destroyer Squadron DESRON 2, 18, 22, 26, & 28 along with Naval Special Warfare Development Group and Group TWO). See Figure 1.

6c. The Cherry Point OPAREA is located in the near shore and offshore waters of North Carolina in the northwestern Atlantic Ocean (see Figure 1). The OPAREA supports training in support of U.S. Marine Corps Base Camp LeJeune and Marine Corps Air Station Cherry Point. The units identified in paragraphs 6b and 6d also train in this OPAREA. See Figure 3.

6d. The Jacksonville and Charleston OPAREAs are located in the South Atlantic Bight
(SAB; the waters of the northwestern Atlantic Ocean off the coasts of southern North
Carolina, South Carolina, Georgia, and northeastern Florida) (see Figure 3). In addition
to the units identified in paragraph 6b, the following units train in these OPAREAs:
Carrier Strike Groups SIX & FOURTEEN; Destroyer Squadrons (DESRON) 14, 18, and
24; Carrier Air Wing 17, Helicopter ASW Wing, Helicopter ASW Light Wing, Sea
Control Wing, and Patrol and Reconnaissance Wing 11. Much of the Fleet's
intermediate and advance phase training is accomplished in these OPAREAs.
See Figure 3.

## OPERATIONAL TEMPO FOR THE U.S. ATLANTIC FLEET IS HIGH

7. On any given day, one-third of the U.S. Atlantic Fleet assets are underway (not in
port; operating at-sea) on deployment in support of a national mission tasking, one-third
are underway in an East Coast at-sea OPAREA training or testing in support of the Fleet
Response Training Plan, and one-third are in port conducting maintenance.

8. The month of March 2005 is illustrative as 20 of the 36 submarines stationed on the
East Coast were underway during the course of the month. There were 18 underways
from port and 18 returns to port in the same period (some vessels remain out past the
month snapshot). Additionally, the underway submarines conducted 20 Brief Stops for
Personnel (BSP) - done to shift out technical representatives involved with at-sea testing
or maintenance, and other personnel moves which can, depending on the weather result
in a transit back to the pier. Most of these BSPs occurred at the three main submarine
home bases of Kings Bay, GA, Norfolk, VA, or Groton, CT, but a few were conducted in
Mayport, FL. Of the 20 submarines underway, all were conducting training designed to
hone their warfighting skills. Six were also conducting inspections or certifications; five
were conducting submarine on submarine training; 3 were transiting either to or from
other theaters (mission taskings); and six were involved with training for both the surface
and aviation Navy. Additionally, during the same period, 4 of 6 carriers were underway,
one of which was forward deployed away from U.S. waters. There were 5 carrier
underways and 5 returns to port in the same period. 11 of 16 amphibious assault ships
were underway, 3 of which were deployed. There were 17 amphibious assault ship
underways and 17 returns to port in the same period. 41 of 105 surface ships were
underway, 12 of which were deployed. There were 81 surface ships underways and 81
returns to port in the same period (some vessels remain out past the March snapshot). Of
the underway periods; 9 were for major inspections, 2 salvage operations were executed,
the remainder were for Unit Level Training (ULT), Intermediate Training exercises or
were in support of fleet services like aircraft qualifications and test and evaluation events.
All were in or around the east coast OPAREAs.

## TWO OF THE EAST COAST AT-SEA OPAREAS CONTAIN DESIGNATED RIGHT WHALE CRITICAL HABITAT

9. The Jacksonville OPAREA contains designated right whale critical habitat. All Naval operations in this area have and will continue to observe the protective measures in place per the 1997 Biological Opinion issued by the National Marine Fisheries Service (NMFS) following formal consultation under the Endangered Species Act (ESA). To restrict the Navy "from operating any ship or conducting any military training operation within 25 nautical miles from the boundary" of designated right whale critical habitat in this OPAREA would prevent our ships access to several major Naval facilities including the Navy homeports of Mayport and Kings Bay. The United Species Navy would be prevented from even putting the surface ships and submarines based at those homeports to sea. Relocating the Naval vessels from their homeports of Mayport and Kings Bay to homeports that are not completely blocked by designated right whale critical habitat would result in a strategic imbalance on the East Coast, would adversely affect training and readiness, and would cause great hardship to the Sailors and their families. Additionally, such a move would be prohibitively costly to the American taxpayer. This cost does not take into account the economic costs to the Mayport/Jacksonville/Kings Bay area.

10. While not located in a designated right whale critical habitat area, Naval Station Norfolk is the largest naval base in the world. While the Navy is but a small percentage of the total vessel traffic in the Hampton Roads region, there are approximately 80 Naval ships operating out of the Norfolk, Virginia area. When they get underway for training or testing at-sea, many of these vessels travel south and north from Norfolk to conduct training in the Cherry Point, Charleston, Jacksonville, Narragansett, and Boston OPAREAs in addition to the Virginia Capes OPAREA. These operating areas have extensive infrastructure designed to facilitate and evaluate that training. The loss of any of these at-sea training areas, and the associated infrastructure would create severe strains on the ability of these forces to adequately prepare for their assigned missions, with negative consequences to their ability to defend the United States.

11. The Boston OPAREA also contains designated right whale critical habitat. All Naval operations in this area have and will continue to observe the protective measures in place while the ESA consultation with the National Marine Fisheries Service (NMFS) is ongoing. To restrict the Navy "from operating any ship or conducting any military training operation within 25 nautical miles from the boundary" of designated right whale critical habitat in this OPAREA would prevent our ships access to several major Naval training facilities including the Navy at-sea inert torpedo testing range and the Great South Channel which is the main shipping channel for the Port of Boston.

## NAVAL OPERATIONS IN AND AROUND THE DESIGNATED CRITICAL HABITATS ARE CONDUCTED WITH MARINE MAMMAL PROTECTIVE MEASURES IN PLACE

12. All Naval vessels operating at-sea employ a series of right whale protective measures in their standard operating procedures. These procedures include right whale awareness training for ship and aircraft crews, use of buffer zones, pre-event visual surveys, and post-event monitoring to detect the presence of marine mammals.

13. Navy initiated consultation with NMFS in March 1996 on the potential impacts of naval activities in the waters of the southeastern United States. On November 27, 1996, Navy completed a Biological Assessment describing naval activities that take place off the southeastern United States, and the mitigation or protective measures that Navy had implemented, or proposed to implement, in connection with those activities to ensure their activities were not likely to jeopardize right whales or other listed species. NMFS issued a Biological Opinion in May 1997 approving a broad range of protective measures many of which apply during the important "calving season" from December 1st to March 31st. These calving season protective measures include the following: Naval Gunfire limited to inert ordnance, and only in certain agreed upon areas. All firing is conducted west to east with surveys conducted to ensure a clear area. Air-Dropped Ordnance is confined to a limited specified area, with similar surveys to ensure a clear area. Transiting through the critical habitat and associated area of concern is limited to east-west directions, where practical. Vessel speed limitations in the critical habitat and associated area of concern is subject to the following requirement: "use extreme caution and use slow safe speed, that is, the slowest speed that is consistent with essential mission, training and operations." Moreover, operations in critical habitat and area of concern are limited to daylight and periods of good visibility, to the extent practicable and consistent with mission, training and operation. One properly trained Marine Mammal Lookout is required when operating in critical habitat. Additionally, Navy coordinates a sophisticated tracking and fusion operation to consolidate whale location reports from numerous sources.

14. As a result of completed and ongoing ESA consultations for testing events in the Gulf of Maine (Boston OPAREA), the following protective measures are in place: Testing will be suspended in certain sea states or if the visibility precludes effective mitigation, and, in some cases, Navy has delayed tests in accordance with the mitigation procedures to avoid potential impacts on protected species. Mitigation measures are required for all torpedo-testing events in the Great South Channel and the Gulf of Maine, including restrictions to test only during daylight hours, requirement for visual surveys and clearance for marine mammals and sea turtles prior to the test, and the placement of trained marine mammal observers on all Navy platforms. In addition, vessels transiting through the critical habitat, while not actually engaged in the test event, shall be alert at all times, use extreme caution, and proceed at a safe speed so that the vessel can take action to avoid collision with a right whale or other marine mammal or listed species. Aerial surveys using a dedicated fixed-wing aircraft also are required to monitor the test, and two trained observers, in addition to the pilot, must be on the aircraft. All observers

must be trained in the field identification, distribution and relevant behaviors of marine mammals of the western north Atlantic. Observers must fill out Standard Sightings Forms that are submitted to the Northeast Fisheries Science Center, and any sightings of right whales are immediately communicated to the Sighting Advisory System.

## HARM OF RESTRICTING THE NAVY "FROM OPERATING ANY SHIP OR CONDUCTING ANY MILITARY TRAINING OPERATION WITHIN 25 NAUTICAL MILES FROM THE BOUNDARY" OF DESIGNATED RIGHT WHALE CRITICAL HABITAT IS GREAT

15. Naval Submarine Base Kings Bay, GA is the sole Atlantic homeport for seven of our nation's 14 strategic ballistic missile submarines. The Trident SSBN force is the most survivable leg of the nuclear triad. They remain in a ready to generate status (deploy and carry out their mission) whether inport or at-sea. At all times they are prepared to respond to emerging global threats associated with an adversary's use or proliferation of nuclear, biological, or chemical weapons and ballistic missiles. To generate from homeport, the Tridents must transit through the Jacksonville operating area and the designated right whale critical habitat en route to deterrent patrol or training operating areas. If denied access to the Jacksonville critical habitat and OPAREA, the Trident fleet will be unable to effectively and successfully execute their assigned strategic deterrence mission. Additionally, course and speed restrictions to and from the approaches to Kings Bay create unacceptable force protection, training, and ship handling hazards. Such a compromise will result in the failure to meet mission requirements directed by the President through the Combatant Commanders resulting in a breach of our nation's security.

16. The Jacksonville and Boston OPAREAs containing designated right whale critical habitat support the majority of the Navy's new ship and weapons testing along with a sizable portion of the intermediate and advanced phase training of the U.S. Atlantic Fleet. The potential impact of denied access, or additional restrictions on the operation of our ships or the conduct of military training and testing operations within the designated right whale critical habitats on the East Coast will have grave consequences to the Navy's readiness and its ability to meet its mission.

CONCLUSION

17. A properly trained and equipped Naval Force is vital to the National Security and the Global War on Terrorism. The Navy must continue to operate and train the Nation's warships and crews in its designated at-sea operating areas or the Atlantic Fleet could be left without an adequately trained force and thereby unable to meet overseas mission tasking, defend the nation against homeland maritime threats, and maintain global maritime domain awareness. Our Forces are operating in compliance with the ESA; we continue to implement protective measures that were developed in consultation with the NMFS designated to help ensure marine mammal protection and in furtherance of critical habitat special management. To restrict the Navy "from operating any ship or conducting any military training operation within 25 nautical miles from the boundary" of designated right whale critical habitat would prevent our ships access to several major Naval facilities including the Navy homeports of Mayport and Kings Bay as well as the Port of Boston and the Boston and New York shipping channels. Such a denial of access to these ports and bases would be a major disruption of the operation of the entire U.S. Atlantic Fleet and would have a detrimental effect on the Navy's readiness. Enjoining the operation of naval vessels within 25 nautical miles from designated right whale critical habitat will cause the national security of the United States great harm.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge.

Date 21 APR 2005



Figure 1



Figure 2



Figure 3

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD MAX STRAHAN, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. |
| | ) 05-10275 |
| v. | ) |
| | ) DECLARATION OF |
| DONALD RUMSFELD, et al., | ) Thomas R. Crabtree |
| | ) |
| Defendants. | ) |

I, Thomas R. Crabtree, pursuant to 28 U.S.C. 1746, declare:

### PROFESSIONAL BACKGROUND AND RESPONSIBILITIES

1. I am a U.S. Navy civilian employee and member of the Senior Executive Service. I am currently the Deputy Director, Readiness and Training for U. S. Fleet Forces Command (FFC), U. S. Atlantic Fleet located in Norfolk, Virginia. FFC's primary mission is to provide Unified Commanders (commanders having operational command of forces from two or more military departments [Army, Navy, or Air Force]), as well as Navy operational commanders, with fully trained, equipped and combat-ready naval forces.

2. I earned my Bachelor's and Master's of Science in Business Administration from Old Dominion University in 1972 and Golden Gate University in 1979, respectively. I was an active duty U.S. Navy officer from 1972 to 1975. I left active duty in 1975, but continued to serve in the Naval Reserve from 1975 to 1980. When I left active duty, I became a U.S. Navy civilian employee, serving in various positions in the Norfolk area. In July 1999, I was selected to the Senior Executive Service and served as Deputy Director, Shore Activity Readiness for the Commander-in-Chief, U.S. Atlantic Fleet. On August 1, 2002, I was named Director of Shore Activities Readiness where I oversaw the full range of environmental operations for FFC's shore installations from compliance to cleanup, as well as personnel housing and public safety issues related to those installations. Additionally, I was and continue to be responsible for all at sea environmental planning and compliance in support of Atlantic Fleet exercise training.

3. Currently, in my capacity as the Deputy Director of Readiness and Training for FFC, I am the deputy principal advisor to the Commander on all matters relating to fleet training and readiness throughout the Atlantic Fleet's area of responsibility. I am therefore responsible for, and familiar with, all training and associated environmental planning and

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Thomas R. Crabtree

compliance activities that relate to fleet readiness for those forces, including the Endangered Species Act (ESA) Section 7 consultations past and present with NOAA National Marine Fisheries Service (NMFS) for Naval activities on the East Coast.

## THERE ARE THREE AREAS OF DESIGNATED CRITICAL HABITAT FOR NORTH ATLANTIC RIGHT WHALES ALONG THE U.S. ATLANTIC COAST

4. All references in this declaration are specific to the North Atlantic right whale, *Eubalaena glacialis*, hereafter referred to as "northern right whale," "right whale," or "NARW."

5. In accordance with the ESA and its implementing regulations, critical habitat is a specific geographic area(s) that is essential for the conservation of a threatened or endangered species and that may require special management and protection. Designation of critical habitat does not result in prohibition of all activity in the critical habitat or vicinity; instead, critical habitat designation allows Federal agencies, via the ESA Section 7 consultation process, to ensure that any action they authorize, fund, or carry out is not likely to result in the destruction or adverse modification of critical habitat. Therefore, the protection afforded by a critical habitat designation comes through the consultation process, either informal or formal.

6. Critical habitat for the northern right whale was designated in 1994 as a result of a May 1990 petition. After consideration of public comments and based on the best available scientific information, NMFS designated three areas of critical habitat essential for the reproduction, rest and refuge, health, continued survival, conservation and recovery of the northern right whale population. The three designated areas located off the U.S. Atlantic Coast are the Great South Channel, Cape Cod Bay, and Southeastern United States critical habitats (50 CFR 226.13). See Figure 1. In the designation (59 FR 28793, June 30, 1994) NMFS evaluated areas meaningful to the species conservation, focusing on particular areas that have essential features that may be in need of special management. The 1994 designation described the biological and physical features and principal constituent elements (such as feeding sites, breeding grounds, and calving areas) within the designated areas that are essential to the northern right whale. On August 28, 2003, per 68 FR 51758, NMFS determined expansion of the three critical habitats for NARW was not warranted.

## NAVY IS MEETING ITS ENDANGERED SPECIES ACT OBLIGATIONS THROUGH SECTION 7 CONSULTATIONS WITH NMFS

7. Since 1995, Navy has completed 23 ESA informal consultations, 3 ESA formal consultations, and is currently engaged in four ESA consultations on training activities in the Navy's Southeastern, Northeastern, and Mid-Atlantic operating areas. Additional

consultations in support of Navy weapon system and platform testing, acquisition and research and development also have been completed. Naval Air Systems Command completed at least six informal consultations with NMFS concurrence that proposed activities were not likely to adversely affect listed species. Naval Sea Systems Command has completed 2 formal consultations and 14 informal consultations since 1995.

### SOUTHEAST CONSULTATION HISTORY

8. Navy operating areas offshore of the Southeastern U.S. include the Jacksonville Operating Area and the Charleston Operating Area. One area of critical habitat is designated in the Southeastern U.S, generally extending 5 to 15 nautical miles off shore. Where Navy determines activities at-sea may affect ESA-listed species or designated critical habitat, Navy initiates Section 7 consultations with NMFS through informal or formal procedures per ESA regulations. Examples of activities subject to consultation in the Southeastern U.S. follow.

9. Informal consultation with NMFS was initiated in 1995 for the proposed action of realigning Commander Afloat Training Group assets from Guantanamo Bay, Cuba to Mayport Naval Station, Mayport, Florida. Based on the finding that overall Navy ship traffic in the right whale critical habitat was not expected to increase over prior year levels, and considering the precautionary measures to be implemented by the U.S. Navy, NMFS determined on September 29, 1995 that the proposed activities were unlikely to adversely affect endangered or threatened species or their critical habitat under NMFS purview.

10. During the first three months of 1996, seven right whale mortalities were documented in the vicinity of the Southeastern U.S. designated right whale critical habitat. Although there was no indication that naval operations were responsible for any of the right whale mortalities, Navy determined that additional review of Atlantic Fleet operations via a formal ESA consultation process was prudent to determine the potential effect on listed species. In addition, NMFS indicated that the recent mortalities could change the biological baseline upon which prior impacts had been evaluated, warranting enhanced protective measures and the requirement to reinitiate consultations. Navy and NMFS held several meetings, and, in March 1996, Navy implemented additional northern right whale protective measures and initiated formal ESA consultation.

10a. The action area for the programmatic consultation on Navy activities in the Southeastern U.S. extends beyond the designated critical habitat boundaries. The consultation area depicted in Figure 3 (attached to RADM Bullard's declaration) includes the critical habitat, an associated area of concern, and areas well north of the critical habitat and seaward of the critical habitat to 80 nautical miles from shore. The consultation area is consistent with the ESA definition of action area (50 CFR 407.02). The programmatic consultation addressed six endangered marine mammals: *Eubaleana glacialis* (NARW), *Megaptera novaeangliae* (Humpback whale), *Physeter macrocephalis* (Sperm whale), *Balaenoptera musculus* (Blue whale), *Balaenoptera*

*physalus* (Fin whale), and *Balaenoptera borealis* (Sei whale), as well as ESA-listed sea turtles.

10b. NMFS issued a Biological Opinion (BO) for Navy Activities off the Southeastern United States along the Atlantic Coast on May 15, 1997. The BO concludes that, with the implementation of the defined protective measures, the likelihood of interactions with right whales and other ESA listed species in the consultation area is significantly reduced, and the Navy activities are not likely to jeopardize the continued existence of any ESA listed species under the purview of NMFS. Similarly, NMFS concluded that Navy activities are not likely to result in the destruction or adverse modification of right whale critical habitat. NMFS also concluded that the long-term continuation of Navy activities is not likely to jeopardize the continued existence of populations of humpback and fin whales, and Kemps ridley, leatherback, hawksbill, green and loggerhead sea turtles.

11. Subsequent to issuance of the 1997 programmatic BO, Navy has continued to review planned activities to determine whether actions may affect listed species or their habitats and are not addressed in the comprehensive BO. For example, Navy consulted with NMFS in 2003 and 2004 to develop harm avoidance measures associated with Navy security systems at Naval Submarine Base, Kings Bay, Georgia, including measures that require documentation and reporting of certain marine mammal sightings to NMFS.

12. In June 1996, Navy initiated formal ESA Section 7 consultation with NMFS for shipshock trials offshore of Mayport, FL. Another formal consultation for a second shipshock was initiated in January 2000. NMFS concluded in both BOs that ship shock testings are not likely to jeopardize the continued existence of the *Caretta caretta* (loggerhead sea turtle), *Dermochelys coriacea* (leatherback sea turtle), *Lepidochelys kempii* (Kemp's ridley sea turtle), *Chelonia mydas* (green sea turtle), *Eretmochelys imbricate* (hawksbill sea turtle), *Eubaleana glacialis* (NARW), *Megaptera novaeangliae* (Humpback whale), *Physeter macrocephalis* (Sperm whale), *Balaenoptera physalus* (Fin whale), *Balaenoptera borealis* (Sei whale) and *Balaenoptera musculus* (blue whale).

### NORTHEAST CONSULTATION HISTORY

13. Navy operating areas offshore of the Northeastern U.S. include the Boston/ Narragansett Operating Areas. Two areas of critical habitat are designated in the Northeastern U.S, one in Cape Cod Bay and one in the Great South Channel. The Northeastern operating areas are important primarily for Fleet unit-level training and for Navy's testing of weapons systems and platforms. Where Navy determines activities at-sea may affect ESA-listed species or designated critical habitat, Navy initiates Section 7 consultations with NMFS through informal or formal procedures per ESA regulations. Examples of activities subject to consultation in the Northeastern U.S. follow.

14. In 1997, an informal consultation under Section 7 of the ESA was initiated with NMFS for torpedo testing (TORPEX) locations in the Cape Cod Test Area, much of which lies within the Great South Channel critical habitat. The initial consultation concluded with NMFS's June 6, 1997 concurrence that Navy torpedo testing in the Great South Channel is not likely to adversely affect listed species or adversely modify or destroy critical habitat, contingent upon adherence to the defined mitigation measures. As a standard practice, the Navy provides information to the NMFS Northeast Regional Office prior to each TORPEX test to indicate that mitigation measures will be implemented, and to provide descriptions of the specific test event. When test parameters change such that they are outside the conditions stated in the 1997 concurrence letter, Navy reinitiates ESA consultation. For example, informal consultation was reinitiated in 2001 for lightweight torpedo exercises and again in 2002 and 2003. For all events, NMFS concurred that the defined Navy activities in the critical habitat are not likely to adversely affect listed species and do not adversely modify or destroy critical habitat.

15. NMFS and Navy initiated a series of meetings to increase focus on potential effects of Navy activities in the Gulf of Maine and vicinity. In concert with NMFS, Navy initiated a programmatic review of activities in the Northeastern operating areas, including Fleet training and testing command activities. Based on a relatively low operational tempo and the prior completion of informal consultation for testing activities in the Great South Channel critical habitat, Navy submitted an informal consultation package on August 27, 2003 with the finding that activities are not likely to adversely affect listed species or their designated critical habitats. The consultation is evaluating the potential effects of Navy activities on five listed sea turtle species and six endangered marine mammals: *Eubaleana glacialis* (NARW), *Megaptera novaeangliae* (Humpback whale), *Physeter macrocephalis* (Sperm whale), *Balaenoptera musculus* (Blue whale), *Balaenoptera physalus* (Fin whale), and *Balaenoptera borealis* (Sei whale). While the consultations are underway, the Navy has mandated extensive mitigation measures for Naval exercises in order to avoid adverse affects on listed species.

## MID-ATLANTIC CONSULTATION HISTORY

16. Navy operating areas off the Mid-Atlantic U.S. include the Cherry Point and VACAPES Operating Areas. Where Navy determines activities at- sea may affect ESA-listed species, Navy initiates Section 7 consultations with NMFS through informal or formal procedures per ESA regulations. Examples of activities subject to consultation in the Mid-Atlantic follow.

17. In 1998, Navy Submarine Forces Atlantic initiated informal consultation for torpedo exercises conducted offshore of Cape Henry, Virginia. These service weapon tests (SWTs) test randomly selected warshot torpedoes. Via the consultation, the original Navy-preferred SWT test area was relocated to deeper water locations, seaward of the VACAPES operating area. Concurrence that these activities are not likely to adversely affect threatened or endangered species under NMFS jurisdiction was received on July 29, 1998. The concurrence applies to subsequent years, provided that the same locations

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Thomas R. Crabtree

are utilized and mitigation measures are followed. SWTs are conducted annually, and Navy notifies the NMFS Northeast Regional Office prior to each event.

18. Fleet training includes the conducting of sinking exercises (SINKEXs) to train personnel, test weapons, study survivability of ship structures, and certify Naval forces preparing for deployment overseas. The primary purpose of the SINKEX program is to train Fleet personnel to use real world, live weapons against representative targets. Navy initiated ESA Section 7 informal consultations for SINKEXs in 1999, followed by submittal of a programmatic informal consultation package to NMFS in December 2000. In March 2001, NMFS requested additional information and requested that Navy enter into formal consultation for programmatic SINKEX activities. Although SINKEX locations vary, a majority of SINKEXs are planned in the deeper waters of Mid-Atlantic OPAREAS or seaward of these OPAREAs. Conduct of SINKEXs in these areas well offshore of the U.S. Mid-Atlantic coast reduces the likelihood of encountering protected species. Generally, the informal consultations have considered the potential effects on endangered marine mammals, including *Eubaleana glacialis* (NARW), *Megaptera novaeangliae* (Humpback whale), *Physeter macrocephalis* (Sperm whale), *Balaenoptera musculus* (Blue whale), *Balaenoptera physalus* (Fin whale), and *Balaenoptera borealis* (Sei whale), as well as listed sea turtle species. As Navy continues to develop programmatic formal consultation information, informal consultations for individual SINKEXs have been completed. Through the consultation process and the development of increasingly stringent mitigation and harm avoidance procedures, NMFS has determined that the proposed Navy activities are not likely to adversely affected listed species under its jurisdiction.

19. In May 2002, Navy initiated informal ESA Section 7 consultation with NMFS for mine warfare activities (MINEX) occurring in Onslow Bay, NC. NMFS concurred that the action may affect, but is unlikely to adversely affect any species under NMFS' purview based on the avoidance measures detailed in their concurrence letter dated May 24, 2002. In July 2002, Navy initiated formal ESA Section 7 consultation for (MINEX) and explosive ordnance disposal (EOD) unit level training at several locations offshore VA, NC, and SC. The BO received October 9, 2002 concluded that explosive mine neutralization and explosive countermining is not likely to jeopardize the continued existence of the *Caretta caretta* (loggerhead sea turtle), *Dermochelys coriacea* (leatherback sea turtle), *Lepidochelys kempii* (Kemp's ridley sea turtle), *Chelonia mydas* (green sea turtle), or *Eretmochelys imbricate* (hawksbill sea turtle) based on the mitigative measures included in the BO. Species of large whales, *Lepidochelys soliveacea* (olive ridley sea turtles), and *Acipenser brevirostrum* (shortnose sturgeon) were found not likely to be adversely affected by MINEX actions.

20. Navy reinitiated a prior consultation for dredging and beach renourishment along the U.S. Navy Fleet Combat Training Center at Dam Neck Annex, Virginia Beach, Virginia. The BO received December 11, 2003 concluded that the dredging at the Sandbridge Shoal borrow site and beach nourishment activities along Dam Neck Annex are not likely to jeopardize the continued existence of the loggerhead sea turtle (*Caretta caretta*), leatherback sea turtle (*Dermochelys coriacea*), Kemp's ridley sea turtle (*Lepidochelys*

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Thomas R. Crabtree

*kempii*), green sea turtle (*Chelonia mydas*), and hawksbill sea turtle (*Eretmochelys imbricata*). In addition, the action may affect, but is not likely to adversely affect the North Atlantic right whale (*Eubalaena glacialis*), humpback whale (*Megaptera novaengliae*), and fin whale (*Balaenoptera physalus*).

21. In 2003, Navy initiated informal consultation for the conduct of firing exercises required for ship certification using a new portable buoy scoring system (the Virtual At-Sea Training Deployable Prototype/Integrated Maritime Portable Acoustic Scoring and Simulator (VAST-DP/IMPASS system). Navy and NMFS completed 4 informal consultations for use of the system in 2003 and early 2004. The informal consultations included use of the system in the VACAPES Operating Area. The ESA-listed species considered in these consultations include North Atlantic right whale (*Eubalaena glacialis*), Finback whale (*Balaenoptera physalus*), Sei Whale (*Balaenoptera borealis*), Humpback whale (*Megaptera novaengliae*), Blue whale (*Balaenoptera musculus*), and Sperm whale (*Physeter macrocephalus*), as well as listed sea turtle species. A programmatic formal consultation for the VAST-IMPASS system was submitted to NMFS in February 2004, and Navy and NMFS are currently engaged in the formal consultation process.

21a. Naval Sea Systems Command Program Executive Office, Ships, conducts activities referred to as Weapons Effects Tests (WET). Generally, these are conducted seaward of Navy Mid-Atlantic or Southeast operating areas. Informal consultations for two such WETS were completed in 2004, with NMFS concurrence that the WETs were not likely to adversely affect listed species, including *Eubaleana glacialis* (NARW), *Physeter macrocephalis* (Sperm whale) *Megaptera novaeangliae* (Humpback whale), *Balaenoptera musculus* (Blue whale), *Balaenoptera physalus* (Fin whale), *Balaenoptera borealis* (Sei whale), and ESA-listed sea turtles.

22. In June 2004, NMFS released an Advance Notice of Proposed Rulemaking (ANPR) for Right Whale Ship Strike Reduction, indicating that ship strike reduction measures for public vessels would be developed via ESA Section 7 consultations, rather than directly via the rulemaking procedure. On 17 November 2004, a Navy vessel reported a strike of an unidentified marine mammal in the VACAPES operating area. Unlike commercial shipping, Navy requires Navy vessels to report ship strikes, and information on the strike was appropriately provided to NMFS. A dead northern right whale washed ashore in North Carolina on November 24, 2004. In total, four confirmed right whale deaths occurred in 2004, two likely from ship strike and two from unknown causes. In addition, two NARW's were found entangled in fishing gear. Through discussion with NMFS in December 2004, the Navy determined that it would be prudent to implement additional ship strike reduction measures for the Mid-Atlantic, using the NMFS ANPR as guidance. Navy issued guidance to all Fleet units on December 17, 2004, requiring the implementation of additional ship strike reduction measures along the U.S. Atlantic Coast. Thus, Navy became the first entity to provide an affirmative response to NMFS's efforts to improve protection of migrating whales along the Mid-Atlantic coast.

23. In December 2004, the Navy initiated ESA Section 7 consultation with NMFS for the proposed installation of an instrumented training area off the East Coast of the United States. Discussions of the draft Biological Assessment (BA) were held between Navy and NMFS in December 2004 and January 2005. Based on recommendations received from NMFS, and the anthropogenic right whale mortalities and gear entanglements in 2004, the Navy agreed to expand the draft BA to specifically address effective mitigation procedures for Navy vessel transits in defined near-shore areas of the Mid-Atlantic (ranging from south and east of Block Island Sound southward to South Carolina) during the Northern right whale migratory seasons. Overall, the consultation reviews the potential to affect ESA-listed sea turtles and endangered marine mammals, including *Eubaleana glacialis* (NARW), *Megaptera novaeangliae* (Humpback whale), *Physeter macrocephalis* (Sperm whale), *Balaenoptera musculus* (Blue whale), *Balaenoptera physalus* (Fin whale), and *Balaenoptera borealis* (Sei whale).

24. Naval Air System Command completed ESA Section 7 consultations on approximately 6 actions in the Chesapeake Bay and areas offshore VA and MD from 1996 through the present. NMFS concurred that these activities, such as underwater cable installation, operational testing and evaluation of Naval aircraft, and deployment of inert projectiles were not likely to adversely affect ESA-listed species under NMFS jurisdiction. The following species were considered in these various consultations: *Eubaleana glacialis* (NARW), *Megaptera novaeangliae* (Humpback whale), *Physeter macrocephalis* (Sperm whale), *Balaenoptera physalus* (Fin whale), *Balaenoptera borealis* (Sei whale), *Caretta caretta* (loggerhead sea turtle), *Dermochelys coriacea* (leatherback sea turtle), *Lepidochelys kempii* (Kemp's ridley sea turtle), *Chelonia mydas* (green sea turtle), *Eretmochelys imbricate* (hawksbill sea turtle) and *Acipenser brevirostrum* (Shortnose sturgeon).

25. Overall, during the conduct of ESA Section 7 consultations with NMFS for various Navy actions on the East Coast, Navy routinely presents and analyzes the potential for vessel collisions as a component of the consultation. NMFS has analyzed the issue of potential Navy vessel strikes in a series of consultations, in most cases including mitigation measures, such as shipboard observers (lookouts) to support the reduction of ship strike risk to listed species. Vessel collision is routinely considered by NMFS in issuance of informal consultation concurrence letters and Biological Opinions for Navy activities along the U.S Atlantic Coast. Typical language from a January 2004 consultation concurrence reads: "On occasion, underway vessels may collide with marine mammals or sea turtles. While whales are highly maneuverable and generally detectable (in daylight) at long range by onboard watchstanders, collisions do occur with surfacing animals, resting animals, or those swimming just below the surface. ... Given the low density of listed species and the harm avoidance measures proposed to be included as part of the proposed action, NOAA Fisheries believes that collision with a listed species during these operations is highly unlikely." Additional mitigation procedures, such as slow speed requirements and additional lookouts, are issued as mitigation measures by NMFS for Navy activities where NMFS believes there is a higher risk of ship strike, such as the procedures identified in the 1997 Southeast BO.

26. NMFS has developed additional measures to reduce the potential for vessel-related impacts. These efforts have been developed under the auspices of the ESA recovery planning process for NARWs, and are a component of ESA protections for this species. Navy has proactively ensured that Navy vessels adhere to these additional measures, including adherence to the Navy mandatory ship reporting requirements that are not otherwise required of sovereign vessels.

26a. As part of recovery actions aimed at reducing vessel related impacts, NMFS published a proposed rule in August 1996 restricting vessel approach to right whales (61 FR 41116) to distances outside of 500 yards in order to minimize human-induced disturbance. The subsequent rules (50 CFR Part 222.32) prohibit both boats and aircraft from approaching any right whale closer than 500 yards, and are designed to reduce the potential for vessel collisions. Via issuance of this 500-yard guidance to the Fleet through annual and standing guidance, Navy ensures that Fleet units implement this requirement when right whales are sighted.

26b. In December 1998, the International Maritime Organization Subcommittee on Safety and Navigation approved a U.S. proposal to implement a mandatory ship reporting (MSR) system in two areas off the east coast of the United States. Via Navy guidance issued June 2002, Navy requires Naval vessels to report to the MSR system.

## THE NAVY IMPLEMENTS PROTECTIVE MEASURES DEVELOPED THROUGH INFORMAL AND FORMAL ESA CONSULTATIONS WITH NMFS

### NORTHEAST PROTECTIVE MEASURES

27. Protective measures for Navy activities in the Northeastern U.S. are primarily a result of the testing community consultations from 1997 forward and the protective measures that Navy has agreed to implement during the continuing programmatic informal consultation for Navy activities in the Gulf of Maine and vicinity.

28. For torpedo testing events conducted by the Navy's Undersea Weapons Program Office, the Navy agreed to a seasonal limitation such that tests are only conducted between July 1 and December 31 of any given year. The nature of testing activities allows more mitigation to be implemented for many test activities than is possible for on-going Fleet training requirements. Testing will be suspended in certain sea states or if the visibility precludes effective mitigation, and, in some cases, Navy has delayed tests in accordance with the mitigation procedures to avoid potential impacts on protected species. Mitigation measures are implemented for all torpedo-testing events in the Great South Channel and the Gulf of Maine, including restrictions to test only during daylight hours, requirement for visual surveys and clearance for marine mammals and sea turtles prior to the test, and the placement of trained marine mammal observers on all Navy platforms. In addition, vessels transiting through the critical habitat, while not actually engaged in the test event, shall be alert at all times, use extreme caution, and proceed at a

safe speed so that the vessel can take action to avoid collision with a right whale or other marine mammal or listed species. Aerial surveys using a dedicated fixed-wing aircraft also are necessary to monitor the test, and two trained observers, in addition to the pilot, must be on the aircraft.

28a. Observers participating in these test events must be trained in the field identification, distribution and relevant behaviors of marine mammals of the western north Atlantic. Observers must fill out Standard Sightings Forms that are submitted to the Northeast Fisheries Science Center, and any sightings of NARWs are immediately communicated to the Sighting Advisory System. Naval Undersea Warfare Center, Newport, Rhode Island established a training program in 1997 for its employees who conduct sea tests or serve as marine mammal observers. A video entitled "Right Whales and the Prudent Mariner" was produced to include a specific section addressing NAVSEA activities, and all marine mammal observers are shown the video during a NMFS-approved training course. In addition, the Atlantic Fleet uses copies of the video to augment its lookout training for vessel and aircraft crews.

29. Navy has implemented a series of protective measures during the ongoing Gulf of Maine and vicinity consultation with NMFS. The Navy issued protective measures for these Northeast-operating areas in June 2002. These procedures include Northern Right Whale awareness training for ship and aircraft crews, use of buffer zones, pre-event visual surveys, and post-event monitoring to detect the presence of marine mammals. For the limited activities that require Navy to use live or inert ordnance, the Navy delays, stops or moves ordnance-training events when marine mammals are within certain distance parameters. Navy vessels follow specific whale avoidance procedures and adhere to safe vessel speeds when approaching or transiting designated critical habitat or other known areas of whale concentrations.

29a. Navy has augmented the use of protective measures as the consultation has progressed. For example, a working meeting was held with Navy and NMFS in January 2004 to provide additional details on aerial survey capabilities of Navy P-3s and crews. NAS Brunswick flight crews received marine mammal identification guides developed by the NMFS Northeast Fisheries Science Center (NEFSC) specifically for aerial observations, and the crews have since provided numerous reportings of Northern right whale sightings to NMFS for their sighting advisory system. For example, in August 2004, sighting data and photographs provided by Navy aircraft to the NEFSC were instrumental in establishing a Dynamic Area Management (DAM) closure in the Gulf of Maine. The cooperation between NAS Brunswick and NMFS Northeast Region has been further strengthened through the establishment of a protocol for improving airspace communication. CPRW-5 also has agreed to provide NMFS with a courtesy advance notice of when ordnance-training activities are scheduled, to allow NMFS to conduct aerial surveys in advance of the training event if crews and aircraft are available.

## SOUTHEAST PROTECTIVE MEASURES

30. Protective measures for activities in the Southeastern U.S. are primarily a result of the 1995 informal consultation and subsequent 1997 biological opinion. To exemplify the extensive protective measures Navy implements to protect marine mammals and other protected species, details on the protective measures from these ESA consultations are provided here.

31. The September 29, 1995 concurrence letter concluding the informal consultation for the Realignment of Commander Afloat Training Group detailed several precautionary measures necessary to support the conclusions that proposed actions are unlikely to adversely affect listed species. Precautionary measures require vessels transit the critical habitat at minimum safe navigable speed. Additionally, from December 1st through March 31st when operating in areas where humpback and right whales occur and in designated right whale critical habitat, Navy vessels post a lookout trained in marine mammal observation. In keeping with mission, Navy vessels within a 15 nautical mile radius of a right whale sighting operate at the slowest safe speed possible, exercise caution, and keep a watch for right and humpback whales. To ensure lookout effectiveness, Navy provides protected species training and awareness programs to Naval personnel. A key precautionary measure is Navy's continued participation in the Right Whale Early Warning System (EWS), including contribution of sighting information to the EWS.

32. In March 1996, Navy implemented additional right whale protective measures in the Southeastern U.S to be followed as programmatic formal consultation was underway. Specifically, during the consultation period, Navy moved all ordnance activities during the right whale calving season to locations at least 50 nm from shore during the right whale calving season, prohibited north-south transits through the critical habitat, and relocated an inert ordnance mine countermeasures exercise to an area further from the critical habitat.

32a. The May 1997 Biological Opinion for Navy activities in the Southeastern U.S. defines a series of protective measures for right whales and other endangered species in the Southeastern critical habitat and larger Navy consultation area. There have been no known impacts to right whales associated with Navy activities in the Jacksonville OPAREA subsequent to the consultation, though the Navy has continued its extensive use of the area for Navy training and operations. This continued use, consistent with the terms of the 1997 Biological Opinion, has proven compatible with the protection and management of right whales and their critical habitat, as well as other threatened and endangered species off the Southeastern U.S. coast.

32b. The BO requires protective measures for vessel operation to reduce the risk of whale ship strike. These measures include posting of 2 lookouts (one on surfaced submarines) at all times while underway and a requirement for lookouts to report all whales and sea turtles sighted to the Officer of the Deck. One of the posted lookouts must have completed the marine mammal training program implemented by Navy.

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Thomas R. Crabtree

Actions to be taken when marine mammals are sighted or when marine mammals have been reported in the vicinity are prescribed, including additional speed reductions and avoidance of approach to any whale head on or within 500 yards. Navy vessels are required to be alert at all times, use extreme caution, and proceed at a safe speed so that the vessel can take proper and effective action to avoid a collision with a marine mammal or other listed species. North-south transits through the critical habitat and AAOC are generally prohibited unless certain conditions are met. Naval vessel operations are undertaken during daylight and periods of good visibility to the extent practicable and consistent with mission, training and operation. As noted in a revised draft Recovery Plan for the North Atlantic Right Whale, NMFS is considering an effort to minimize the transit time and distance through the SE critical habitat by requiring ships to approach and depart the coast on east-west headings. The draft plan specifically notes: "All U.S. Navy ships transiting between port and offshore waters currently are directed to use such courses, and the Navy is to be commended for those efforts."

32c. For other training activities, the Fleet Area Control and Surveillance Facility (FACSFAC) Jacksonville will recommend modifying or canceling exercises as needed to prevent whale encounters, and range clearance for marine mammals and sea turtles are required prior to the conduct of certain exercises. Additionally, the BO restricts the location of certain activities, such as naval gunnery, within the consultation area during the calving season, and limits Navy to only three types of exercises within the critical habitat and associated area of concern during the calving season. Based on the time of year and location, additional restrictions such as the requirement to use inert rounds, restriction on locations, requirement for prior reporting of ordnance activities to the southeast implementation team, clearance of exercise areas for marine mammals prior to the exercise, and other measures are in place.

32d. Important monitoring and reporting procedures are addressed in the BO to increase right whale avoidance. FACSFAC tracks right whale locations and provides information to naval units, and coordinates and manages Navy use of the Jacksonville and Charleston operating areas. Navy ships transiting the consultation area obtain the latest whale sighting information. Navy ships and aircraft in the consultation area report all right whale sightings to FACSFAC, and FACSFAC has a system to alert all naval units in the consultation area of sightings.

## MID-ATLANTIC PROTECTIVE MEASURES

33. Endangered species protective measures in the Mid-Atlantic operating areas have been developed via consultations to address the diverse types of Navy activities that occur in this region, including the protective measures that Navy has agreed to implement to reduce the risk of vessel collisions during on-going Section 7 consultation.

34. Where possible in accordance with mission requirements, Navy has agreed to move certain activities such as SWTs and SINKEXs to deeper, offshore waters with few bathymetric features and lower expected occurrence of protected

species. In addition, for SWT, SINKEX and VAST-DP/IMPASS events, Navy has agreed to conduct these events during daylight hours. Additional mitigation for these exercises typically involves both aural (sonobuoy) and visual surveys and clearance of defined areas around the exercise location for marine mammals and sea turtles for established time periods prior to the event. Exercises are suspended or moved away from the area if marine mammals are encountered or if environmental conditions are present that reduce the ability to conduct effective mitigation. Lookouts are stationed on vessel and aerial platforms, typically including at least one lookout that has been trained in marine mammal observation. For SWT events, trained observers complete sighting logs for all observed sightings and these are forwarded to NMFS. Post-exercise monitoring also is performed.

35. Mitigation measures are also in place for MINEX actions occurring in the near-shore areas off VA, NC and SC. Mitigation is similar to the above, including conducting training primarily during daylight hours and performing pre- and post-exercise monitoring. In addition, divers survey the area and report any sightings to surface observers. If a sea turtle or marine mammal is spotted within the area, the animal will be allowed to leave on its own volition before conducting the event. In addition, the Navy will suspend exercises until the area remains clear of protected species for 30 minutes. Exercises are not conducted near estuarine inlets, shoreline, artificial reefs, shipwrecks, live hard bottom communities, or in the vicinity of the Onslow Bay sea turtle sanctuary.

36. To reduce the risk of vessel collision with marine mammals, the Navy issued ship strike reduction measures to all Atlantic Fleet units in December 2004. Implementation of these measures is in place for all units as the Navy continues preparation of the biological assessment for a formal consultation to include vessel transits in the Mid-Atlantic region. Navy's December 2004 guidance addresses areas where ships transit between southern New England and northern Florida. The guidance was coordinated with NMFS to identify seasonal Northern right whale occurrence patterns. Navy requires its vessels to exercise caution and operate at a slow, safe speed within 20 nautical mile arcs of identified ports and coastal reference points. The guidance reiterates previous Navy instructions that ships must post at least two lookouts under certain conditions, and at least one of these lookouts must have completed marine mammal observer training. When considered in combination with the Biological Opinion in the Southeast and the existing measures in place to support continuing consultations in the Northeast, the December guidance ensures that the Navy's protective measures cover ships transiting through or in the vicinity of Northern right whale critical habitats and migratory corridors along the entire U.S. Atlantic coastline.

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Thomas R. Crabtree

THE NAVY CONTRIBUTES SUBSTANTIVELY TO THE CONSERVATION OF
ENDANGERED MARINE MAMMALS ALONG THE U.S. ATLANTIC COAST

37. The September 29, 1995 NMFS letter of concurrence for an afloat group relocation
in the Southeast included several recommendations above and beyond the necessary
precautionary measures. Example recommendations from 1995 are provided here, and
similar recommendations in other consultations have resulted in improvement of Navy
best practices for environmental planning and personnel training.

38. NMFS recommended Navy formalize a Memorandum of Understanding between
NMFS, the U.S. Coast Guard and the U.S. Army Corps of Engineers to support the Early
Warning System (EWS). The "Early Warning System" (EWS) for right whales in the
Southeast United States was first developed via Section 7 consultations between NMFS
and the Army Corps of Engineers (ACOE). The EWS now consists of aerial surveys at
the core and a communication plan to provide information flow between the appropriate
agencies, groups, and mariners. The Navy, Army Corps of Engineers, and Coast Guard
currently contribute over $100,000.00 per year to the Early Warning System aerial
surveys. Survey flights by the New England Aquarium and others are flown daily,
weather permitting, December through March, covering over 1000 square miles of ocean
and encompassing the region's major shipping channels. The Navy's Fleet Area Control
and Surveillance Facility, Jacksonville, is home to the Whale Fusion Center, which
synthesizes sightings information from the surveys and from other platforms of
opportunity, providing real-time Northern right whale sightings to Navy vessels and
aircraft, as well as to Coast Guard vessels and civilian shipping during the Northern right
whale calving season. The Navy has become the central repository and dispenser of
sighting location information used for the communication networks. The relay of
continuously updated sighting information from survey teams to area mariners provides
the situational awareness that helps all mariners avoid encountering whales.

39. NMFS recommended Navy develop training for personnel that emphasizes not only
stranding and enforcement issues, but also information on the distribution and behavior
of these species that will help the Navy to anticipate where and when conflicts may
occur. Navy has since developed the most extensive compilation of published data on
marine mammal and sea turtle distribution currently available for the East Coast and Gulf
of Mexico. This information, compiled in a series of "Marine Resource Assessments"
(MRAs) specific to each of Navy's major east coast operating areas, was developed to
ensure Navy had access to the best available science for use in at-sea operational
environmental planning. The MRAs provide detailed descriptions of where important
resources, such as coral reef, marine sanctuaries, and essential fish habitat, occur, and
additionally provide marine mammal species-by-species occurrence information for use
in effective planning. MRAs compile available sighting, stranding, incidental fisheries
bycatch, satellite tracking and other data for marine mammals and sea turtles to analyze
the occurrence patterns of these protected species. For each MRA, a geographic
information system is used to enter, store and visualize spatial data for the operating area.

## THE NAVY PARTICIPATES IN OTHER INITIATIVES TO PROMOTE THE RECOVERY OF LARGE WHALES ON THE U.S. ATLANTIC COAST

40. The Southeastern U.S. Northern right whale Recovery Plan Implementation Team (SEI-T) formed in 1993. At the team's inception, the SEIT consisted of representatives of state and federal resources agencies and regulated entities, including representatives of the U.S. Navy Naval Air Station Jacksonville and U.S. Navy Submarine Group Kings Bay Georgia. The Navy has continued proactive participation in the SEIT recovery team since its inception in 1993.

41. NMFS established the Northeast Recovery Plan Implementation Team (NEI-T) in 1994 to address Northern right whale and Humpback Whale Recovery Plan implementation from Maine to Virginia. The NEI-T includes representatives of state and Federal agencies, along with private institutions that have an active role in undertaking actions specified in the Humpback and Northern right whale Recovery Plans. There has been a Navy representative on the Northeast Implementation Team (NEI-T) since 1996, who has served as Vice Chair and most recently Chair of the Team. The team recently was reorganized with a primary mission of reducing the threat of ship strikes to the North Atlantic right whale.

42. Using the Southeast U.S. EWS program as a model, efforts were initiated in 1997 to develop a similar program in Cape Cod Bay and the Great South Channel, resulting in the Northern right whale Sighting Advisory System (SAS). The System provides real-time Northern right whale sighting information to the commercial shipping industry and other marine traffic from aerial and shipboard surveys conducted by several agencies and organizations and from verified opportunistic sightings. The program is a cooperative effort by NMFS, the Coast Guard, Massachusetts's resource agencies, the Navy, the U.S. Army Corps and others. Northern right whale sightings from aerial survey platforms and multiple voluntary platforms, including Navy opportunistic sightings, are reported to NMFS' Northeast Regional Office for dissemination to cooperators. Navy receives these reports via email to 24-hour watch centers, and immediately redistributes this information to the operational Fleet. Navy biologists from Newport have participated as observers on NOAA surveillance flights for NARW over the Gulf of Maine since 1998.

43. The U.S. Navy is a leader in marine mammal research, spending nearly $10 million per year, representing 70% of the dollars spent on this type of research in the U.S. and 50% of such dollars spent worldwide. Approximately 33 universities, institutes, and technical companies are supported by Navy research and development funds, primarily through grants from the Office of Naval Research. This research includes investigations of marine mammal hearing anatomy and function, field monitoring of behavioral response to manmade sound, tools for the assessment and mitigation of adverse impacts from manmade sounds on the marine environment, and modeling and simulation tools for impact assessment and risk management.

CONCLUSION

The Navy has and continues to meet its ESA Section 7 obligations regarding listed species in the waters of the East Coast. Navy is a federal leader in NARW protection and has one of the most robust federal protective programs for NARW. We must be allowed to operate and train the Nation's warships and crews, or the Atlantic Fleet could be left without ready and trained forces. Because of the Global War on Terrorism, the potential impact of any restriction on the operation of our ships or the conduct of military training operations within 25 nautical miles of designated critical habitat on the East Coast has grave consequences to naval training and readiness. Operating within 25 nautical miles is necessary in order to access several major Naval facilities and preventing access to those ports and bases would be a major disruption of the operation of the entire Atlantic Fleet and would have a detrimental effect on the Navy's readiness and its ability to successfully accomplish its assigned mission. Enjoining the operation of naval vessels within 25 nautical miles from NARW critical habitat will cause the national security of the United States great harm.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge.

Date ____4/21/05____

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| **RICHARD MAX STRAHAN** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| | ) | |
| **v.** | ) | **05-10275-NMG** |
| | ) | |
| **DONALD RUMSFELD,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of Federal Defendants' Opposition to Amended

Application for Temporary Restraining Order and Motion for Preliminary Injunction was sent by

overnight mail to:

Richard Max Strahan
Unit #5
928 Dorchester Avenue
Boston, MA 02125
(617) 233-3854

               MICHAEL J. SULLIVAN, United States Attorney
               ANTON GIEDT, Assistant United States Attorney

               KELLY A. JOHNSON, Acting Assistant Attorney General
               JEAN E. WILLIAMS, Section Chief
               SETH M. BARSKY, Assistant Section Chief

                /s/ S. Jay Govindan
               S. JAY GOVINDAN, Trial Attorney (MD Bar # 25946)
               United States Department of Justice
               Environment & Natural Resources Division
               Wildlife & Marine Resources Section
               Ben Franklin Station, P.O. Box 7369
               Washington, DC 20044-7369
               T: (202) 305-0237
               F: (202) 305-0275
               E: Jay.Govindan@usdoj.gov