UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD MAX STRAHAN ) | |
| ) | |
| Plaintiff, ) | Civil Action No. |
| ) | |
| v. ) | 05-10275-NMG |
| ) | |
| DONALD RUMSFELD, *et al.*, ) | |
| ) | |
| Defendants. ) | |

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR RECUSAL

Federal Defendants, Donald Rumsfeld, in his official capacity as Secretary of the Department of Defense, Gordon England, in his official capacity as Secretary of the Department of Navy, and Vern Clark, in his official capacity as Chief of Naval Operations for the United States Navy, (collectively, "the Navy"), by and through their undersigned attorneys, respectfully submit the following opposition to Plaintiff's motion for recusal.

### ARGUMENT

Plaintiff has filed a motion for the recusal of the District Court judge in this matter, the Honorable Nathaniel M. Gorton, United States District Judge for the District of Massachusetts. Plaintiff calls for the court's recusal "in order to avoid the appearence [sic] of prejudice in favor of the Defendants," and his motion is predicated on the fact that the presiding judge was an officer in the United States Navy some years ago. Motion for Recusal at ¶ 1. He suggests that by denying Plaintiff's motions for temporary restraining orders, the Court "has already acted in a manner that shows unacceptable bias towards the U.S. Navy." Id.

Congress has provided for the recusal of a federal justice, judge, or magistrate in one of two circumstances. First, a judge should be recused when "his impartiality might reasonably be questioned." 28 U.S.C. § 455(a). Second, recusal is also appropriate in one of several specifically listed circumstances set out in 28 U.S.C. § 455(b), the most relevant of which is when the judge "has a personal bias or prejudice concerning a party." 28 U.S.C. § 455(b)(1). Although Plaintiff does not explicitly state the statutory section upon which he bases his motion for recusal, Plaintiff's motion suggests a reliance upon the first of the two reasons for recusal, namely § 455(a). This conclusion also comports with the First Circuit's interpretation of the difference between § 455(a) and § 455(b)(1). That court has interpreted § 455(a) as being a basis for mandatory disqualification, independent of § 455(b), "requir[ing] no determination of bias in fact," whereas § 455(b)(1) requires a clear showing of bias in fact. United States v. Chantal, 902 F.2d 1018, 1023 (1st Cir. 1990). Plaintiff's preoccupation with the "appearence [sic] of prejudice" rather than actual prejudice suggests that he intended to argue for recusal under § 455(a), especially since Plaintiff has not made, or even attempted to make, any showing of actual bias here.

In the First Circuit, the test for § 455(a) recusal is objective and utilizes the "reasonable person" standard. When performing a § 455(a) analysis, the question is "whether the judge's statement or action would lead a reasonable person to question whether the judge would remain impartial." Chantal, 902 F.2d at 1023 (citation omitted). Similarly, the test as originally stated "is whether the charge of lack of impartiality is grounded on facts that would create a reasonable doubt concerning the judge's impartiality...in the mind of the reasonable man." United States v. Cowden, 545 F.2d

257, 265 (1st Cir. 1976). The mere fact that the presiding judge in this case was once an officer in the Navy creates no such reasonable doubt.

The court in Cowden made clear that "litigants are not entitled to have a judge disqualify himself merely because they fear an adverse decision." Id. at 265.[1] A reasonable person would easily conclude that a federal district court judge who had served in the Navy many years prior could honestly and professionally execute his duties to the litigants before him without allowing any emotional or sentimental attachments to affect his decision-making. Therefore, if there is no reasonable basis for recusal, and if the only explanation which remains is that the motion has been precipitated by the court's two prior rulings against Plaintiff, the motion for recusal must be denied because a mere desire for a different judge is no basis for a motion for recusal.[2]

Finally, in order to correct the record, it is necessary to address an unsubstantiated accusation made in Plaintiff's motion regarding the discovery of a dead Northern Right Whale in April 2005. Plaintiff claims that the week before he filed the motion for recusal, "another Northern Right Whale was killed…*by a Navy ship* off the Massachusetts coast." Motion for Recusal at ¶ 3 (emphasis added). Although it is not even clear whether the whale was struck by a ship before or after it died, there is simply no factual basis for Plaintiff's claim that the whale was killed by a Naval vessel. See, Declaration of Captain Michael Wayne Reedy at ¶¶ 2-3. To the contrary, using records

---

[1] Legislative history supports this conclusion as well: "Nothing in this proposed legislation should be read to warrant the transformation of litigant's fear that a judge may decide a question against him into a 'reasonable fear' that the judge will not be impartial. Litigants...are not entitled to judges of their own choice." H. Rep. No. 1453, 93rd Cong., 2d Sess., 1974 U.S. Code Cong. & Admin. News 6355.

[2] Federal Defendants do not oppose Plaintiff's separate request for a scheduling conference.

Strahan v. Rumsfeld, 05-10275-NMG        3
Opposition to Motion for Recusal

of naval activities in that area during the time period when the whale would have likely expired, the Navy convincingly shows that it is highly unlikely that this whale was killed due to Naval activities. Reedy Declaration at ¶¶ 3-5. Naval vessels are required to report any strikes of marine mammals. Reedy Decl. at ¶ 3-3a. No navy surface, subsurface or air units reporting a marine mammal strike in the vicinity (or within 63,000 square nautical miles) of the whale's estimated location during a three-week span in the month of April (preceding, and up to, the estimated time of death). Reedy Decl. at ¶¶ 4-4d. As such, the Navy can state with confidence that Plaintiff's assertions regarding responsibility for the recent whale stranding are unfounded.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Federal Defendants respectfully request that Plaintiff's motion for recusal be denied.

Dated this 16th day of May, 2005

        MICHAEL J. SULLIVAN, U.S. Attorney
        ANTON GIEDT, Asst. U.S. Attorney
        KELLY A. JOHNSON, Acting Asst. Atty. General
        JEAN E. WILLIAMS, Section Chief
        SETH M. BARSKY, Asst. Section Chief

        /s/_S. Jay Govindan_____
        S. JAY GOVINDAN
        Jay.Govindan@usdoj.gov
        U.S. Department of Justice
        Environment & Natural Resources Division
        Wildlife & Marine Resources Section
        P.O. Box 7369
        Benjamin Franklin Station
        Washington, D.C. 20044-7369
        Phone: (202) 305-0237
        Facsimile: (202) 305-0275

        Attorneys for Federal Defendants

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of May, 2005, I sent by electronic mail and first-class mail a copy of the preceding Opposition to Motion for Recusal, and Declaration of Michael Wayne Reedy to:

Richard Max Strahan
Unit #5
928 Dorchester Avenue
Boston, MA  02125
einstein@fasterthanc.org

                                                         _/s/_____
                                                         S. Jay Govindan

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD MAX STRAHAN, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. |
| ) | 05-10275 |
| v. ) | |
| ) | DECLARATION OF |
| DONALD RUMSFELD, et al., ) | Michael Wayne REEDY |
| ) | |
| Defendants. ) | |

I, Michael Wayne REEDY, pursuant to 28 U.S.C. 1746, declare:

PROFESSIONAL BACKGROUND AND RESPONSIBILITIES

1. I am a Commissioned Officer in the U.S. Navy with 25 years of commissioned service. I presently hold the grade of Captain, U. S. Navy. I have been a Surface Warfare qualified officer for 24 years and have served aboard five Naval Combatants, commanding USS Exploit (MSO-440) and USS Carr (FFG-52). I am presently the Deputy Director for Fleet Training for the U. S. Atlantic Fleet. In this position, I am responsible for resources in support of Atlantic Fleet exercise training and environmental planning.

2. On Thursday 28 April 2005 at 5:00 pm, the Cape Cod Stranding Network received a report from USFWS of a right whale dead on South Monomoy Island, Chatham MA, USA. See Figure 1 for the approximate location of the stranding. The Navy learned of this event from a publicly available e-mail list server maintained by Woods Hole Oceanographic Institute (WHOI). Personnel from the New England Aquarium's (Aquarium) Rescue and Rehabilitation Program and WHOI responded to the stranding and, following standard practice, posted updates for interested public and scientists on the list server. The whale was very decomposed, and the reports from the stranding response team indicated that the likely estimated date of death was two weeks prior to the stranding; approximately April 15th. Initial findings of the *in situ* necropsy posted on the list server by Aquarium and WHOI scientists indicated substantial blubber bruise in the right flank area overlying multiple fractured right lumbar transverse processes, indicative of blunt trauma. The whale appeared to have been ship-struck, but it is not known whether the strike occurred before or after death. On May 2nd, the Aquarium identified the whale as a 9-year old female, NEA#2617, last observed in the Bay of Fundy on Sept. 3, 2003.

3. Navy is actively involved in large whale protection programs, and has established internal reporting requirements for all ship-whale strikes. Navy established a whale strike reporting policy in 1998, and promulgated specific reporting format requirements to all Atlantic Fleet units in June 1998. To ensure situational awareness of protective

measures and of reporting procedures, the reporting requirement is redistributed via Naval message to all Atlantic Fleet units annually prior to the Northern right whale calving season. The reporting requirements in place ensure that there is full awareness and reporting of any ship strike that occurs at sea. No Naval units have reported a ship strike in the Atlantic Ocean in calendar year 2005.

3a. Clearly, a vessel crew must be capable of registering that a strike has occurred in order for that strike to be reported. Navy vessels are much more likely than commercial vessels to be aware of the occurrence of a ship strike. As described by NMFS in the Large Whale Ship Strike Database (NOAA Technical Memorandum NMFS-OPR-25 dtd Nov 03), the size, bridge location and manning of ships are important factors in recognizing that a whale has been hit. For commercial vessels, NMFS notes that *"Many ship strike fatalities almost certainly go undetected, so our database provides a minimum account of such occurrences."* The report adds *"Federal ships carry substantial crew, a number of whom are generally on the bridge at any one time (bridge crew on Navy vessels often consists of half a dozen individuals or more). Such crews are more likely to spot a whale and/or register that a collision has occurred than a container ship or tanker with only one or two individuals at the helm."*

4. Navy has no indication from either NMFS or the Aquarium that there is any concern that Navy activities may have been associated with NEA#2617's death. Navy activities in the Northeast operating areas are typically low. No Navy surface, subsurface or air units reported a marine mammal strike in the vicinity of or the time period preceding NEA#2617's mortality.

4a. Even though there was no reported Navy ship strike, approximate to the death of NEA#2617, an inquiry of Naval activities in a very broad ocean area surrounding Monomoy Island was conducted by Fleet Forces Command. To ensure a thorough inquiry, the time period and geographic extent of the internal review extended well beyond the location and projected timeframe of the specific stranding, covering an approximate 63,000 square nautical mile area for the period of April 6th through April 28th. Where historic information is available, those data were requested for the month of April 2005. In addition to reviewing all surface, subsurface, and relevant aircraft training activities, Fleet Forces Command coordinated with Navy research, development test and evaluation commands that might conduct acquisition program testing activities along the East Coast. No Navy testing activities or research activities were identified in the defined 63,000 square nautical mile area during the month of April.

4b. The inquiry confirmed that only one Navy surface vessel, a supply ship, was present in the larger 63,000 square nautical mile area during the requested time period, and this Navy vessel was well south and west of Northern right whale critical habitats and of Monomoy Island. The vessel was in close proximity to Naval Weapons Station Earle, New Jersey approximately 194 NM from Monomoy Island (Figure 1). The supply ship was present in this area on April 27th. Based on the advanced state of decomposition of NEA#2617 on 28 April and the expert's estimated date of death as April 15th, it is clear that the Navy supply ship was in no way associated with the death of this whale.

4c. Eleven Navy subsurface units were present in the large 63,000 square mile area during the requested time period. Due to the large geographic extent of the Navy's inquiry, the number of units includes routine submarine movements associated with their primary homeport at Naval Submarine Base New London, Connecticut (Figure 1), located well south and west of Cape Cod. Subsurface units would have complete awareness of a large whale strike, and, as described above, are required to report a strike in the unlikely event that one might occur. No such strikes were reported, and all unit commanders re-confirmed that no strikes occurred.

4d. Navy policy requires all Naval aircraft to contact Commander Patrol Reconnaissance Wing Five (CPRW-5) prior to any ordnance drops in the Northeastern operating areas. CPRW-5 confirms that no live ordnance drops occurred in the defined geographic area during April 2005. Only one inert or practice drop occurred during April 2005 (April 5th over 78 nautical miles northeast of Monomoy Island) and it was well clear of the two designated Northern right whale critical habitat areas. Although interactions with marine mammals are not anticipated during practice drops, CPRW-5 has developed cooperative procedures with NMFS to ensure that stringent marine mammal criteria are followed even for practice drops. The criteria include a requirement that Northern right whale sighting advisory system reports, updated near-daily by NMFS, are reviewed by aircrews as part of mission planning, and that CPRW-5 cooperatively provide advance information on scheduled activities to NMFS. In addition, aircrews adhere to specific survey protocol to ensure no marine mammals are present in the exercise area, and do not conduct the exercise if whales are sighted in the defined vicinity. CPRW-5 review of historic NMFS Northern right whale sighting information for the month of April 2005 indicates that no Northern right whales were sighted by NMFS in or around the designated CPRW-5 exercise area, and that most sightings in April were concentrated very close to Cape Cod, where Navy aircraft do not train.

5. In contrast to the very small number of Navy activities in the larger northeastern area during the month of April, NMFS Northeast region indicates that 75 commercial vessels arrived through the Northeastern Mandatory Ship Reporting (MSR) area in April 2005, and 57 of these complied with the mandatory ship reporting procedures established in 33 CFR Part 169. Note that the larger total number of commercial and recreation vessels present in the equivalent 63,000 square nautical mile reviewed by Navy is not known, nor is the total number of smaller commercial and recreational vessels that are not required to report to the MSR system. Although Navy has established requirements to self-report any whale strike by a Naval vessel, no standardized procedure for the reporting of whale strikes is required of commercial and/or recreational vessels.

Per 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge.

_____        // MayyB_____
Michael Wayne REEDY, Captain, USN        Date

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Captain Michael Wayne Reedy, USN