### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RICHARD MAX STRAHAN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. |
| | ) | |
| v. | ) | 05-10275-NMG |
| | ) | |
| DONALD RUMSFELD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND IN SUPPORT OF MOTION TO DISMISS

Federal Defendants, Donald Rumsfeld, in his official capacity as Secretary of the

Department of Defense, Gordon England, in his official capacity as Secretary of the Department

of Navy, and Vern Clark, in his official capacity as Chief of Naval Operations for the United

States Navy (collectively "the Navy"), respectfully submit this memorandum in opposition to

Plaintiff's motion for preliminary injunction,[1] and in support of the Navy's motion to dismiss

pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3).[2]

### INTRODUCTION

This case involves a challenge to the Navy's operations on the Atlantic seaboard and its

alleged impacts on various endangered whale species, particularly the Northern Right whale.

Plaintiff Richard Max Strahan has brought claims alleging violations of sections 7(a)(2) and 9 of

---

[1]  This Court denied Plaintiffs' amended application for a temporary restraining order and motion for preliminary injunction on April 22, 2005.  The Navy had viewed this order as a denial of both the TRO application and the PI motion.  In light of the Court's May 18, 2005, Order setting the preliminary injunction motion for hearing, the Navy respectfully submits this more complete briefing on Plaintiff's preliminary injunction motion.

[2]  As noted *infra*, the Navy believes that dismissal for lack of jurisdiction under Federal Rules of Civil Procedure 12(b)(1) and 12(h)(3) is appropriate, but to the extent necessary, the Navy moves for dismissal in the alternative pursuant to Rule 12(c).

the Endangered Species Act ("ESA"), 16 U.S.C. §1536(a)(2), §1538, and the Marine Mammal

Protection Act ("MMPA") 16 U.S.C. §1361.  He seeks an injunction halting all Navy operations

within 25 nautical miles of designated right whale critical habitat, as well as various restrictions

imposed elsewhere along the coastline, including a requirement that the Navy notify the Plaintiff

every time any whale species is seen within 2000 yards of any Navy vessel within 200 miles of

the United States coast.  He also seeks an order compelling the Navy to engage in ESA Section 7

consultation.  This Court has twice denied Plaintiff's motions for a temporary restraining order.

For the reasons set forth below, Plaintiff's preliminary injunction motion should be denied and

the case should be dismissed for lack of jurisdiction.

## BACKGROUND

### I.    STATUTORY BACKGROUND

#### A.    The Endangered Species Act

##### 1.    Section 7 Consultation

Section 7(a)(2) of the ESA, provides that each federal agency must, in consultation with

either the Secretary of Interior or Commerce, insure that any action authorized, funded, or

carried out by the agency is not likely to jeopardize the continued existence of any species that

has been listed as endangered or threatened under the ESA, or result in the destruction or adverse

modification of any designated "critical habitat" of the species.[3] 16 U.S.C. § 1536(a)(2).  To

assist action agencies in complying with this provision, Section 7 and the implementing

regulations set out a detailed consultation process for determining the biological impacts of a

proposed activity. 16 U.S.C. § 1536; 50 C.F.R. Part 402.

---

[3] Generally, the Secretary of Commerce acting through the National Marine Fisheries Service ("NMFS") has responsibility, as here, for marine species, and the Secretary of the Interior acting through the United States Fish and Wildlife Service ("FWS") has responsibility for terrestrial species.  16 U.S.C. § 532(15); Turtle Island Restoration Network v. NMFS, 340 F.3d 969, 973-74 (9th Cir. 2003).  "Critical habitat" is defined at 16 U.S.C. §1532(5).

The regulations implementing ESA state that an action agency may meet its procedural obligations under ESA section 7(a)(2) by conducting "informal consultation" or "formal consultation" as appropriate.  The regulations establish the use of "informal consultation" to assist an action agency in determining whether and when further consultation is necessary.  Informal consultation is "an optional process that includes all discussions, correspondence, etc., between the Service and the Federal agency . . . designed to assist the [action agency]  in determining whether formal consultation . . . is required."  50 C.F.R. § 402.13(a).  "If during informal consultation it is determined by the [action agency] with the written concurrence of the Service, that the action is not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary."  Id.  Therefore, even where it is determined that an agency action "may affect" species, thus triggering the need to initiate some form of consultation, but it is determined by the action agency with the concurrence of the Services that the action is "not likely to adversely affect" a listed species, formal consultation is not required.  See WaterKeeper Alliance v. Department of Defense, 271 F.3d 21, 25 (1st Cir. 2001).  If an action agency chooses to forego informal consultation or the informal consultation has not resolved the issue, "formal consultation" must be undertaken.  Id. at 26; C.F.R. § 402.14.  Formal consultation procedures require the U.S. Fish & Wildlife Service or NMFS to prepare a biological opinion including a conclusion as to whether the proposed action is likely to jeopardize the continued existence of a listed species or result in destruction or adverse modification of critical habitat.  WaterKeeper, 271 F.3d at 26; 50 C.F.R. § 402.14.

## 2.    The Section 9 "Take" Prohibition

The ESA prohibits any person from "taking" a listed species.  16 U.S.C. § 1538(a)(1)(B). To "take" is defined as "to harass, harm, pursue, shoot, wound, kill, trap, capture, or collect or attempt to engage in any such conduct."  16 U.S.C. § 1532(19).  There are certain exceptions to

this prohibition including an exemption for takings that are in compliance with the terms and conditions of an incidental take statement issued in conjunction with a biological opinion and an exception for certain permitted activities. 16 U.S.C. §§ 1536(o)(2) and 1539(a). Any incidental take statement issued for a listed marine mammal must specify measures necessary to comply with the provisions of the MMPA regarding takings. 16 U.S.C. § 1536(b)(4)(iii).

###    B.    The Marine Mammal Protection Act

The MMPA was enacted in 1972 based upon Congress's finding that "certain species and population stocks of marine mammals are, or may be, in danger of extinction or depletion as a result of man's activities." 16 U.S.C. §1361(1). Congress declared as the "major objective" of the MMPA that, "such species and population stocks should not be permitted to diminish beyond the point at which they cease to be a significant functioning element in the ecosystem of which they are a part, and, consistent with this major objective, they should not be permitted to diminish below their optimum sustainable population." 16 U.S.C. §1361(2). The MMPA imposes a general moratorium on the "taking" and importation of marine mammals and marine mammal products; however, the Act provides for a number of exceptions to this rule. 16 U.S.C. §1371(a). Regulated through a permitting process, the MMPA authorizes the "taking" of marine mammals for scientific research, public display, and photography purposes, 16 U.S.C. § 1371(a)(1); incidentally in the course of commercial fishing operations, id at (a)(2); and pursuant to MMPA §101(a)(5)(A) .

## II.    FACTUAL BACKGROUND

###    A.    Procedural History

On February 10, 2005, along with his Complaint, Plaintiff filed a motion for a temporary restraining order and motion for preliminary injunction. The motion sought to "enjoin the Defendants from operating any ship or conducting any military operation within 25 nautical miles from the boundary of marine habitat designated pursuant to the Endangered Species Act as

listed critical habitat for the Northern Right Whale" and an order requiring "Defendants to report to the Plaintiff any occurrence of a whale within 1000 yards of any vessel" operated by the Navy. First TRO Mot. at 1.  The Court denied the motion on February 11, 2005 because Plaintiff failed to certify his efforts to give notice as required by the Federal Rules of Civil Procedure.

Plaintiff then filed an "Amended Application for Temporary Restraining Order and Motion for Preliminary Injunction" on April 11, 2005.  This Amended Application sought the similar relief as the first motion, although this time Plaintiff included a demand that the Navy "report to the Plaintiff any occurrence of a large whale of any federally protected species within 2000 yards of any vessel operated by the [Navy] within 200 miles of the U.S. Atlantic coastline and then record and report the number of sighted whales, the species of the sighted whales, the location of the sighting, the distance of the sighted whales from the ship, the speed of the vessel, the weather, and the direction of the vessel in regards to location of the sighted whales." Amended TRO Application at 2, ¶ 3.  Plaintiff also included a demand that the Navy be ordered to enter into section 7 consultation "on the impact of their vessel and military training operations on ESA listed species of whales along the Atlantic coastline of the United States."  Id. at 1, ¶ 1.

The Navy filed an opposition to the Amended Application for TRO/PI on April 22, 2005, and incorporate that opposition herein by reference.  That same day, this Court issued an order declaring that it would treat Plaintiff's second filing as a motion to reconsider the first order. The Court ruled that Plaintiff had again failed to demonstrate a likelihood of success on the merits and denied Plaintiff's motions.  The Court ordered that the Navy respond to Plaintiff's Complaint by May 5, 2005.  In compliance, the Navy filed an Answer on May 5, 2005.

Plaintiff then filed a motion for recusal, and a motion requesting a hearing on the preliminary injunction motion.  The Navy had read the Court's April 22, 2005 order as resolving both the TRO application as well as the preliminary injunction motion.  Navy's April 22, Opp.

Brief at 1.   However, to provide the Court with more complete brief than was provided in its abbreviated opposition, the Navy now submits this fuller opposition to Plaintiff's motion for preliminary injunction.  The Navy also moves for dismissal for lack of jurisdiction.

**ARGUMENT**

## I.    PLAINTIFF'S ACTION SHOULD BE DISMISSED FOR LACK OF JURISDICTION

The Navy moves to dismiss Plaintiff's Complaint for lack of jurisdiction, pursuant to Rules 12(b)(1), 12(h) and 12(c). A motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1), may be considered at any stage of the proceeding.  When evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) on the grounds that the complaint fails to state facts upon which jurisdiction can be found, all well-pleaded facts are treated as true, and the plaintiff receives the benefit of all reasonable inferences.  Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995) However, the party invoking the jurisdiction of a federal court carries the burden of providing its existence.  Id.  The plaintiff may not "rest merely on unsupported conclusions or interpretations of law.  Subjective characterizations or conclusory descriptions of a general scenario which could be dominated by unpleaded facts will not defeat a motion to dismiss."  Id. (citations and internal quotation marks omitted).

Rule 12(h)(3) provides that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action."  Fed. R. Civ. P. 12(h)(3).  Accordingly, motions brought pursuant to Rule 12(h)(3) are subject to the same standards as motions to dismiss for want of subject matter jurisdiction brought pursuant to Rule 12(b)(1).  Perrodin v. United States, 350 F.Supp.2d 706 (D. S.C. 2004); see also, Berkshire Fashions, Inc. v. M.V. Hakusan II, 954 F.2d 874, 880 n.3 (3rd Cir. 1992) (motions under 12(b)(1) and 12(h)(3) are governed by identical standards except that the latter may be asserted at any time and need not be responsive to a pleading).  Rule 12(c) similarly

permits a party to move for judgment at any time after the close of pleadings.

### A.    THIS COURT LACKS JURISDICTION OVER PLAINTIFF'S CLAIMS

#### 1.    Plaintiff's ESA Claims Must Be Dismissed Because  Has Failed to Satisfy the ESA's Sixty-Day Notice Requirement

The ESA allows a citizen, such as the Plaintiff here, to commence a civil suit on his own behalf to enjoin any person "who is alleged to be in violation of any provision of" the ESA or its implementing regulations. 16 U.S.C. § 1540(g)(1)(A).  But the ESA provides that no suit may be brought "prior to sixty days after written notice of the violation has been given to the Secretary, and to the alleged violator of any such provision or regulation[.]" 16 U.S.C.  §1540(g)(2)(A)(i).

The First Circuit has held that the ESA's 60-day notice requirement is jurisdictional, and failure to adhere to its strictures requires that the case be dismissed.  See, Water Keeper Alliance, 271 F.3d at 29-30 (noting that in claims brought under the ESA, 60-day notice requirement is jurisdictional); Maine Audubon Society v. Purslow, 907 F.2d 265 (1st Cir. 1990) (ESA notice requirement is jurisdictional); Strahan v. Coxe, 939 F.Supp. 963, 976 (D.Mass. 1996), *aff'd in part and vacated in part*, 127 F.3d 155 (1st Cir. 1997).  Similarly, other courts have held that compliance with the sixty-day notice provision of the ESA is a jurisdictional prerequisite and has construed the requirements strictly.  See Southwest Center for Biological Diversity v. Bureau of Reclamation, 143 F.3d 515, 520 (9th Cir. 1998) ("A failure to strictly comply with the notice requirement acts as an absolute bar to bringing suit under the ESA"); Save the Yaak Comm. v. Block, 840 F.2d 714, 721 (9th Cir. 1988) (holding that the sixty-day notice requirement under the citizen suit provision of the ESA is jurisdictional).  The sixty-day notice requirement provides for a litigation-free window within which the government agency may, if warranted, cure any alleged violation.  See Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., 484 U.S. 49, 60 (1987); Marbled Murrelet v. Babbitt, 83 F.3d 1068, 1072 (9th Cir. 1996) ("The purpose of this notice is to give the federal government and any alleged violators an opportunity to comply, and

thus render a citizen suit unnecessary"). In this case, the Plaintiff has never submitted a notice of intent to sue addressing the violations set forth in his complaint. As such, the ESA claims must be dismissed for lack of jurisdiction.

This conclusion is not altered by the fact that Plaintiff attached to his Complaint an eight year old 60-day notice of intent to sue, dated August 25, 1996. Complaint at ¶ 18; Attachment to Complaint.[4] Among other things, this letter states that "[i]n addition to the Navy's routine killing and injuring of listed species of endangered marine wildlife through the Navy's activities at sea ... the Navy has failed to enter into the required consultation, pursuant to the provisions of Section 7 of the ESA, with [NMFS] over most of the Navy's activities at sea." Included in Plaintiff's list of complaints was the Navy's "ongoing dredging operation for the shipping channel at the Navy's Trident Submarine base at King's Bay, GA" and "conducting training exercises just outside of listed designated critical habitat for the Northern Right Whale, along the GA/FL border, during the winter birthing season." Letter at 2. Plaintiff advised that he "will most likely add the Navy, and its officials, as defendants in [his] already ongoing litigation against the Coast Guard [Strahan v. Linnon, 94-CV-11128, 967 F.Supp. 581 (1997)]." Letter at 1. This letter is insufficient notice within the meaning of the ESA citizen suit provision for numerous reasons. First, the violations alleged in the 1996 notice letter cannot serve as the basis for the alleged violations in Plaintiffs' present complaint, because any violations identified in the 1996 notice letter are wholly past, and in any event would have had to be acted upon within the applicable six-year statute of limitations. The Supreme Court has made clear that the citizen suit provisions of the type at issue here cannot be used to remedy wholly past violations. Gwaltney

_____

[4] The Navy has no record of receiving the letter attached to the Complaint, which was sent on behalf of "GreenWorld Inc." and signed by Mr. Strahan as "National Campaign Director and for hisself." [sic] However, the Navy acknowledges receipt of a letter from the law firm which previously represented Plaintiff in 1996. That letter, dated April 30, 1996, is substantially similar in content to the letter attached to the Complaint.

of Smithfield v. Chesapeake Bay Foundation, 483 U.S. 49, 57-60 (1987). Here, in November 1996, the Navy initiated formal Section 7 with NMFS, and that consultation culminated in the issuance of a May 15, 1997 biological opinion. Crabtree Declaration at ¶ 10b; Bullard Declaration at ¶13.[5] That biological opinion focused on naval activities in the southeastern operations area, including the right whale designated critical habitat off of the Florida coast. Id. The Navy subsequently initiated informal consultation with NMFS on activities in the northeast, in 2003. This informal consultation incorporates many of the protective and mitigation measures developed in the course of the 1997 biological opinion. Crabtree Decl. at ¶¶27-36; Bullard Decl. at ¶14. In addition, pursuant to ESA Section 7, the Navy has engaged in consultation on discrete exercises and operations on numerous occasions since that time. Thus, any violations that Plaintiff alleged in 1996 have been cured, and those same violations cannot be the basis for his Complaint filed more than 8 years later in 2005.

That the 1996 notice letter cannot serve as sufficient notice for violations alleged in Plaintiffs' 2005 complaint is further underscored by the fact that to the extent Plaintiff identified actionable violations in his 1996 letter, he would have had to file such claims within the six-year statute of limitations for civil actions against the United States. 28 U.S.C. § 2401(a). Strahan v. Linnon, 967 F. Supp. 581, 607 (D. Mass. 1997) (statute of limitations of 28 U.S.C. § 2401(a) applies to claims brought under the ESA). Section 2401(a) provides in relevant part that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." "[A] cause of action against an administrative agency 'first accrues,' within the meaning of §2401(a), as soon as the person

---

[5] For the convenience of the Court, the Navy is attaching to this memorandum the declarations of Thomas R. Crabtree ("Crabtree Decl.") and Rear Admiral Donald K. Bullard ("Bullard Decl.") which were previously submitted on April 22, 2005 with the Navy's initial opposition to Plaintiff's request for injunctive relief. The Navy is also again submitting the declaration of Captain Michael Wayne Reedy ("Reedy Decl."), which was previously submitted on May 16, 2005, in support of the Navy's opposition to Plaintiff's motion for recusal.

challenging the agency action can institute and maintain a suit in court." Trafalgar Capital Associates, Inc. v. Cuomo, 159 F.3d 21, 35 (1st Cir. 1998). Here, if Plaintiff was aware of any alleged violations in 1996, he could have maintained suit to seek redress for those alleged violations after the expiration of 60 days, that is, in October 1996. Thus, under § 2401(a), any suit for violations alleged in the 1996 notice letter would have had to been brought no later than October 2002. Accordingly, Plaintiff cannot now claim that the 1996 notice covers the same alleged violations he seeks to vindicate in his 2005 complaint. In short, the 60-day notice requirement is not satisfied by providing a notice at some point in time identifying purported violations that were occurring at that time, and then arguing that such notice is sufficient to cover any alleged violation that ever may arise in perpetuity. Rather, the strict construction requirements of the 60-day notice provisions require that a plaintiff give notice of the actual violations that form the basis of his present complaint.

Nor can Plaintiff contend that his 1996 notice is sufficient because it provided notice of any violations that may occur at some point in the future. Plaintiff's Complaint and preliminary injunction papers appear to be more focused upon a ship strike that occurred in November 2004. Complaint at ¶ 19. To the extent that Plaintiff's notice is predicated on this incident (which had obviously not yet occurred in 1996), Plaintiff's notice was premature. Plaintiff cannot submit a sixty-day notice to alleged violators of the ESA prior to the actual alleged violation, because a notice of intent submitted before the alleged violation does not satisfy the ESA's jurisdictional notice provision. See Moden v. U.S. Fish & Wildlife Service, 281 F.Supp.2d 1193, 1205-06 (D. Or. 2003) (anticipatory pre-violation notice insufficient under ESA, and dismissal was warranted); Atlantic States Legal Found. v. United Musical Instruments, 61 F.3d 473 (6th Cir. 1995)(notice of intention to hold manufacturer liable for future violations of environmental statute failed to satisfy statute's requirement for sixty-day notice); American Rivers v. NMFS, 109 F.3d 1484 (9th Cir. 1997) (notice of intent to sue to challenge a prior biological opinion and

"any revised or replacement biological opinion" failed to satisfy the jurisdictional requirement),
*vacated and remanded on other grounds, by* 126 F.3d 1118 (9th Cir. 1997). The Court in
Hallstrom v. Tillamook County, 493 U.S. 20, 29 (1989), noted that the congressional goals for
notice provisions were twofold: "[f]irst, notice allows Government agencies to take
responsibility for enforcing environmental regulations, thus obviating the need for citizen
suits...[s]econd, notice gives the alleged violator 'an opportunity to bring itself into complete
compliance with the [RCRA] and thus likewise render unnecessary a citizen suit.'"

Yet here, Plaintiff relies on a sixty-day notice submitted over *eight years* before the
alleged violation took place. Plaintiff's pre-violation notice could not and did not serve as
sufficient notice to the Navy for the violations alleged in Plaintiff's Complaint. Because
Plaintiff has failed to fulfill the jurisdictional prerequisite, Plaintiff's Complaint must be
dismissed for lack of jurisdiction.[6]

**2.    Plaintiff's Suit Must Be Dismissed for the Independent Reason that
Plaintiff Has Failed to Allege Facts Sufficient to Establish Standing.**

Plaintiff's suit must be dismissed for the independent reason that Plaintiff has failed to
allege the facts necessary to establish standing. "Standing to sue is part of the common
understanding of what it takes to make a justiciable case." Steel Co. v. Citizens for a Better
Environment, 523 U.S. 83, 102 (1998). "We presume that federal courts lack jurisdiction 'unless
'the contrary appears affirmatively from the record.'" Renne v. Geary, 501 U.S. 312, 316
(1991). To establish constitutional standing under Article III at the pleadings stage, the Plaintiff
must allege facts showing that (1) the plaintiff has suffered an "injury in fact" – an invasion of a
legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not
conjectural or hypothetical; (2) there is a causal connection between the injury and the conduct

---

[6] Dismissal is the appropriate remedy. See Moden, 281 F.Supp.2d at 1206 (dismissing ESA
claim); Hallstrom, 493 U.S. at 29 (Plaintiff cannot cure notice defect after commencing action).

complained of – the injury has to be fairly . . . trace[able] to the challenged action of the

defendant, and not . . . the result [of] the independent action of some third party not before the

court; and (3)  it is likely, as opposed to merely speculative, that the injury will be redressed by a

favorable decision.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-561 (1992).  In cases

such as this one, Plaintiffs' burden of proving standing is particularly heavy.   "[W]hen the

plaintiff is not himself the object of the government action or inaction he challenges, standing is

not precluded, but it is ordinarily 'substantially more difficult to establish.'"  Id., 504 U.S. at 562.

In his Complaint, Plaintiff provides only a general assertion that he has standing because

he is an "avid whale watcher" with an "extended history of researching and developing

conservation plans for species of [e]ndangered [w]hales."  Complaint at ¶ 11. To establish

standing, however, it is not enough that a plaintiff (or an organization) may have a special

interest in the species at issue.  "[S]tanding is not measured by the intensity of the litigant's

interest or the fervor of his advocacy;" the judicial power requires "more for its invocation than

important issues and able litigants."  Valley Forge Christian College v. Americans United for

Separation of Church & State, 454 U.S. 464, 486, 489 (1982).  "[A] mere 'interest in a problem,'

no matter how longstanding the interest and no matter how qualified the organization is in

evaluating the problem, is not sufficient by itself" to establish standing.  Sierra Club v. Morton,

405 U.S. 727, 739 (1972).   The law is clear that an assertion of spiritual or emotional injury is

simply not cognizable for purposes of standing.  "[G]eneral emotional 'harm', no matter how

deeply felt, cannot suffice for injury-in-fact for standing purposes."  Humane Society v. Babbitt,

46 F.3d 93, 98 (D.C. Cir. 1995).[7]

---

[7]     Moreover, Plaintiff's interest in ensuring implementation of the ESA, without more, does not suffice to establish standing:

> By the mere bringing of his suit, every plaintiff demonstrates his belief that a favorable judgment will make him happier.  But although a suitor may derive great comfort and joy from the fact that the United States Treasury is not cheated,

Apart from the general assertion described above, Plaintiff's Complaint provides little else to support his assertion of standing.  The Complaint states that Plaintiff's business address is in San Francisco, California.  Complaint at ¶ 6.[8]  There is nothing in the Complaint to establish that this Pacific Coast-based Plaintiff has a particularized personal interest in *these* Atlantic whales that are the subject of this lawsuit.   Such general claims of injury lack the specificity required to establish injury-in-fact for standing purposes.  Lujan v. Defenders of Wildlife, 504 U.S. at 572-78 (generalized allegations of injury insufficient to establish standing).

Because Plaintiff has not demonstrated standing, his claim must be dismissed.[9]

### 3.    Plaintiff's Claim Under the Marine Mammal Protection Act Must Be Dismissed for Lack of Jurisdiction

When the statute upon which a complaint rests provides no private right of action, the defect is jurisdictional in nature.  Oldfield v. Athletic Congress, 779 F.2d 505, 508 (9th Cir. 1985);  Chilkat Indian Village v. Johnson, 643 F.Supp. 535, 536 (D. Alaska 1986).

Here, Plaintiff also alleges that the Navy has violated the "take" prohibitions of the MMPA by failing to obtain a permit from NMFS.  Complaint at ¶¶ 38-39.   Unlike the ESA,

---

that a wrongdoer gets his just desserts, or that the Nation's laws are faithfully enforced, that psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury.

Steel Co., 523 U.S. at 107 (citations omitted); see, Allen v. Wright, 468 U.S. 737, 755 (1984) (parties "have no standing to complain simply that their Government is violating the law").

[8]  A week after filing the Complaint, on February 18, 2005, Plaintiff filed a notice with the Court changing his mailing address to a Boston location.

[9] Plaintiff suggests that simply because he has been able to bring suit in this Court in the past, standing should be inferred.  Complaint at ¶¶ 11-12.  Circumstances change, however, and the Plaintiff relocated to California, and he is not entitled to the presumption which he seeks. Rather, Plaintiff must demonstrate standing every time he files a lawsuit, regardless of parallels to prior litigation.  Becker v. FEC, 230 F.3d 381, 386 n.3 (1st Cir. 2000) (standing is assessed based on the facts that exist at the time the lawsuit is filed).  Thus, the fact that Plaintiff may have established standing in a prior suit several years ago involving different claims does not exempt him from pleading the necessary facts to establish standing in this case.

however, private citizens may not bring suit to enforce the MMPA's "take" prohibition. <u>Strahan v. Coxe</u>, 127 F.3d at 160; <u>Didrickson v. Department of the Interior</u>, 982 F.2d 1332, 1338 (9th Cir. 1992); <u>Kanoa Inc. dba Body Glove Cruises v. Clinton</u>, 1 F. Supp.2d 1088, 1093 (D. Haw. 1998). The Act states that, "[e]xcept as otherwise provided in this subchapter, the Secretary shall enforce the provisions of this subchapter." 16 U.S.C. § 1377(a). The only provision within the MMPA affording a private right to judicial review allows for a party opposed to the issuance of an MMPA permit to "obtain judicial review of the terms and conditions of any permit issued by the Secretary under this Section." 16 U.S.C. § 1374(d)(6). A petition for review must be filed "within sixty days after the date on which such permit is issued or denied." Because Plaintiff is not attempting to review the terms of any permit that has been issued, the sole avenue for judicial review with regard to this statute is the APA, under which judicial review is limited to review of final agency actions. 5 U.S.C. § 704.

Here, Plaintiff has raised no APA challenge to any final agency action. Rather, Plaintiff seeks to bring a direct cause of action under the MMPA. Since there is no authority for Plaintiff to bring suit under the MMPA against the Navy, this claim must be dismissed for lack of jurisdiction. <u>Strahan</u>, 127 F.3d at 160; <u>Chilkat Indian Village</u>, 643 F.Supp. at 536.

## II.    PLAINTIFF'S PRELIMINARY INJUNCTION MOTION SHOULD BE DENIED

The First Circuit has established that when a plaintiff seeks emergency injunctive relief, the district court must consider: (1) the likelihood of plaintiff's success on the merits of their claim; (2) the potential for irreparable harm if the injunction is denied; (3) the hardship to the non-movant if enjoined compared to the hardship to the movant if the injunction is denied; and (4) the effect of the court's ruling on the public interest. <u>Water Keeper Alliance</u>, 271 F.3d at 30. Here, Plaintiff has failed to make *any* showing that relief should be granted under *any* of these prongs. To the contrary, the factors clearly weigh in favor of a denial of injunctive relief.

## A.    PLAINTIFF HAS FAILED TO DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

### 1.    The Court Lacks Jurisdiction, And Should Dismiss All Claims

For the reasons set forth in Section I above, Plaintiff's failure to satisfy the jurisdiction prerequisites of the ESA, the lack of jurisdiction under the MMPA and the failure to establish standing all justify a dismissal of his Complaint.  Even if the Court declines to rule on the motion to dismiss at this time, the likelihood of Plaintiff's success on the merits of his claim is low, which warrants denial of the preliminary injunction motion.

### 2.    In Addition to the Lack of Jurisdiction, Plaintiff Cannot Demonstrate Any Likelihood of Success on the Merits.

In addition to the Court's lack of jurisdiction, Plaintiff cannot show any likelihood of success on the merits of his claims.[10]

### i.    Plaintiff Has Offered No Evidence In Support of His Section 9 Claims

To prevail on an ESA section 9 claim, a plaintiff bears the burden of presenting evidence demonstrating actual harm or harassment or a reasonably certain threat of imminent harm of harassment to the protected species.  General allegations or speculation of possible future harm to listed species are not sufficient to sustain a Section 9 claim.  American Bald Eagle v. Bhatti, 9 F.3d 163, 166 (1st Cir. 1993) (noting that courts have granted injunctive relief "only where petitioners have shown that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species"); Defenders of Wildlife v. Bernal, 204 F.3d 920, 924-25 (9th Cir. 2000); National Wildlife Fed. v. Burlington Northern R.R., 23 F.3d 1508, 1511 (9th Cir. 1994).

Plaintiff claims that the Navy struck a pregnant northern right whale on November 17,

---

[10]  In his motion for preliminary injunction, Plaintiff does not rely on his MMPA claim. Accordingly, here the Navy addresses only the ESA claims.

2004, and that a whale washed ashore on November 24, 200[5].  Complaint at ¶ 19.  Plaintiff

also has alleged that the Navy struck another female right whale in April 2005.  Motion for

Recusal at 2.  Apart from these bare allegations, Plaintiff offers no other evidence for these

assertions.  The Navy acknowledges that the *U.S.S. Iwo Jima* collided with a whale in November

2004 outside of the Chesapeake Bay.  The investigation of this incident is ongoing, but there is

no evidence that that collision was with an endangered right whale as Plaintiff infers in his

Complaint.

Further, as set forth in the Declaration of Captain Michael Wayne Reedy, the Navy has

undertaken a diligent investigation and can state with confidence that no Navy vessel was

responsible for the right whale carcass discovered in April 2005.  Reedy Decl. at ¶¶ 2-4d

(submitted in support of the Navy's opposition to Plaintiff's motion for recusal)**.**  Indeed, it is

unclear whether that whale was killed by a ship strike at all.  Id. at ¶2**.**  But in any event, the

Navy accounted for its vessels' and aircrafts' whereabouts during a 3-week window of time

leading up to the estimated date of mortality, and there were no known interactions with whales

during that time.  Id. at ¶¶ 4-5.  Thus, Plaintiff's entire Section 9 claim is premised upon a series

of assumptions and speculation that have not been substantiated.

As a matter of law, Plaintiff is not entitled to injunctive relief for a wholly past violation.

Gwaltney of Smithfield, 484 U.S. at 59 (in Clean Water Act case, holding that citizen suit

cannot be brought for past violations).  Plaintiff has not established the likelihood that take will

occur without an injunction.  The law is clear that mere speculation is not sufficient; there must

be a definite threat of future harm to a protected species.  National Wildlife Federation, 23 F.3d

at 1512 n.8.  The First Circuit has stated that, under the ESA that injunctive relief can be granted

only where a plaintiff has shown "that the alleged activity has actually harmed the species or if

continued will actually, as opposed to potentially, cause harm to the species."  American Bald

Eagle, 9 F.3d at 166.  Here, Plaintiff has offered no *evidence*, as opposed to accusations, to

demonstrate that harm *will* befall any listed species as a result of the Navy's operations and training exercises in the Gulf of Maine operating area or elsewhere.

Indeed, unlike many of the numerous other vessel operators in right whale habitat, the Navy implements a number of protective measures for the benefit of listed whale species, including specialized training devoted to the awareness of the Northern Right Whale and its habitat in particular. Crabtree Decl. at ¶¶ 27-43; Bullard Decl. at ¶¶ 13-14. Plaintiff's Section 9 claims are without merit, therefore he cannot show a likelihood of success on the merits of these claims.

### ii.      Count III of the Complaint Regarding § 7 Consultation Must Fail

Contrary to Plaintiff's allegations, the Navy has initiated consultation with NMFS, pursuant to the requirements of Section 7 of the ESA, 16 U.S.C. § 1536. See, Crabtree Decl. at ¶¶ 7-26. On May 15, 1997, NMFS issued a biological opinion for Naval activities in the southeastern United States, and concluded that the Navy's actions were not likely to jeopardize the continued existence of any listed species, including the Northern right whales. Crabtree Decl. at ¶ 10b. On August 27, 2003, the Navy initiated informal consultation with NMFS on Navy activities in the Gulf of Maine. Crabtree Decl. at ¶15. In the course of this ongoing consultation, the Navy has implemented a number of protective measures for the benefit of marine mammals, including Northern right whales and humpback whales. Crabtree Decl. at ¶¶ 27-29a (protective measures in Northeast operating areas); see, ¶¶ 30-36 (protective measures in Southeast and Mid-Atlantic operating areas); see also Bullard Decl. at ¶¶ 12-14. In addition, the Navy has successfully completed informal consultations with NMFS for numerous activities that it determined "may affect" listed species. On each of those informal consultations, NMFS has concurred that the Navy's activities will not adversely affect listed species in that region.

Crabtree Decl. at ¶¶ 8-10, 13-26.[11]  Thus, Plaintiff is unlikely to succeed on any Section 7 claim.

Setting aside the fact that Plaintiff's assertions regarding Navy's initiation of Section 7 consultation are flawed, Plaintiff has further failed to challenge a discrete agency action, for which he believes Section 7 consultation is required.  Instead, he seeks a Court order requiring the Navy to consult "on the impact of their vessel and military training operations on ESA listed species of whales along the Atlantic coastline of the United States."  Amended Application for TRO at 1.  However, the ESA requires that "[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any *action* authorized, funded, or carried out by such agency" is not likely to jeopardize the continued existence of any listed species.  16 U.S.C. § 1536(a)(2).  Thus, the law is clear that a plaintiff must identify discrete, particularized final agency action which requires consultation – a sweeping demand for consultation over all "vessel operations" cannot stand.[12]  In other words, even though the Navy has voluntarily elected to initiate consultation on its programmatic activities in the Northeast, Plaintiff cannot bring a freestanding claim attempting to compel such a programmatic consultation.

**B.    THE BALANCE OF HARDSHIPS FAVORS THE NAVY**

Along with showing a likelihood of success on the merits, Plaintiff must show that irreparable injury will occur in the absence of the issuance of an injunction.  The burden of justifying interim relief lies with the movant, and threatened, speculative harm does not amount to irreparable injury for purposes of justifying an injunction.  Nat'l Wildlife Fed., 23 F.3d at

---

[11] Furthermore, the Navy has undertaken a number of measures for the benefit of marine mammals, including the Northern right whale.  Crabtree Declaration at ¶¶ 40-43.

[12] The Supreme Court recently reaffirmed the principle that the Plaintiff cannot use this Court to pursue wholesale improvement of the Navy's compliance with the ESA.  Norton v. Southern Utah Wilderness Alliance, 124 S. Ct. 2373, 2379-80 (2004); Lujan v. National Wildlife Federation, 497 U.S. 871, 891 (1990).  Rather, a plaintiff "must direct its attack against some particular 'agency action' that causes it harm."  Lujan, 497 U.S. at 891. A plaintiff "cannot demand a general judicial review of the [agency]'s day-to-day operations."  Id. at 899.

1512; Water Keeper, 271 F.3d at 34.

**1.    Plaintiff Has Failed to Demonstrate Irreparable Harm**

In addition to his failure to establish a likelihood of success on the merits, Plaintiff has

offered no evidence to support his assertion that irreparable harm will result absent an

injunction.[13]  There is no support for any allegation of widespread harm to Plaintiff.  In

WaterKeeper, the First Circuit upheld a district court's finding that "assertions concerning

irreparable harm stemming from the 'death of even a single member of an endangered species'

were insufficient to justify granting injunctive relief."  271 F.3d at 34.  That court found that,

without "a more concrete showing of probable deaths during the interim period and of how these

deaths may impact the species," plaintiff had failed to show irreparable harm that would justify

granting injunctive relief.  Id. (emphasis added).  See also Strahan v. Coxe, 127 F.3d at 171

(upholding denial of PI to halt activity causing take and holding that such an injunction was

mandatory only where activity would have caused eradication of entire species).  No such

showing has been made here.

Furthermore, Plaintiff cannot demonstrate that the injunction he seeks would redress his

injury.  Given the fact that the Navy comprises only a small fraction of the overall shipping

traffic along the Atlantic seaboard (and in the Northeast coastline in particular), enjoining the

Navy from continuing its national security efforts will do nothing to abate the commercial

shipping traffic traveling to ports in Boston, New York, and elsewhere.  Reedy Decl. at ¶ 5.

Indeed, these vessels are, in most instances, not equipped with the protective measures designed

---

[13]  As stated in the Navy's TRO opposition, it is important to note that a portion of the relief
Plaintiff seeks has no basis in law whatsoever.  Specifically, Plaintiff requests, among other
things, that the Court "[o]rder the [Navy] to report to the Plaintiff any occurrence of a large
whale of any federally protected species within 2000 yards of any vessel operated by the
Department of the Navy within 200 miles of the U.S. Atlantic coastline...."  Amended
Application for TRO at 2.  Apart from the inherent overbreadth of this request, nothing in the
ESA, its implementing regulations, nor any other provision of law affords an individual litigant
the authority which Plaintiff seeks here.

to minimize impacts to whales.  Thus, even if Plaintiff were to obtain injunctive relief and halt all operations of the Navy, the high shipping activity in the northeast would continue, and the risk of ship strikes by those actors (who do not use protective measures) would be unaffected.[14]

### 2.    The Navy Would Be Irreparably Harmed By an Injunction

In contrast to Plaintiff's failure to demonstrate harm, the harm to the Navy that would result from an injunction would be extreme.  Plaintiff is seeking to enjoin all naval seafaring (as well as some airborne) activities in large sections of the Atlantic seaboard. See, Amended TRO Appl. at 2.  As set forth Rear Admiral Bullard's declaration, the potential impact of any restriction on the operation of the Navy ships and military training operations on the East Coast would have grave consequences to naval readiness and national security. See, e.g., Bullard Decl. at  ¶¶ 6-8; 9-11; 14-17.  Thus, the hardship to the Navy and the United States from an injunction significantly outweighs any hardship to the Plaintiff that would result if the motion were denied.

### 3.    The Public Interest Favors a Denial of Injunctive Relief

In light of the vital national security priorities which the Navy must meet, and the need to maintain a military that is fully trained and mission-ready at all times, the public interest compels a denial of Plaintiff's requested injunction.

### CONCLUSION

WHEREFORE, for the foregoing reasons, the Navy respectfully requests that Plaintiff's Complaint be dismissed and Plaintiff's motion for preliminary injunction be denied.

---

[14]  Plaintiff's own delay also counsels against a finding of irreparable harm, and is evidence that there would be no hardship to Plaintiff if injunctive relief is denied.  Plaintiff's Complaint is based on events that occurred in November 2004, over six months ago.  Plaintiff is not entitled to emergency injunctive relief for a wholly past harm, especially when Plaintiff has waited many months before seeking relief.  "As a general proposition, delay in seeking preliminary relief cuts against finding irreparable injury." Kansas Health Care Ass'n v. Kansas Dep't of Social & Rehab. Serv., 31 F.3d 1536, 1543-44 (10th Cir. 1994); Majorica v. RH Macy & Co., 762 F.2d 7, 8 (2nd Cir. 1985) (lack of diligence may preclude issuance of PI); Lydo Enters. v Las Vegas, 745 F.2d 1211, 1213 (9th Cir. 1984).

MICHAEL J. SULLIVAN, United States Attorney
ANTON GIEDT, Assistant United States Attorney

KELLY A. JOHNSON, Acting Assistant Attorney General
JEAN E. WILLIAMS, Section Chief
SETH M. BARSKY, Assistant Section Chief

 /s/ S. Jay Govindan
S. JAY GOVINDAN, Trial Attorney (MD Bar # 25946)
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, DC 20044-7369
T: (202) 305-0237
F: (202) 305-0275
E: Jay.Govindan@usdoj.gov

Attorneys for Federal Defendants


## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of May, 2005, a true and correct copy of the preceding Memorandum in Opposition to Plaintiff's Motion for Preliminary Injunction and in Support of Motion to Dismiss was sent by overnight mail to:

Richard Max Strahan
Unit #5
928 Dorchester Avenue
Boston, MA 02125


/s/ S. Jay Govindan
S. JAY GOVINDAN
Counsel for Federal Defendants

## RULE 7.1 CERTIFICATION

Plaintiff in this action is *pro se*, and therefore is not represented by counsel, and Local Rule 7.1 should not apply. As such, Defendants request a waiver of this requirement. However, undersigned counsel hereby certifies that he sent an email to Plaintiff on the 27th day of May, 2005 to confer on the issues raised in this motion. No response was received.

/s/_S. Jay Govindan
S. JAY GOVINDAN
Counsel for Federal Defendants

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD MAX STRAHAN, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. |
| | ) 05-10275 |
| v. | ) |
| | ) DECLARATION OF |
| DONALD RUMSFELD, et al., | ) Thomas R. Crabtree |
| | ) |
| Defendants. | ) |

I, Thomas R. Crabtree, pursuant to 28 U.S.C. 1746, declare:

## PROFESSIONAL BACKGROUND AND RESPONSIBILITIES

1. I am a U.S. Navy civilian employee and member of the Senior Executive Service. I am currently the Deputy Director, Readiness and Training for U. S. Fleet Forces Command (FFC), U. S. Atlantic Fleet located in Norfolk, Virginia. FFC's primary mission is to provide Unified Commanders (commanders having operational command of forces from two or more military departments [Army, Navy, or Air Force]), as well as Navy operational commanders, with fully trained, equipped and combat-ready naval forces.

2. I earned my Bachelor's and Master's of Science in Business Administration from Old Dominion University in 1972 and Golden Gate University in 1979, respectively. I was an active duty U.S. Navy officer from 1972 to 1975. I left active duty in 1975, but continued to serve in the Naval Reserve from 1975 to 1980. When I left active duty, I became a U.S. Navy civilian employee, serving in various positions in the Norfolk area. In July 1999, I was selected to the Senior Executive Service and served as Deputy Director, Shore Activity Readiness for the Commander-in-Chief, U.S. Atlantic Fleet. On August 1, 2002, I was named Director of Shore Activities Readiness where I oversaw the full range of environmental operations for FFC's shore installations from compliance to cleanup, as well as personnel housing and public safety issues related to those installations. Additionally, I was and continue to be responsible for all at sea environmental planning and compliance in support of Atlantic Fleet exercise training.

3. Currently, in my capacity as the Deputy Director of Readiness and Training for FFC, I am the deputy principal advisor to the Commander on all matters relating to fleet training and readiness throughout the Atlantic Fleet's area of responsibility. I am therefore responsible for, and familiar with, all training and associated environmental planning and

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Thomas R. Crabtree

compliance activities that relate to fleet readiness for those forces, including the Endangered Species Act (ESA) Section 7 consultations past and present with NOAA National Marine Fisheries Service (NMFS) for Naval activities on the East Coast.

## THERE ARE THREE AREAS OF DESIGNATED CRITICAL HABITAT FOR NORTH ATLANTIC RIGHT WHALES ALONG THE U.S. ATLANTIC COAST

4. All references in this declaration are specific to the North Atlantic right whale, *Eubalaena glacialis*, hereafter referred to as "northern right whale," "right whale," or "NARW."

5. In accordance with the ESA and its implementing regulations, critical habitat is a specific geographic area(s) that is essential for the conservation of a threatened or endangered species and that may require special management and protection. Designation of critical habitat does not result in prohibition of all activity in the critical habitat or vicinity; instead, critical habitat designation allows Federal agencies, via the ESA Section 7 consultation process, to ensure that any action they authorize, fund, or carry out is not likely to result in the destruction or adverse modification of critical habitat. Therefore, the protection afforded by a critical habitat designation comes through the consultation process, either informal or formal.

6. Critical habitat for the northern right whale was designated in 1994 as a result of a May 1990 petition. After consideration of public comments and based on the best available scientific information, NMFS designated three areas of critical habitat essential for the reproduction, rest and refuge, health, continued survival, conservation and recovery of the northern right whale population. The three designated areas located off the U.S. Atlantic Coast are the Great South Channel, Cape Cod Bay, and Southeastern United States critical habitats (50 CFR 226.13). See Figure 1. In the designation (59 FR 28793, June 30, 1994) NMFS evaluated areas meaningful to the species conservation, focusing on particular areas that have essential features that may be in need of special management. The 1994 designation described the biological and physical features and principal constituent elements (such as feeding sites, breeding grounds, and calving areas) within the designated areas that are essential to the northern right whale. On August 28, 2003, per 68 FR 51758, NMFS determined expansion of the three critical habitats for NARW was not warranted.

## NAVY IS MEETING ITS ENDANGERED SPECIES ACT OBLIGATIONS THROUGH SECTION 7 CONSULTATIONS WITH NMFS

7. Since 1995, Navy has completed 23 ESA informal consultations, 3 ESA formal consultations, and is currently engaged in four ESA consultations on training activities in the Navy's Southeastern, Northeastern, and Mid-Atlantic operating areas. Additional

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Thomas R. Crabtree

consultations in support of Navy weapon system and platform testing, acquisition and research and development also have been completed. Naval Air Systems Command completed at least six informal consultations with NMFS concurrence that proposed activities were not likely to adversely affect listed species. Naval Sea Systems Command has completed 2 formal consultations and 14 informal consultations since 1995.

## SOUTHEAST CONSULTATION HISTORY

8. Navy operating areas offshore of the Southeastern U.S. include the Jacksonville Operating Area and the Charleston Operating Area. One area of critical habitat is designated in the Southeastern U.S, generally extending 5 to 15 nautical miles off shore. Where Navy determines activities at-sea may affect ESA-listed species or designated critical habitat, Navy initiates Section 7 consultations with NMFS through informal or formal procedures per ESA regulations. Examples of activities subject to consultation in the Southeastern U.S. follow.

9. Informal consultation with NMFS was initiated in 1995 for the proposed action of realigning Commander Afloat Training Group assets from Guantanamo Bay, Cuba to Mayport Naval Station, Mayport, Florida. Based on the finding that overall Navy ship traffic in the right whale critical habitat was not expected to increase over prior year levels, and considering the precautionary measures to be implemented by the U.S. Navy, NMFS determined on September 29, 1995 that the proposed activities were unlikely to adversely affect endangered or threatened species or their critical habitat under NMFS purview.

10. During the first three months of 1996, seven right whale mortalities were documented in the vicinity of the Southeastern U.S. designated right whale critical habitat. Although there was no indication that naval operations were responsible for any of the right whale mortalities, Navy determined that additional review of Atlantic Fleet operations via a formal ESA consultation process was prudent to determine the potential effect on listed species. In addition, NMFS indicated that the recent mortalities could change the biological baseline upon which prior impacts had been evaluated, warranting enhanced protective measures and the requirement to reinitiate consultations. Navy and NMFS held several meetings, and, in March 1996, Navy implemented additional northern right whale protective measures and initiated formal ESA consultation.

10a. The action area for the programmatic consultation on Navy activities in the Southeastern U.S. extends beyond the designated critical habitat boundaries. The consultation area depicted in Figure 3 (attached to RADM Bullard's declaration) includes the critical habitat, an associated area of concern, and areas well north of the critical habitat and seaward of the critical habitat to 80 nautical miles from shore. The consultation area is consistent with the ESA definition of action area (50 CFR 407.02). The programmatic consultation addressed six endangered marine mammals: *Eubaleana glacialis* (NARW), *Megaptera novaeangliae* (Humpback whale), *Physeter macrocephalis* (Sperm whale), *Balaenoptera musculus* (Blue whale), *Balaenoptera*

*physalus* (Fin whale), and *Balaenoptera borealis* (Sei whale), as well as ESA-listed sea turtles.

10b. NMFS issued a Biological Opinion (BO) for Navy Activities off the Southeastern United States along the Atlantic Coast on May 15, 1997. The BO concludes that, with the implementation of the defined protective measures, the likelihood of interactions with right whales and other ESA listed species in the consultation area is significantly reduced, and the Navy activities are not likely to jeopardize the continued existence of any ESA listed species under the purview of NMFS. Similarly, NMFS concluded that Navy activities are not likely to result in the destruction or adverse modification of right whale critical habitat. NMFS also concluded that the long-term continuation of Navy activities is not likely to jeopardize the continued existence of populations of humpback and fin whales, and Kemps ridley, leatherback, hawksbill, green and loggerhead sea turtles.

11. Subsequent to issuance of the 1997 programmatic BO, Navy has continued to review planned activities to determine whether actions may affect listed species or their habitats and are not addressed in the comprehensive BO. For example, Navy consulted with NMFS in 2003 and 2004 to develop harm avoidance measures associated with Navy security systems at Naval Submarine Base, Kings Bay, Georgia, including measures that require documentation and reporting of certain marine mammal sightings to NMFS.

12. In June 1996, Navy initiated formal ESA Section 7 consultation with NMFS for shipshock trials offshore of Mayport, FL. Another formal consultation for a second shipshock was initiated in January 2000. NMFS concluded in both BOs that ship shock testings are not likely to jeopardize the continued existence of the *Caretta caretta* (loggerhead sea turtle), *Dermochelys coriacea* (leatherback sea turtle), *Lepidochelys kempii* (Kemp's ridley sea turtle), *Chelonia mydas* (green sea turtle), *Eretmochelys imbricate* (hawksbill sea turtle), *Eubaleana glacialis* (NARW), *Megaptera novaeangliae* (Humpback whale), *Physeter macrocephalis* (Sperm whale), *Balaenoptera physalus* (Fin whale), *Balaenoptera borealis* (Sei whale) and *Balaenoptera musculus* (blue whale).

## NORTHEAST CONSULTATION HISTORY

13. Navy operating areas offshore of the Northeastern U.S. include the Boston/ Narragansett Operating Areas. Two areas of critical habitat are designated in the Northeastern U.S, one in Cape Cod Bay and one in the Great South Channel. The Northeastern operating areas are important primarily for Fleet unit-level training and for Navy's testing of weapons systems and platforms. Where Navy determines activities at-sea may affect ESA-listed species or designated critical habitat, Navy initiates Section 7 consultations with NMFS through informal or formal procedures per ESA regulations. Examples of activities subject to consultation in the Northeastern U.S. follow.

14. In 1997, an informal consultation under Section 7 of the ESA was initiated with NMFS for torpedo testing (TORPEX) locations in the Cape Cod Test Area, much of which lies within the Great South Channel critical habitat. The initial consultation concluded with NMFS's June 6, 1997 concurrence that Navy torpedo testing in the Great South Channel is not likely to adversely affect listed species or adversely modify or destroy critical habitat, contingent upon adherence to the defined mitigation measures. As a standard practice, the Navy provides information to the NMFS Northeast Regional Office prior to each TORPEX test to indicate that mitigation measures will be implemented, and to provide descriptions of the specific test event. When test parameters change such that they are outside the conditions stated in the 1997 concurrence letter, Navy reinitiates ESA consultation. For example, informal consultation was reinitiated in 2001 for lightweight torpedo exercises and again in 2002 and 2003. For all events, NMFS concurred that the defined Navy activities in the critical habitat are not likely to adversely affect listed species and do not adversely modify or destroy critical habitat.

15. NMFS and Navy initiated a series of meetings to increase focus on potential effects of Navy activities in the Gulf of Maine and vicinity. In concert with NMFS, Navy initiated a programmatic review of activities in the Northeastern operating areas, including Fleet training and testing command activities. Based on a relatively low operational tempo and the prior completion of informal consultation for testing activities in the Great South Channel critical habitat, Navy submitted an informal consultation package on August 27, 2003 with the finding that activities are not likely to adversely affect listed species or their designated critical habitats. The consultation is evaluating the potential effects of Navy activities on five listed sea turtle species and six endangered marine mammals: *Eubaleana glacialis* (NARW), *Megaptera novaeangliae* (Humpback whale), *Physeter macrocephalis* (Sperm whale), *Balaenoptera musculus* (Blue whale), *Balaenoptera physalus* (Fin whale), and *Balaenoptera borealis* (Sei whale). While the consultations are underway, the Navy has mandated extensive mitigation measures for Naval exercises in order to avoid adverse affects on listed species.

## MID-ATLANTIC CONSULTATION HISTORY

16. Navy operating areas off the Mid-Atlantic U.S. include the Cherry Point and VACAPES Operating Areas. Where Navy determines activities at- sea may affect ESA-listed species, Navy initiates Section 7 consultations with NMFS through informal or formal procedures per ESA regulations. Examples of activities subject to consultation in the Mid-Atlantic follow.

17. In 1998, Navy Submarine Forces Atlantic initiated informal consultation for torpedo exercises conducted offshore of Cape Henry, Virginia. These service weapon tests (SWTs) test randomly selected warshot torpedoes. Via the consultation, the original Navy-preferred SWT test area was relocated to deeper water locations, seaward of the VACAPES operating area. Concurrence that these activities are not likely to adversely affect threatened or endangered species under NMFS jurisdiction was received on July 29, 1998. The concurrence applies to subsequent years, provided that the same locations

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Thomas R. Crabtree

are utilized and mitigation measures are followed. SWTs are conducted annually, and Navy notifies the NMFS Northeast Regional Office prior to each event.

18. Fleet training includes the conducting of sinking exercises (SINKEXs) to train personnel, test weapons, study survivability of ship structures, and certify Naval forces preparing for deployment overseas. The primary purpose of the SINKEX program is to train Fleet personnel to use real world, live weapons against representative targets. Navy initiated ESA Section 7 informal consultations for SINKEXs in 1999, followed by submittal of a programmatic informal consultation package to NMFS in December 2000. In March 2001, NMFS requested additional information and requested that Navy enter into formal consultation for programmatic SINKEX activities. Although SINKEX locations vary, a majority of SINKEXs are planned in the deeper waters of Mid-Atlantic OPAREAS or seaward of these OPAREAs. Conduct of SINKEXs in these areas well offshore of the U.S. Mid-Atlantic coast reduces the likelihood of encountering protected species. Generally, the informal consultations have considered the potential effects on endangered marine mammals, including *Eubaleana glacialis* (NARW), *Megaptera novaeangliae* (Humpback whale), *Physeter macrocephalis* (Sperm whale), *Balaenoptera musculus* (Blue whale), *Balaenoptera physalus* (Fin whale), and *Balaenoptera borealis* (Sei whale), as well as listed sea turtle species. As Navy continues to develop programmatic formal consultation information, informal consultations for individual SINKEXs have been completed. Through the consultation process and the development of increasingly stringent mitigation and harm avoidance procedures, NMFS has determined that the proposed Navy activities are not likely to adversely affected listed species under its jurisdiction.

19. In May 2002, Navy initiated informal ESA Section 7 consultation with NMFS for mine warfare activities (MINEX) occurring in Onslow Bay, NC. NMFS concurred that the action may affect, but is unlikely to adversely affect any species under NMFS' purview based on the avoidance measures detailed in their concurrence letter dated May 24, 2002. In July 2002, Navy initiated formal ESA Section 7 consultation for (MINEX) and explosive ordnance disposal (EOD) unit level training at several locations offshore VA, NC, and SC. The BO received October 9, 2002 concluded that explosive mine neutralization and explosive countermining is not likely to jeopardize the continued existence of the *Caretta caretta* (loggerhead sea turtle), *Dermochelys coriacea* (leatherback sea turtle), *Lepidochelys kempii* (Kemp's ridley sea turtle), *Chelonia mydas* (green sea turtle), or *Eretmochelys imbricate* (hawksbill sea turtle) based on the mitigative measures included in the BO. Species of large whales, *Lepidochelys soliveacea* (olive ridley sea turtles), and *Acipenser brevirostrum* (shortnose sturgeon) were found not likely to be adversely affected by MINEX actions.

20. Navy reinitiated a prior consultation for dredging and beach renourishment along the U.S. Navy Fleet Combat Training Center at Dam Neck Annex, Virginia Beach, Virginia. The BO received December 11, 2003 concluded that the dredging at the Sandbridge Shoal borrow site and beach nourishment activities along Dam Neck Annex are not likely to jeopardize the continued existence of the loggerhead sea turtle (*Caretta caretta*), leatherback sea turtle (*Dermochelys coriacea*), Kemp's ridley sea turtle (*Lepidochelys*

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Thomas R. Crabtree

*kempii*), green sea turtle (*Chelonia mydas*), and hawksbill sea turtle (*Eretmochelys imbricata*). In addition, the action may affect, but is not likely to adversely affect the North Atlantic right whale (*Eubalaena glacialis*), humpback whale (*Megaptera novaengliae*), and fin whale (*Balaenoptera physalus*).

21. In 2003, Navy initiated informal consultation for the conduct of firing exercises required for ship certification using a new portable buoy scoring system (the Virtual At-Sea Training Deployable Prototype/Integrated Maritime Portable Acoustic Scoring and Simulator (VAST-DP/IMPASS system). Navy and NMFS completed 4 informal consultations for use of the system in 2003 and early 2004. The informal consultations included use of the system in the VACAPES Operating Area. The ESA-listed species considered in these consultations include North Atlantic right whale (*Eubalaena glacialis*), Finback whale (*Balaenoptera physalus*), Sei Whale (*Balaenoptera borealis*), Humpback whale (*Megaptera novaengliae*), Blue whale (*Balaenoptera musculus*), and Sperm whale (*Physeter macrocephalus*), as well as listed sea turtle species. A programmatic formal consultation for the VAST-IMPASS system was submitted to NMFS in February 2004, and Navy and NMFS are currently engaged in the formal consultation process.

21a. Naval Sea Systems Command Program Executive Office, Ships, conducts activities referred to as Weapons Effects Tests (WET). Generally, these are conducted seaward of Navy Mid-Atlantic or Southeast operating areas. Informal consultations for two such WETS were completed in 2004, with NMFS concurrence that the WETs were not likely to adversely affect listed species, including *Eubaleana glacialis* (NARW), *Physeter macrocephalis* (Sperm whale) *Megaptera novaeangliae* (Humpback whale), *Balaenoptera musculus* (Blue whale), *Balaenoptera physalus* (Fin whale), *Balaenoptera borealis* (Sei whale), and ESA-listed sea turtles.

22. In June 2004, NMFS released an Advance Notice of Proposed Rulemaking (ANPR) for Right Whale Ship Strike Reduction, indicating that ship strike reduction measures for public vessels would be developed via ESA Section 7 consultations, rather than directly via the rulemaking procedure. On 17 November 2004, a Navy vessel reported a strike of an unidentified marine mammal in the VACAPES operating area. Unlike commercial shipping, Navy requires Navy vessels to report ship strikes, and information on the strike was appropriately provided to NMFS. A dead northern right whale washed ashore in North Carolina on November 24, 2004. In total, four confirmed right whale deaths occurred in 2004, two likely from ship strike and two from unknown causes. In addition, two NARW's were found entangled in fishing gear. Through discussion with NMFS in December 2004, the Navy determined that it would be prudent to implement additional ship strike reduction measures for the Mid-Atlantic, using the NMFS ANPR as guidance. Navy issued guidance to all Fleet units on December 17, 2004, requiring the implementation of additional ship strike reduction measures along the U.S. Atlantic Coast. Thus, Navy became the first entity to provide an affirmative response to NMFS's efforts to improve protection of migrating whales along the Mid-Atlantic coast.

23. In December 2004, the Navy initiated ESA Section 7 consultation with NMFS for the proposed installation of an instrumented training area off the East Coast of the United States. Discussions of the draft Biological Assessment (BA) were held between Navy and NMFS in December 2004 and January 2005. Based on recommendations received from NMFS, and the anthropogenic right whale mortalities and gear entanglements in 2004, the Navy agreed to expand the draft BA to specifically address effective mitigation procedures for Navy vessel transits in defined near-shore areas of the Mid-Atlantic (ranging from south and east of Block Island Sound southward to South Carolina) during the Northern right whale migratory seasons. Overall, the consultation reviews the potential to affect ESA-listed sea turtles and endangered marine mammals, including *Eubaleana glacialis* (NARW), *Megaptera novaeangliae* (Humpback whale), *Physeter macrocephalis* (Sperm whale), *Balaenoptera musculus* (Blue whale), *Balaenoptera physalus* (Fin whale), and *Balaenoptera borealis* (Sei whale).

24. Naval Air System Command completed ESA Section 7 consultations on approximately 6 actions in the Chesapeake Bay and areas offshore VA and MD from 1996 through the present. NMFS concurred that these activities, such as underwater cable installation, operational testing and evaluation of Naval aircraft, and deployment of inert projectiles were not likely to adversely affect ESA-listed species under NMFS jurisdiction. The following species were considered in these various consultations: *Eubaleana glacialis* (NARW), *Megaptera novaeangliae* (Humpback whale), *Physeter macrocephalis* (Sperm whale), *Balaenoptera physalus* (Fin whale), *Balaenoptera borealis* (Sei whale), *Caretta caretta* (loggerhead sea turtle), *Dermochelys coriacea* (leatherback sea turtle), *Lepidochelys kempii* (Kemp's ridley sea turtle), *Chelonia mydas* (green sea turtle), *Eretmochelys imbricate* (hawksbill sea turtle) and *Acipenser brevirostrum* (Shortnose sturgeon).

25. Overall, during the conduct of ESA Section 7 consultations with NMFS for various Navy actions on the East Coast, Navy routinely presents and analyzes the potential for vessel collisions as a component of the consultation. NMFS has analyzed the issue of potential Navy vessel strikes in a series of consultations, in most cases including mitigation measures, such as shipboard observers (lookouts) to support the reduction of ship strike risk to listed species. Vessel collision is routinely considered by NMFS in issuance of informal consultation concurrence letters and Biological Opinions for Navy activities along the U.S Atlantic Coast. Typical language from a January 2004 consultation concurrence reads: "On occasion, underway vessels may collide with marine mammals or sea turtles. While whales are highly maneuverable and generally detectable (in daylight) at long range by onboard watchstanders, collisions do occur with surfacing animals, resting animals, or those swimming just below the surface. ... Given the low density of listed species and the harm avoidance measures proposed to be included as part of the proposed action, NOAA Fisheries believes that collision with a listed species during these operations is highly unlikely." Additional mitigation procedures, such as slow speed requirements and additional lookouts, are issued as mitigation measures by NMFS for Navy activities where NMFS believes there is a higher risk of ship strike, such as the procedures identified in the 1997 Southeast BO.

26. NMFS has developed additional measures to reduce the potential for vessel-related impacts. These efforts have been developed under the auspices of the ESA recovery planning process for NARWs, and are a component of ESA protections for this species. Navy has proactively ensured that Navy vessels adhere to these additional measures, including adherence to the Navy mandatory ship reporting requirements that are not otherwise required of sovereign vessels.

26a. As part of recovery actions aimed at reducing vessel related impacts, NMFS published a proposed rule in August 1996 restricting vessel approach to right whales (61 FR 41116) to distances outside of 500 yards in order to minimize human-induced disturbance. The subsequent rules (50 CFR Part 222.32) prohibit both boats and aircraft from approaching any right whale closer than 500 yards, and are designed to reduce the potential for vessel collisions. Via issuance of this 500-yard guidance to the Fleet through annual and standing guidance, Navy ensures that Fleet units implement this requirement when right whales are sighted.

26b. In December 1998, the International Maritime Organization Subcommittee on Safety and Navigation approved a U.S. proposal to implement a mandatory ship reporting (MSR) system in two areas off the east coast of the United States. Via Navy guidance issued June 2002, Navy requires Naval vessels to report to the MSR system.

## THE NAVY IMPLEMENTS PROTECTIVE MEASURES DEVELOPED THROUGH INFORMAL AND FORMAL ESA CONSULTATIONS WITH NMFS

### NORTHEAST PROTECTIVE MEASURES

27. Protective measures for Navy activities in the Northeastern U.S. are primarily a result of the testing community consultations from 1997 forward and the protective measures that Navy has agreed to implement during the continuing programmatic informal consultation for Navy activities in the Gulf of Maine and vicinity.

28. For torpedo testing events conducted by the Navy's Undersea Weapons Program Office, the Navy agreed to a seasonal limitation such that tests are only conducted between July 1 and December 31 of any given year. The nature of testing activities allows more mitigation to be implemented for many test activities than is possible for on-going Fleet training requirements. Testing will be suspended in certain sea states or if the visibility precludes effective mitigation, and, in some cases, Navy has delayed tests in accordance with the mitigation procedures to avoid potential impacts on protected species. Mitigation measures are implemented for all torpedo-testing events in the Great South Channel and the Gulf of Maine, including restrictions to test only during daylight hours, requirement for visual surveys and clearance for marine mammals and sea turtles prior to the test, and the placement of trained marine mammal observers on all Navy platforms. In addition, vessels transiting through the critical habitat, while not actually engaged in the test event, shall be alert at all times, use extreme caution, and proceed at a

safe speed so that the vessel can take action to avoid collision with a right whale or other marine mammal or listed species. Aerial surveys using a dedicated fixed-wing aircraft also are necessary to monitor the test, and two trained observers, in addition to the pilot, must be on the aircraft.

28a. Observers participating in these test events must be trained in the field identification, distribution and relevant behaviors of marine mammals of the western north Atlantic. Observers must fill out Standard Sightings Forms that are submitted to the Northeast Fisheries Science Center, and any sightings of NARWs are immediately communicated to the Sighting Advisory System. Naval Undersea Warfare Center, Newport, Rhode Island established a training program in 1997 for its employees who conduct sea tests or serve as marine mammal observers. A video entitled "Right Whales and the Prudent Mariner" was produced to include a specific section addressing NAVSEA activities, and all marine mammal observers are shown the video during a NMFS-approved training course. In addition, the Atlantic Fleet uses copies of the video to augment its lookout training for vessel and aircraft crews.

29. Navy has implemented a series of protective measures during the ongoing Gulf of Maine and vicinity consultation with NMFS. The Navy issued protective measures for these Northeast-operating areas in June 2002. These procedures include Northern Right Whale awareness training for ship and aircraft crews, use of buffer zones, pre-event visual surveys, and post-event monitoring to detect the presence of marine mammals. For the limited activities that require Navy to use live or inert ordnance, the Navy delays, stops or moves ordnance-training events when marine mammals are within certain distance parameters. Navy vessels follow specific whale avoidance procedures and adhere to safe vessel speeds when approaching or transiting designated critical habitat or other known areas of whale concentrations.

29a. Navy has augmented the use of protective measures as the consultation has progressed. For example, a working meeting was held with Navy and NMFS in January 2004 to provide additional details on aerial survey capabilities of Navy P-3s and crews. NAS Brunswick flight crews received marine mammal identification guides developed by the NMFS Northeast Fisheries Science Center (NEFSC) specifically for aerial observations, and the crews have since provided numerous reportings of Northern right whale sightings to NMFS for their sighting advisory system. For example, in August 2004, sighting data and photographs provided by Navy aircraft to the NEFSC were instrumental in establishing a Dynamic Area Management (DAM) closure in the Gulf of Maine. The cooperation between NAS Brunswick and NMFS Northeast Region has been further strengthened through the establishment of a protocol for improving airspace communication. CPRW-5 also has agreed to provide NMFS with a courtesy advance notice of when ordnance-training activities are scheduled, to allow NMFS to conduct aerial surveys in advance of the training event if crews and aircraft are available.

## SOUTHEAST PROTECTIVE MEASURES

30. Protective measures for activities in the Southeastern U.S. are primarily a result of the 1995 informal consultation and subsequent 1997 biological opinion. To exemplify the extensive protective measures Navy implements to protect marine mammals and other protected species, details on the protective measures from these ESA consultations are provided here.

31. The September 29, 1995 concurrence letter concluding the informal consultation for the Realignment of Commander Afloat Training Group detailed several precautionary measures necessary to support the conclusions that proposed actions are unlikely to adversely affect listed species. Precautionary measures require vessels transit the critical habitat at minimum safe navigable speed. Additionally, from December 1st through March 31st when operating in areas where humpback and right whales occur and in designated right whale critical habitat, Navy vessels post a lookout trained in marine mammal observation. In keeping with mission, Navy vessels within a 15 nautical mile radius of a right whale sighting operate at the slowest safe speed possible, exercise caution, and keep a watch for right and humpback whales. To ensure lookout effectiveness, Navy provides protected species training and awareness programs to Naval personnel. A key precautionary measure is Navy's continued participation in the Right Whale Early Warning System (EWS), including contribution of sighting information to the EWS.

32. In March 1996, Navy implemented additional right whale protective measures in the Southeastern U.S to be followed as programmatic formal consultation was underway. Specifically, during the consultation period, Navy moved all ordnance activities during the right whale calving season to locations at least 50 nm from shore during the right whale calving season, prohibited north-south transits through the critical habitat, and relocated an inert ordnance mine countermeasures exercise to an area further from the critical habitat.

32a. The May 1997 Biological Opinion for Navy activities in the Southeastern U.S. defines a series of protective measures for right whales and other endangered species in the Southeastern critical habitat and larger Navy consultation area. There have been no known impacts to right whales associated with Navy activities in the Jacksonville OPAREA subsequent to the consultation, though the Navy has continued its extensive use of the area for Navy training and operations. This continued use, consistent with the terms of the 1997 Biological Opinion, has proven compatible with the protection and management of right whales and their critical habitat, as well as other threatened and endangered species off the Southeastern U.S. coast.

32b. The BO requires protective measures for vessel operation to reduce the risk of whale ship strike. These measures include posting of 2 lookouts (one on surfaced submarines) at all times while underway and a requirement for lookouts to report all whales and sea turtles sighted to the Officer of the Deck. One of the posted lookouts must have completed the marine mammal training program implemented by Navy.

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Thomas R. Crabtree

Actions to be taken when marine mammals are sighted or when marine mammals have been reported in the vicinity are prescribed, including additional speed reductions and avoidance of approach to any whale head on or within 500 yards. Navy vessels are required to be alert at all times, use extreme caution, and proceed at a safe speed so that the vessel can take proper and effective action to avoid a collision with a marine mammal or other listed species. North-south transits through the critical habitat and AAOC are generally prohibited unless certain conditions are met. Naval vessel operations are undertaken during daylight and periods of good visibility to the extent practicable and consistent with mission, training and operation. As noted in a revised draft Recovery Plan for the North Atlantic Right Whale, NMFS is considering an effort to minimize the transit time and distance through the SE critical habitat by requiring ships to approach and depart the coast on east-west headings. The draft plan specifically notes: "All U.S. Navy ships transiting between port and offshore waters currently are directed to use such courses, and the Navy is to be commended for those efforts."

32c. For other training activities, the Fleet Area Control and Surveillance Facility (FACSFAC) Jacksonville will recommend modifying or canceling exercises as needed to prevent whale encounters, and range clearance for marine mammals and sea turtles are required prior to the conduct of certain exercises. Additionally, the BO restricts the location of certain activities, such as naval gunnery, within the consultation area during the calving season, and limits Navy to only three types of exercises within the critical habitat and associated area of concern during the calving season. Based on the time of year and location, additional restrictions such as the requirement to use inert rounds, restriction on locations, requirement for prior reporting of ordnance activities to the southeast implementation team, clearance of exercise areas for marine mammals prior to the exercise, and other measures are in place.

32d. Important monitoring and reporting procedures are addressed in the BO to increase right whale avoidance. FACSFAC tracks right whale locations and provides information to naval units, and coordinates and manages Navy use of the Jacksonville and Charleston operating areas. Navy ships transiting the consultation area obtain the latest whale sighting information. Navy ships and aircraft in the consultation area report all right whale sightings to FACSFAC, and FACSFAC has a system to alert all naval units in the consultation area of sightings.

## MID-ATLANTIC PROTECTIVE MEASURES

33. Endangered species protective measures in the Mid-Atlantic operating areas have been developed via consultations to address the diverse types of Navy activities that occur in this region, including the protective measures that Navy has agreed to implement to reduce the risk of vessel collisions during on-going Section 7 consultation.

34. Where possible in accordance with mission requirements, Navy has agreed to move certain activities such as SWTs and SINKEXs to deeper, offshore waters with few bathymetric features and lower expected occurrence of protected

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Thomas R. Crabtree

species. In addition, for SWT, SINKEX and VAST-DP/IMPASS events, Navy has agreed to conduct these events during daylight hours. Additional mitigation for these exercises typically involves both aural (sonobuoy) and visual surveys and clearance of defined areas around the exercise location for marine mammals and sea turtles for established time periods prior to the event. Exercises are suspended or moved away from the area if marine mammals are encountered or if environmental conditions are present that reduce the ability to conduct effective mitigation. Lookouts are stationed on vessel and aerial platforms, typically including at least one lookout that has been trained in marine mammal observation. For SWT events, trained observers complete sighting logs for all observed sightings and these are forwarded to NMFS. Post-exercise monitoring also is performed.

35. Mitigation measures are also in place for MINEX actions occurring in the near-shore areas off VA, NC and SC. Mitigation is similar to the above, including conducting training primarily during daylight hours and performing pre-and post-exercise monitoring. In addition, divers survey the area and report any sightings to surface observers. If a sea turtle or marine mammal is spotted within the area, the animal will be allowed to leave on its own volition before conducting the event. In addition, the Navy will suspend exercises until the area remains clear of protected species for 30 minutes. Exercises are not conducted near estuarine inlets, shoreline, artificial reefs, shipwrecks, live hard bottom communities, or in the vicinity of the Onslow Bay sea turtle sanctuary.

36. To reduce the risk of vessel collision with marine mammals, the Navy issued ship strike reduction measures to all Atlantic Fleet units in December 2004. Implementation of these measures is in place for all units as the Navy continues preparation of the biological assessment for a formal consultation to include vessel transits in the Mid-Atlantic region. Navy's December 2004 guidance addresses areas where ships transit between southern New England and northern Florida. The guidance was coordinated with NMFS to identify seasonal Northern right whale occurrence patterns. Navy requires its vessels to exercise caution and operate at a slow, safe speed within 20 nautical mile arcs of identified ports and coastal reference points. The guidance reiterates previous Navy instructions that ships must post at least two lookouts under certain conditions, and at least one of these lookouts must have completed marine mammal observer training. When considered in combination with the Biological Opinion in the Southeast and the existing measures in place to support continuing consultations in the Northeast, the December guidance ensures that the Navy's protective measures cover ships transiting through or in the vicinity of Northern right whale critical habitats and migratory corridors along the entire U.S. Atlantic coastline.

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Thomas R. Crabtree

## THE NAVY CONTRIBUTES SUBSTANTIVELY TO THE CONSERVATION OF ENDANGERED MARINE MAMMALS ALONG THE U.S. ATLANTIC COAST

37. The September 29, 1995 NMFS letter of concurrence for an afloat group relocation in the Southeast included several recommendations above and beyond the necessary precautionary measures. Example recommendations from 1995 are provided here, and similar recommendations in other consultations have resulted in improvement of Navy best practices for environmental planning and personnel training.

38. NMFS recommended Navy formalize a Memorandum of Understanding between NMFS, the U.S. Coast Guard and the U.S. Army Corps of Engineers to support the Early Warning System (EWS). The "Early Warning System" (EWS) for right whales in the Southeast United States was first developed via Section 7 consultations between NMFS and the Army Corps of Engineers (ACOE). The EWS now consists of aerial surveys at the core and a communication plan to provide information flow between the appropriate agencies, groups, and mariners. The Navy, Army Corps of Engineers, and Coast Guard currently contribute over $100,000.00 per year to the Early Warning System aerial surveys. Survey flights by the New England Aquarium and others are flown daily, weather permitting, December through March, covering over 1000 square miles of ocean and encompassing the region's major shipping channels. The Navy's Fleet Area Control and Surveillance Facility, Jacksonville, is home to the Whale Fusion Center, which synthesizes sightings information from the surveys and from other platforms of opportunity, providing real-time Northern right whale sightings to Navy vessels and aircraft, as well as to Coast Guard vessels and civilian shipping during the Northern right whale calving season. The Navy has become the central repository and dispenser of sighting location information used for the communication networks. The relay of continuously updated sighting information from survey teams to area mariners provides the situational awareness that helps all mariners avoid encountering whales.

39. NMFS recommended Navy develop training for personnel that emphasizes not only stranding and enforcement issues, but also information on the distribution and behavior of these species that will help the Navy to anticipate where and when conflicts may occur. Navy has since developed the most extensive compilation of published data on marine mammal and sea turtle distribution currently available for the East Coast and Gulf of Mexico. This information, compiled in a series of "Marine Resource Assessments" (MRAs) specific to each of Navy's major east coast operating areas, was developed to ensure Navy had access to the best available science for use in at-sea operational environmental planning. The MRAs provide detailed descriptions of where important resources, such as coral reef, marine sanctuaries, and essential fish habitat, occur, and additionally provide marine mammal species-by-species occurrence information for use in effective planning. MRAs compile available sighting, stranding, incidental fisheries bycatch, satellite tracking and other data for marine mammals and sea turtles to analyze the occurrence patterns of these protected species. For each MRA, a geographic information system is used to enter, store and visualize spatial data for the operating area.

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Thomas R. Crabtree

## THE NAVY PARTICIPATES IN OTHER INITIATIVES TO PROMOTE THE RECOVERY OF LARGE WHALES ON THE U.S. ATLANTIC COAST

40. The Southeastern U.S. Northern right whale Recovery Plan Implementation Team (SEI-T) formed in 1993. At the team's inception, the SEIT consisted of representatives of state and federal resources agencies and regulated entities, including representatives of the U.S. Navy Naval Air Station Jacksonville and U.S. Navy Submarine Group Kings Bay Georgia. The Navy has continued proactive participation in the SEIT recovery team since its inception in 1993.

41. NMFS established the Northeast Recovery Plan Implementation Team (NEI-T) in 1994 to address Northern right whale and Humpback Whale Recovery Plan implementation from Maine to Virginia. The NEI-T includes representatives of state and Federal agencies, along with private institutions that have an active role in undertaking actions specified in the Humpback and Northern right whale Recovery Plans. There has been a Navy representative on the Northeast Implementation Team (NEI-T) since 1996, who has served as Vice Chair and most recently Chair of the Team. The team recently was reorganized with a primary mission of reducing the threat of ship strikes to the North Atlantic right whale.

42. Using the Southeast U.S. EWS program as a model, efforts were initiated in 1997 to develop a similar program in Cape Cod Bay and the Great South Channel, resulting in the Northern right whale Sighting Advisory System (SAS). The System provides real-time Northern right whale sighting information to the commercial shipping industry and other marine traffic from aerial and shipboard surveys conducted by several agencies and organizations and from verified opportunistic sightings. The program is a cooperative effort by NMFS, the Coast Guard, Massachusetts's resource agencies, the Navy, the U.S. Army Corps and others. Northern right whale sightings from aerial survey platforms and multiple voluntary platforms, including Navy opportunistic sightings, are reported to NMFS' Northeast Regional Office for dissemination to cooperators. Navy receives these reports via email to 24-hour watch centers, and immediately redistributes this information to the operational Fleet. Navy biologists from Newport have participated as observers on NOAA surveillance flights for NARW over the Gulf of Maine since 1998.

43. The U.S. Navy is a leader in marine mammal research, spending nearly $10 million per year, representing 70% of the dollars spent on this type of research in the U.S. and 50% of such dollars spent worldwide. Approximately 33 universities, institutes, and technical companies are supported by Navy research and development funds, primarily through grants from the Office of Naval Research. This research includes investigations of marine mammal hearing anatomy and function, field monitoring of behavioral response to manmade sound, tools for the assessment and mitigation of adverse impacts from manmade sounds on the marine environment, and modeling and simulation tools for impact assessment and risk management.

CONCLUSION

The Navy has and continues to meet its ESA Section 7 obligations regarding listed species in the waters of the East Coast. Navy is a federal leader in NARW protection and has one of the most robust federal protective programs for NARW. We must be allowed to operate and train the Nation's warships and crews, or the Atlantic Fleet could be left without ready and trained forces. Because of the Global War on Terrorism, the potential impact of any restriction on the operation of our ships or the conduct of military training operations within 25 nautical miles of designated critical habitat on the East Coast has grave consequences to naval training and readiness. Operating within 25 nautical miles is necessary in order to access several major Naval facilities and preventing access to those ports and bases would be a major disruption of the operation of the entire Atlantic Fleet and would have a detrimental effect on the Navy's readiness and its ability to successfully accomplish its assigned mission. Enjoining the operation of naval vessels within 25 nautical miles from NARW critical habitat will cause the national security of the United States great harm.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge.

Date ___4/21/05___

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD MAX STRAHAN, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. |
| | ) 05-10275 |
| v. | ) |
| | ) DECLARATION OF |
| | ) RADM Donald K. Bullard, USN |
| DONALD RUMSFELD, et al., | ) |
| | ) |
| Defendants. | ) |

I, Donald K. Bullard, pursuant to 28 U.S.C. 1746, declare:

## PROFESSIONAL BACKGROUND AND RESPONSIBILITIES

1. I am an Officer on active duty in the United States Navy in the grade of Rear Admiral. I am currently the Director, Fleet Readiness and Training, U.S. Fleet Forces Command (FFC), located in Norfolk, Virginia. FFC's primary mission is to provide Unified Commanders (commanders having operational command of forces from two or more military departments [Army, Navy, or Air Force]), as well as Navy operational commanders, with fully trained, equipped and combat-ready naval forces.

2. I received my Bachelor of Science Degree from the University of Southern California and was commissioned through the Naval Reserve Officer Training Corps Program in June 1973. I was designated a Naval Aviator in March 1975. I received my Masters Degree with highest distinction from the Naval War College and am a graduate of the Armed Forces Staff College. I am also a graduate of the Syracuse University Maxwell School National Security Studies Program and have served on the Staff of the Center for Naval Warfare Studies.

3. My operational sea tours include flying the A-7E *Corsair* in Attack Squadron One One Three (VA 113) in *USS Ranger* (CV 61), Attack Squadron One Nine Five (VA 195) in *USS Kitty Hawk* (CV 63), Carrier Air Wing Fourteen (CVW 14) in *USS Coral Sea* (CV 43), Attack Squadron Two Seven (VA 27) in *USS Carl Vinson* (CVN 70) and flying the F/A-18 *Hornet* in Strike Fighter Squadron Nine Seven (VFA 97) in *USS Kitty Hawk* (CV 63). My shore assignments include duty with Attack Squadron One Two Two (VA 122), with Commander, Naval Air Force, U.S. Pacific Fleet and on the Staff of the Deputy Chief of Naval Operations (Air Warfare). In January 1991, I assumed command of Strike Fighter Squadron Nine Seven (VFA 97) embarked in *Kitty Hawk*. In July 1995, I reported as Commanding Officer of the amphibious assault ship *USS New Orleans* (LPH 11). I became the 28th Commanding Officer of the aircraft carrier *USS Constellation* (CV 64) in January 1998. In October 1999, I reported as Chief of Staff for Commander,

Naval Air Force, U.S. Pacific Fleet. In July 2000, I was assigned to the Joint Staff as Deputy Director for Operations in the National Military Command Center. In September 2002, I assumed command of Carrier Group Six/*John F. Kennedy* Battle Group. I assumed my current duties in October 2004.

4. Currently, in my capacity as the Director, Fleet Readiness and Training, I am the principal advisor to the Commander, U. S. Fleet Forces Command on all matters relating to fleet training and readiness throughout FFC's area of responsibility, which includes the U. S. Atlantic Fleet. I am therefore responsible for, and familiar with, all training and readiness issues associated with the Atlantic Fleet.

U. S. FLEET FORCES COMMAND AND UNITS OF THE U. S. ATLANTIC FLEET ARE ORGANIZED TO SUPPORT THE UNIFIED COMMANDERS AND NATIONAL TASKING

5. The U.S. Atlantic Fleet is comprised of six aircraft carriers, 16 amphibious assault ships, and an additional 105 surface ships, 36 submarines, and 1,130 aircraft. The Force is made up of more than 70 commands. Our 115,239 personnel are stationed both Stateside (from Bath, Maine to Corpus Christi, Texas) and on the high seas (from the Norwegian Sea in the Atlantic Ocean to the Persian Gulf of the Arabian Sea in the Indian Ocean).

5a. The six aircraft carriers are the heart of the forward presence the Navy provides the Nation. The carrier provides a wide range of options to the U.S. government from simply demonstrating a strategic presence worldwide to attacks on airborne, afloat and ashore targets. Because carriers operate in international waters, its aircraft do not need to secure landing rights on foreign soil. These ships also engage in sustained operations in support of other forces. Each carrier is organized in a Carrier Strike Group (CSG) that will include on average: (1) a guided missile cruiser (a multi-mission surface combatant equipped with tomahawk long-range cruise missiles for long-range strike capability); (2) two guided missile destroyers (multi-mission surface combatants, used primarily for anti-air warfare); (3) an attack submarine (operating in a direct support role seeking out and destroying hostile surface ships and submarines); and (4) a combined ammunition, oiler, and supply ship (providing logistic support enabling the Navy's forward presence). Together, the CSG is on station, ready to respond to the orders of the Commander-in-Chief.

5b. The Cruisers, Destroyers, and Frigates maintain constant readiness to engage enemy land targets, aircraft, ships, and submarines. Together with the Amphibious ships, with embarked U.S. Marines, they project Sea Power ashore by maintaining the capability of landing the Marines by helicopters, amphibious track vehicles, air cushion landing craft, and assault craft whenever and wherever the need arises. This unit is an Expeditionary Strike Group (ESG).

5c. The Combat Logistics Force Ships keep the rest of the Navy mobile and independent of United States and foreign support bases by supplying the food, fuel, and equipment

necessary for sustained deployed operations. They also provide essential salvage, diving, towing, and repair services for combat forces and in response to national emergencies. Mine countermeasures ships ensure that transit routes used by U.S. and Allied ships are free from mines, keeping International Sea Lanes open, safe and free. In time of war, they also ensure that coastal areas and restricted passages are free of mines, making possible the use of these areas by other ships of the fleet. The Naval Beach Group, consisting of the Amphibious Seabees, a Beach Master Unit, and Assault Craft Units, provide essential pre- and post-landing support to our Amphibious Forces. Other special function units include Cargo Handlers, Mobile Diving/Salvage Teams, Explosive Ordinance Disposal Teams, Fleet Surgical Teams, and Fleet Introduction Teams.

5d. The CSGs and ESGs along with the support vessels and personnel prepare for operational assignments by following the Fleet Response Training Plan (FRTP). The FRTP begins after ships are made available for maintenance (a period of in port time either at the pier or in dry-dock). They then complete a seven-month basic training phase. Following the basic training phase, there is an intermediate training phase after which units are certified as surge ready – ready to deploy upon short notice if required. At this time, the units can be called upon to respond to an emergent crisis. If the unit has not surged, the training phase continues to the advance phase, which is designed to ensure these forces are prepared for scheduled deployments in support of the Global War on Terrorism or any other operational tasking. Units will then embark on a six-month deployment, after which they begin the FRTP cycle all over again. The goal of this continuous at-sea training cycle is to be prepared to deploy a significant portion of the Fleet at a moment's notice on the orders of the President of the United States and Secretary of Defense to defend the United States and its interests.

## THE NAVY MUST BE ABLE TO OPERATE IN AND AROUND ITS EAST COAST PORTS AND OPERATING AREAS

6. The primary mission of the U.S. Navy is to bring the fight to our enemies. However, the U.S. Navy also has a mission to detect, deter, and defend the nation against homeland maritime threats. To be successful in both of these roles, the Navy must maintain global maritime domain awareness. We have to be aware of the current and potential changes to the operating environment. The increasing dependence of our world on the seas, coupled with growing uncertainty of other nations' ability or desire to impede access in a future conflict, will continue to drive the need for Naval forces and the capability to project decisive joint power from the seas. The increased emphasis on the littorals (shallow water, near shore areas) and the global nature of the terrorist threat will demand the ability to strike where and when required, with the maritime domain serving as the key enabler for U.S. military forces. Anti-Submarine Warfare, Mine Countermeasures, Ship Self-Defense and Naval Surface Fire Support are critical capabilities both for ensuring worldwide access and for successfully executing the Navy's overall strategy. Additionally, we are continuing to execute the Global War on Terrorism while transforming for the future fight. In order to "train as we fight" and deliver the kind of dominant maritime power required by our Commander-in-Chief, the Fleet must train and test its tactics and weapon systems. To accomplish this training and testing at-sea, the

Atlantic Fleet primarily uses at-sea operating areas on the East Coast of the United States. An at-sea operating area (OPAREA) is a designated ocean area for surface, subsurface, or aircraft training and operations. The following OPAREAs primarily support Fleet training, testing, and operations on the East Coast: Boston/Narragansett, Virginia Capes, Cherry Point, and Charleston/Jacksonville. OPAREAs are designated in the locations depicted in Figure 1 in order to support aircraft carrier air wing training. During the basic and intermediate level training, the air wings must be within 120 nautical miles from a land-based airfield in order to safely divert and land if they are unable to do so on the deck of the aircraft carrier.

6a. The Boston and Narragansett OPAREAs are located in waters off the Northeast Coast and include the Gulf of Maine (GoME) and the Great South Channel (GSC).  FFC and Naval Sea Systems Command (NAVSEA) undertake regularly occurring Navy training and testing activities in this area.  FFC has assets operating out of Naval Air Station Brunswick, ME, Naval Shipyard Portsmouth, NH, Newport Naval Station, RI, Submarine Base, New London/ Groton, CT, and Naval Weapons Station, Earle, NJ.  FFC has the following Command forces and their component forces train, test, and operate in the Boston and Narragansett OPAREAs: Submarine Group TWO, Submarine Squadrons (SUBRON) 2 and 4 and Submarine Development Squadron 12; Commander, Naval Air Forces, U. S. Atlantic Fleet (AIRLANT); and 4 Maritime Patrol Squadrons. All of these assets train in the Boston/Narragansett OPAREAs. Naval Sea Systems Command is responsible for ship and weapon development and testing, both of which occur in the Boston and Narragansett OPAREAs. Of significant importance is the torpedo testing conducted in the Great South Channel, since conducting these tests at the same sites, and thus in the same ocean environment, over time is critical to the long-term success of the Navy's torpedo program. See Figure 2.

6b. The Virginia Capes OPAREA is located in the coastal and offshore waters of the western North Atlantic Ocean adjacent to the states of Delaware, Maryland, Virginia, and North Carolina (see Figure 2). FFC has the following Command forces and their component forces training and operating in the Virginia Capes OPAREA: Amphibious Group TWO (Amphibious Squadrons 2, 4, 6, 8 and Naval Beach Group 2); Commander, Naval Air Forces, U.S. Atlantic Fleet, AIRLANT (Carrier Air Wings 1, 3, 7, 8; Helicopter Tactical Wing; Airborne Early Warning Wing; Fighter Wing and Strike Fighter Wing); Commander, Submarine Force, U.S. Atlantic Fleet, SUBLANT (SUBRON 6 and 8); Commander, U.S. SECOND Fleet (Carrier Strike Groups TWO, FOUR, EIGHT, TEN, & TWELVE); Commander, Naval Surface Force, U.S. Atlantic Fleet, SURFLANT (Destroyer Squadron DESRON 2, 18, 22, 26, & 28 along with Naval Special Warfare Development Group and Group TWO). See Figure 1.

6c. The Cherry Point OPAREA is located in the near shore and offshore waters of North Carolina in the northwestern Atlantic Ocean (see Figure 1). The OPAREA supports training in support of U.S. Marine Corps Base Camp LeJeune and Marine Corps Air Station Cherry Point. The units identified in paragraphs 6b and 6d also train in this OPAREA. See Figure 3.

6d. The Jacksonville and Charleston OPAREAs are located in the South Atlantic Bight (SAB; the waters of the northwestern Atlantic Ocean off the coasts of southern North Carolina, South Carolina, Georgia, and northeastern Florida) (see Figure 3). In addition to the units identified in paragraph 6b, the following units train in these OPAREAs: Carrier Strike Groups SIX & FOURTEEN; Destroyer Squadrons (DESRON) 14, 18, and 24; Carrier Air Wing 17, Helicopter ASW Wing, Helicopter ASW Light Wing, Sea Control Wing, and Patrol and Reconnaissance Wing 11. Much of the Fleet's intermediate and advance phase training is accomplished in these OPAREAs. See Figure 3.

## OPERATIONAL TEMPO FOR THE U.S. ATLANTIC FLEET IS HIGH

7. On any given day, one-third of the U.S. Atlantic Fleet assets are underway (not in port; operating at-sea) on deployment in support of a national mission tasking, one-third are underway in an East Coast at-sea OPAREA training or testing in support of the Fleet Response Training Plan, and one-third are in port conducting maintenance.

8. The month of March 2005 is illustrative as 20 of the 36 submarines stationed on the East Coast were underway during the course of the month. There were 18 underways from port and 18 returns to port in the same period (some vessels remain out past the month snapshot). Additionally, the underway submarines conducted 20 Brief Stops for Personnel (BSP) - done to shift out technical representatives involved with at-sea testing or maintenance, and other personnel moves which can, depending on the weather result in a transit back to the pier. Most of these BSPs occurred at the three main submarine home bases of Kings Bay, GA, Norfolk, VA, or Groton, CT, but a few were conducted in Mayport, FL. Of the 20 submarines underway, all were conducting training designed to hone their warfighting skills. Six were also conducting inspections or certifications; five were conducting submarine on submarine training; 3 were transiting either to or from other theaters (mission taskings); and six were involved with training for both the surface and aviation Navy. Additionally, during the same period, 4 of 6 carriers were underway, one of which was forward deployed away from U.S. waters. There were 5 carrier underways and 5 returns to port in the same period. 11 of 16 amphibious assault ships were underway, 3 of which were deployed. There were 17 amphibious assault ship underways and 17 returns to port in the same period. 41 of 105 surface ships were underway, 12 of which were deployed. There were 81 surface ships underways and 81 returns to port in the same period (some vessels remain out past the March snapshot). Of the underway periods; 9 were for major inspections, 2 salvage operations were executed, the remainder were for Unit Level Training (ULT), Intermediate Training exercises or were in support of fleet services like aircraft qualifications and test and evaluation events. All were in or around the east coast OPAREAs.

## TWO OF THE EAST COAST AT-SEA OPAREAS CONTAIN DESIGNATED RIGHT WHALE CRITICAL HABITAT

9. The Jacksonville OPAREA contains designated right whale critical habitat. All Naval operations in this area have and will continue to observe the protective measures in place per the 1997 Biological Opinion issued by the National Marine Fisheries Service (NMFS) following formal consultation under the Endangered Species Act (ESA). To restrict the Navy "from operating any ship or conducting any military training operation within 25 nautical miles from the boundary" of designated right whale critical habitat in this OPAREA would prevent our ships access to several major Naval facilities including the Navy homeports of Mayport and Kings Bay. The United States Navy would be prevented from even putting the surface ships and submarines based at those homeports to sea. Relocating the Naval vessels from their homeports of Mayport and Kings Bay to homeports that are not completely blocked by designated right whale critical habitat would result in a strategic imbalance on the East Coast, would adversely affect training and readiness, and would cause great hardship to the Sailors and their families. Additionally, such a move would be prohibitively costly to the American taxpayer. This cost does not take into account the economic costs to the Mayport/Jacksonville/Kings Bay area.

10. While not located in a designated right whale critical habitat area, Naval Station Norfolk is the largest naval base in the world. While the Navy is but a small percentage of the total vessel traffic in the Hampton Roads region, there are approximately 80 Naval ships operating out of the Norfolk, Virginia area. When they get underway for training or testing at-sea, many of these vessels travel south and north from Norfolk to conduct training in the Cherry Point, Charleston, Jacksonville, Narragansett, and Boston OPAREAs in addition to the Virginia Capes OPAREA. These operating areas have extensive infrastructure designed to facilitate and evaluate that training. The loss of any of these at-sea training areas, and the associated infrastructure would create severe strains on the ability of these forces to adequately prepare for their assigned missions, with negative consequences to their ability to defend the United States.

11. The Boston OPAREA also contains designated right whale critical habitat. All Naval operations in this area have and will continue to observe the protective measures in place while the ESA consultation with the National Marine Fisheries Service (NMFS) is ongoing. To restrict the Navy "from operating any ship or conducting any military training operation within 25 nautical miles from the boundary" of designated right whale critical habitat in this OPAREA would prevent our ships access to several major Naval training facilities including the Navy at-sea inert torpedo testing range and the Great South Channel which is the main shipping channel for the Port of Boston.

## NAVAL OPERATIONS IN AND AROUND THE DESIGNATED CRITICAL HABITATS ARE CONDUCTED WITH MARINE MAMMAL PROTECTIVE MEASURES IN PLACE

12. All Naval vessels operating at-sea employ a series of right whale protective measures in their standard operating procedures. These procedures include right whale awareness training for ship and aircraft crews, use of buffer zones, pre-event visual surveys, and post-event monitoring to detect the presence of marine mammals.

13. Navy initiated consultation with NMFS in March 1996 on the potential impacts of naval activities in the waters of the southeastern United States. On November 27, 1996, Navy completed a Biological Assessment describing naval activities that take place off the southeastern United States, and the mitigation or protective measures that Navy had implemented, or proposed to implement, in connection with those activities to ensure their activities were not likely to jeopardize right whales or other listed species. NMFS issued a Biological Opinion in May 1997 approving a broad range of protective measures many of which apply during the important "calving season" from December 1st to March 31st. These calving season protective measures include the following: Naval Gunfire limited to inert ordnance, and only in certain agreed upon areas. All firing is conducted west to east with surveys conducted to ensure a clear area. Air-Dropped Ordnance is confined to a limited specified area, with similar surveys to ensure a clear area. Transiting through the critical habitat and associated area of concern is limited to east-west directions, where practical. Vessel speed limitations in the critical habitat and associated area of concern is subject to the following requirement: "use extreme caution and use slow safe speed, that is, the slowest speed that is consistent with essential mission, training and operations." Moreover, operations in critical habitat and area of concern are limited to daylight and periods of good visibility, to the extent practicable and consistent with mission, training and operation. One properly trained Marine Mammal Lookout is required when operating in critical habitat. Additionally, Navy coordinates a sophisticated tracking and fusion operation to consolidate whale location reports from numerous sources.

14. As a result of completed and ongoing ESA consultations for testing events in the Gulf of Maine (Boston OPAREA), the following protective measures are in place: Testing will be suspended in certain sea states or if the visibility precludes effective mitigation, and, in some cases, Navy has delayed tests in accordance with the mitigation procedures to avoid potential impacts on protected species. Mitigation measures are required for all torpedo-testing events in the Great South Channel and the Gulf of Maine, including restrictions to test only during daylight hours, requirement for visual surveys and clearance for marine mammals and sea turtles prior to the test, and the placement of trained marine mammal observers on all Navy platforms. In addition, vessels transiting through the critical habitat, while not actually engaged in the test event, shall be alert at all times, use extreme caution, and proceed at a safe speed so that the vessel can take action to avoid collision with a right whale or other marine mammal or listed species. Aerial surveys using a dedicated fixed-wing aircraft also are required to monitor the test, and two trained observers, in addition to the pilot, must be on the aircraft. All observers

must be trained in the field identification, distribution and relevant behaviors of marine mammals of the western north Atlantic. Observers must fill out Standard Sightings Forms that are submitted to the Northeast Fisheries Science Center, and any sightings of right whales are immediately communicated to the Sighting Advisory System.

## HARM OF RESTRICTING THE NAVY "FROM OPERATING ANY SHIP OR CONDUCTING ANY MILITARY TRAINING OPERATION WITHIN 25 NAUTICAL MILES FROM THE BOUNDARY" OF DESIGNATED RIGHT WHALE CRITICAL HABITAT IS GREAT

15. Naval Submarine Base Kings Bay, GA is the sole Atlantic homeport for seven of our nation's 14 strategic ballistic missile submarines. The Trident SSBN force is the most survivable leg of the nuclear triad. They remain in a ready to generate status (deploy and carry out their mission) whether inport or at-sea. At all times they are prepared to respond to emerging global threats associated with an adversary's use or proliferation of nuclear, biological, or chemical weapons and ballistic missiles. To generate from homeport, the Tridents must transit through the Jacksonville operating area and the designated right whale critical habitat en route to deterrent patrol or training operating areas. If denied access to the Jacksonville critical habitat and OPAREA, the Trident fleet will be unable to effectively and successfully execute their assigned strategic deterrence mission. Additionally, course and speed restrictions to and from the approaches to Kings Bay create unacceptable force protection, training, and ship handling hazards. Such a compromise will result in the failure to meet mission requirements directed by the President through the Combatant Commanders resulting in a breach of our nation's security.

16. The Jacksonville and Boston OPAREAs containing designated right whale critical habitat support the majority of the Navy's new ship and weapons testing along with a sizable portion of the intermediate and advanced phase training of the U.S. Atlantic Fleet. The potential impact of denied access, or additional restrictions on the operation of our ships or the conduct of military training and testing operations within the designated right whale critical habitats on the East Coast will have grave consequences to the Navy's readiness and its ability to meet its mission.

CONCLUSION

17. A properly trained and equipped Naval Force is vital to the National Security and the Global War on Terrorism. The Navy must continue to operate and train the Nation's warships and crews in its designated at-sea operating areas or the Atlantic Fleet could be left without an adequately trained force and thereby unable to meet overseas mission tasking, defend the nation against homeland maritime threats, and maintain global maritime domain awareness. Our Forces are operating in compliance with the ESA; we continue to implement protective measures that were developed in consultation with the NMFS designated to help ensure marine mammal protection and in furtherance of critical habitat special management. To restrict the Navy "from operating any ship or conducting any military training operation within 25 nautical miles from the boundary" of designated right whale critical habitat would prevent our ships access to several major Naval facilities including the Navy homeports of Mayport and Kings Bay as well as the Port of Boston and the Boston and New York shipping channels. Such a denial of access to these ports and bases would be a major disruption of the operation of the entire U.S. Atlantic Fleet and would have a detrimental effect on the Navy's readiness. Enjoining the operation of naval vessels within 25 nautical miles from designated right whale critical habitat will cause the national security of the United States great harm.

Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge.

Donald K. Bullard           Date 21 APR 2005



Figure 1



Figure 2



Figure 3

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RICHARD MAX STRAHAN,    )
    )
    Plaintiff,    )    Civil Action No.
    )    05-10275
v.    )
    )    DECLARATION OF
DONALD RUMSFELD, et al.,    )    Michael Wayne REEDY
    )
    Defendants.    )

I, Michael Wayne REEDY, pursuant to 28 U.S.C. 1746, declare:

PROFESSIONAL BACKGROUND AND RESPONSIBILITIES

1. I am a Commissioned Officer in the U.S. Navy with 25 years of commissioned service. I presently hold the grade of Captain, U. S. Navy. I have been a Surface Warfare qualified officer for 24 years and have served aboard five Naval Combatants, commanding USS Exploit (MSO-440) and USS Carr (FFG-52). I am presently the Deputy Director for Fleet Training for the U. S. Atlantic Fleet. In this position, I am responsible for resources in support of Atlantic Fleet exercise training and environmental planning.

2. On Thursday 28 April 2005 at 5:00 pm, the Cape Cod Stranding Network received a report from USFWS of a right whale dead on South Monomoy Island, Chatham MA, USA. See Figure 1 for the approximate location of the stranding. The Navy learned of this event from a publicly available e-mail list server maintained by Woods Hole Oceanographic Institute (WHOI). Personnel from the New England Aquarium's (Aquarium) Rescue and Rehabilitation Program and WHOI responded to the stranding and, following standard practice, posted updates for interested public and scientists on the list server. The whale was very decomposed, and the reports from the stranding response team indicated that the likely estimated date of death was two weeks prior to the stranding; approximately April 15th. Initial findings of the *in situ* necropsy posted on the list server by Aquarium and WHOI scientists indicated substantial blubber bruise in the right flank area overlying multiple fractured right lumbar transverse processes, indicative of blunt trauma. The whale appeared to have been ship-struck, but it is not known whether the strike occurred before or after death. On May 2nd, the Aquarium identified the whale as a 9-year old female, NEA#2617, last observed in the Bay of Fundy on Sept. 3, 2003.

3. Navy is actively involved in large whale protection programs, and has established internal reporting requirements for all ship-whale strikes. Navy established a whale strike reporting policy in 1998, and promulgated specific reporting format requirements to all Atlantic Fleet units in June 1998. To ensure situational awareness of protective

measures and of reporting procedures, the reporting requirement is redistributed via Naval message to all Atlantic Fleet units annually prior to the Northern right whale calving season. The reporting requirements in place ensure that there is full awareness and reporting of any ship strike that occurs at sea. No Naval units have reported a ship strike in the Atlantic Ocean in calendar year 2005.

3a. Clearly, a vessel crew must be capable of registering that a strike has occurred in order for that strike to be reported. Navy vessels are much more likely than commercial vessels to be aware of the occurrence of a ship strike. As described by NMFS in the Large Whale Ship Strike Database (NOAA Technical Memorandum NMFS-OPR-25 dtd Nov 03), the size, bridge location and manning of ships are important factors in recognizing that a whale has been hit. For commercial vessels, NMFS notes that *"Many ship strike fatalities almost certainly go undetected, so our database provides a minimum account of such occurrences."* The report adds *"Federal ships carry substantial crew, a number of whom are generally on the bridge at any one time (bridge crew on Navy vessels often consists of half a dozen individuals or more). Such crews are more likely to spot a whale and/or register that a collision has occurred than a container ship or tanker with only one or two individuals at the helm."*

4. Navy has no indication from either NMFS or the Aquarium that there is any concern that Navy activities may have been associated with NEA#2617's death. Navy activities in the Northeast operating areas are typically low. No Navy surface, subsurface or air units reported a marine mammal strike in the vicinity of or the time period preceding NEA#2617's mortality.

4a. Even though there was no reported Navy ship strike, approximate to the death of NEA#2617, an inquiry of Naval activities in a very broad ocean area surrounding Monomoy Island was conducted by Fleet Forces Command. To ensure a thorough inquiry, the time period and geographic extent of the internal review extended well beyond the location and projected timeframe of the specific stranding, covering an approximate 63,000 square nautical mile area for the period of April 6th through April 28th. Where historic information is available, those data were requested for the month of April 2005. In addition to reviewing all surface, subsurface, and relevant aircraft training activities, Fleet Forces Command coordinated with Navy research, development test and evaluation commands that might conduct acquisition program testing activities along the East Coast. No Navy testing activities or research activities were identified in the defined 63,000 square nautical mile area during the month of April.

4b. The inquiry confirmed that only one Navy surface vessel, a supply ship, was present in the larger 63,000 square nautical mile area during the requested time period, and this Navy vessel was well south and west of Northern right whale critical habitats and of Monomoy Island. The vessel was in close proximity to Naval Weapons Station Earle, New Jersey approximately 194 NM from Monomoy Island (Figure 1). The supply ship was present in this area on April 27th. Based on the advanced state of decomposition of NEA#2617 on 28 April and the expert's estimated date of death as April 15th, it is clear that the Navy supply ship was in no way associated with the death of this whale.

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Captain Michael Wayne Reedy, USN

4c.  Eleven Navy subsurface units were present in the large 63,000 square mile area during the requested time period.  Due to the large geographic extent of the Navy's inquiry, the number of units includes routine submarine movements associated with their primary homeport at Naval Submarine Base New London, Connecticut (Figure 1), located well south and west of Cape Cod.  Subsurface units would have complete awareness of a large whale strike, and, as described above, are required to report a strike in the unlikely event that one might occur.  No such strikes were reported, and all unit commanders re-confirmed that no strikes occurred.

4d.  Navy policy requires all Naval aircraft to contact Commander Patrol Reconnaissance Wing Five (CPRW-5) prior to any ordnance drops in the Northeastern operating areas.  CPRW-5 confirms that no live ordnance drops occurred in the defined geographic area during April 2005.  Only one inert or practice drop occurred during April 2005 (April 5th over 78 nautical miles northeast of Monomoy Island) and it was well clear of the two designated Northern right whale critical habitat areas.  Although interactions with marine mammals are not anticipated during practice drops, CPRW-5 has developed cooperative procedures with NMFS to ensure that stringent marine mammal criteria are followed even for practice drops.  The criteria include a requirement that Northern right whale sighting advisory system reports, updated near-daily by NMFS, are reviewed by aircrews as part of mission planning, and that CPRW-5 cooperatively provide advance information on scheduled activities to NMFS.  In addition, aircrews adhere to specific survey protocol to ensure no marine mammals are present in the exercise area, and do not conduct the exercise if whales are sighted in the defined vicinity.  CPRW-5 review of historic NMFS Northern right whale sighting information for the month of April 2005 indicates that no Northern right whales were sighted by NMFS in or around the designated CPRW-5 exercise area, and that most sightings in April were concentrated very close to Cape Cod, where Navy aircraft do not train.

5.  In contrast to the very small number of Navy activities in the larger northeastern area during the month of April, NMFS Northeast region indicates that 75 commercial vessels arrived through the Northeastern Mandatory Ship Reporting (MSR) area in April 2005, and 57 of these complied with the mandatory ship reporting procedures established in 33 CFR Part 169.  Note that the larger total number of commercial and recreation vessels present in the equivalent 63,000 square nautical mile reviewed by Navy is not known, nor is the total number of smaller commercial and recreational vessels that are not required to report to the MSR system.  Although Navy has established requirements to self-report any whale strike by a Naval vessel, no standardized procedure for the reporting of whale strikes is required of commercial and/or recreational vessels.

Per 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge.

_____          _____
Michael Wayne REEDY, Captain, USN        Date

Strahan v. Rumsfeld, Civ. No. 05-10275
Declaration of Captain Michael Wayne Reedy, USN