## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD MAX STRAHAN | ) |
| | ) |
| Plaintiff | ) |
| | ) Civil Action No. |
| v. | ) |
| | ) 05 – 10275 - NMG |
| DONALD RUMSFELD, et al. | ) |
| | ) 31 May 2005 |
| Defendants | ) |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS
## MOTION FOR A PRELIMINARY INJUNCTION

The Plaintiff — Richard Max Strahan — files this memorandum of law in support of his pending motion for a preliminary injunction. See 31 May 2005 "Plaintiff's Amended Motion for a Preliminary Injunction" ("Preliminary Injunction Motion").

Strahan Complaint raises claims against that the Defendants' daily ship transit operations routinely kill, injure and otherwise "take" endangered whales designated as listed species under the Endangered Species Act ("ESA") in violation of the Act's Section 9 prohibitions on said takings. 16 U. S. C. §§ 1531 *et seq.* These unlicensed takings and violations of the ESA's Section 9 take prohibitions by Navy ships has been going on ever since the ESA was adopted by Congress in 1973 and it is foreseeable that it will continue to do so into the future unless the Court orders otherwise.

In November of 2004 the Navy ship *U. S. S. Iwo Jima* struck and killed a pregnant Northern Right Whale off the Virginia coast. The dead carcass of the pregnant whale eventually washed up on a nearby beach. It is unlikely that the Navy would have been credited with this killing except that within an hour of the whale being struck, a recreational fisherman reported the

struck whale to the National marine Fisheries Service. The Navy did not. The fisherman's report

of an injured whale caused an immediate intensive aerial search for the whale which also

revealed the presence of the *Iwo Jima* in the immediate area and subjected to scrutiny as the ship

that struck the sighted whale. Eventually after several days the Navy reported to NMFS that it

had indeed struck a whale at the same time and location as that reported by the fisherman and

that the striking caused an identical injury to the whale that was sighted by the fisherman and

that eventually stranded nearby. The Defendants have formally admitted to this strike in a

response to the Plaintiff's request for admissions.

The *Iwo Jima*'s striking and killing of a listed species of whale is a direct violation of the

ESA Section 9 prohibitions against the taking of listed species of endangered wildlife. The

continued operation of the *Iwo Jima* and other ships operated by the Defendants is a continuing

violation of the section 9 take prohibitions of the ESA and pose a significant and continuing

threat to kill, injure and otherwise take listed species of whales in violation of the Section 9 take

prohibitions of the ESA. Upon information and belief, the Defendants have made no attempt to

apply to NMFS for a ESA Section 10 take permit or otherwise have sought authorization from

NMFS to take listed species of whales pursuant to its ship operations.

The NMFS issued a report in 2004 assessing the impact of coastal ship operations on

listed species of whales. See Attach #1 — NMFS' January 2004 "Large Whale Ship Strike

Database." This report listed Navy ships as the number one source of ship strikes on listed

species of whales over any other category of ship traffic along the United States coastline.

NMFS has requested that the Navy enter into consultation with it pursuant to Section 7

of the ESA over the impact of its ship operations on listed species of whales. 16 U. S. C. §

1536(a). See Attach. #2. To this day, the Defendants have refused to request a formal

consultation pursuant to Section 7 of the ESA with the NMFS over the adverse impact of the *Iwo Jima* and other similar ships operated by the Navy on listed species of whales. To this day the Defendants remains in flagrant violation of their mandatory and non-discretionary duty by failing to request a *formal* Section 7 consultation with the NMFS over the adverse impact of its ship operations on listed species of endangered whales.

At the beginning of March 2005 — over a month after the instant action was commenced — a Northern Right Whale stranded on Monomoy Island off Chatham, MA. A necropsy performed on this whale by NMFS conclusively established that it was killed from a ship strike. The location of the stranding was a few miles away from a testing range operated by the Defendants and in which torpedoes and other weapons are routinely tested by the Defendants. The stranded Northern Right Whale was most likely killed by a Navy ship that struck it or the whale was struck by a torpedo launched by a Navy ship in the test range.

Unless the Court grants Strahan his requested interlocutory injunctive relief, the Defendants ship operations will likely cause the death and/or injury of another member of a listed species of endangered whale. The killing a single further Northern Right Whale by the Defendants could precipitate — if not already so — the imminent and irreversible extinction of the Northern Right Whale. The Defendants do not dispute this fact.

### The Endangered Species Act

The Endangered Species Act, 16 U. S. C. §§ 1531-1544, ("ESA") was enacted, in part, to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved...[and] a program for the conservation of such endangered species and threatened species..." 16 U. S. C. § 1531(b). The ESA "is the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee*

*Valley Authority v. Hi*ll, 437 U. S. 153, 180 (1978). The Supreme Court's review of the ESA's

"language, history, and structure" convinced the Court "beyond a doubt" that "Congress intended

endangered species to be afforded the highest of priorities." *Id.* at 174. As the Court found, "the

plain intent of Congress in enacting this statute was to halt and reverse the trend toward species

extinction, whatever the cost." *Id.* at 184.

    The ESA vests primary responsibility for administering and enforcing the statute with the

Secretaries of Commerce and Interior. The Secretaries of Commerce and Interior have delegated

this responsibility to the National Marine Fisheries Service ("NMFS") and the U.S. Fish and

Wildlife Service ("FWS") respectively. 50 C. F. R. §402.01(b). NMFS has primary

responsibility for administering the ESA with regards to most marine species, including sea

turtles and whales, while FWS has responsibility for terrestrial species, as well as Polar Bears

and all seabirds. In order to fulfill the substantive purposes of the ESA,

    Federal agencies are required to engage in consultation with NMFS or FWS to "insure that

any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the

continued existence of any endangered species or threatened species or result in the adverse

modification of habitat of such species... determined...to be critical ..." 16 U. S. C. § 1536(a)(2)

(Section 7 consultation). Section 7 consultation is required for "any action [that] may affect

listed species or critical habitat." 50 C. F. R. § 402.14. Agency "action" is defined in the ESA's

implementing regulations to include "all activities or programs of any kind authorized, funded,

or carried out, in whole or in part, by Federal agencies in the United States or upon the high seas.

Examples include, but are not limited to:    (a) actions intended to conserve listed species or their

habitat; (b) the promulgation of regulations; (c) the granting of licenses, contracts, leases,

easements, rights-of-way, permits, or grants-in-aid; or (d) actions directly or indirectly causing

modifications to the land, water, or air." 50 C. F. R. § 402.02.  (emphasis added).  See also

*Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1054-55 (9th Cir. 1994), cert. denied, 514 U.S.

1082 (1995) (recognizing that Congress intended "agency action" to be interpreted broadly,

admitting of no limitations).  Where NMFS is also the acting agency (as in this case), and its

actions affect species under its own jurisdiction, NMFS must undertake internal consultation (i.e.

one branch of the agency, the Office   4 of Sustainable Fisheries, consults with another, the

Office of Protected Resources) to comply with this requirement. When NMFS is the acting

agency, and its actions affect species under FWS's jurisdiction, NMFS must undertake

consultation with FWS. When a proposed action may affect a protected species, consultation

must occur and be completed before the federal action may take place. *Pacific Rivers*, 30 F. 3d at

1056; *Thomas v. Peterson*, 753 F. 2d 754, 764-65 (9th Cir. 1985).

     If an agency fails to consult on an action that affects listed species, all activities that "may

affect" the species must be enjoined. *Pacific Rivers*, 30 F. 3d at 1056-57. ("[The Forest

Service's] conclusion that these activities "may affect" the protected salmon is sufficient reason

to enjoin these projects. Only after the Forest Service complies with § 7(a)(2) can any activity

that may affect the protected salmon go forward."). Section 7(d) of the ESA, 16 U. S. C. §

1536(d), provides that once a federal agency initiates consultation on an action under the ESA, it

"shall not make any irreversible or irretrievable commitment of resources with respect to the

agency action which has the effect of foreclosing the formulation or implementation of any

reasonable and prudent alternative measures which would not violate subsection  (a)(2) of this

section." The purpose of Section 7(d) is to maintain the ecological status quo during

consultation, preventing the agency from undertaking activities that may harm protected species

during consultation or taking actions that ultimately would preclude reasonable and prudent

alternatives. *Pacific Rivers*, 30 F. 3d at 1056; *Conner v. Burford*, 848 F. 2d 1441, 1455 n. 34

(9th Cir. 1988), cert. denied, 489 U. S. 1012 (1989); *Pacific Rivers Council v. Thomas*, 936 F.

Supp. 738 (D. Idaho 1996). Section 7(d) is strictly prohibitory in nature; Section "7(d) does not

serve as a basis for any governmental action unless and until consultation has been initiated."

*Pacific Rivers*, 30 F. 3d at 1056. During the course of consultation, NMFS or FWS may

"suggest modifications" to the action to "avoid the likelihood of adverse effects" to the listed

species. 50 C. F. R. § 402.13. At the completion of consultation NMFS or FWS issues a

Biological Opinion ("BO") that determines if the agency action is likely to jeopardize the

species. See 50 C. F. R. § 402.02. If so, the agency may not proceed with any program, permit,

or decision that would jeopardize a species' survival unless the BO specifies reasonable and

prudent alternatives that will avoid jeopardy and allow the agency to proceed with the action. 16

U. S. C. § 1536(b). See also *Sierra Club v. Marsh*, 816 F. 2d 1376, 1384-86 (9th Cir. 1987)

(enjoining highway construction because agency could not meet burden of absolute assurance

that mitigation required to avoid jeopardy was possible). An agency's duty to avoid jeopardy is

continuing, and "where discretionary Federal involvement or control over the action has been

retained or is authorized by law," the agency must in certain circumstances reinitiate formal

consultation. 50 C. F. R. § 402.16. Although procedural, consultation is the backbone of the

ESA. As the Ninth Circuit recognized, "[o]nly by requiring substantial compliance with the act's

procedures can we effectuate" congressional intent to protect species. Sierra Club v. Marsh, 816

F. 2d at 1384 (9th Cir. 1987). In addition to the proscriptive requirement that agencies ensure

that their actions do not jeopardize listed species, Section 7 also places an affirmative obligation

on agencies to take action to "conserve" listed species. 16 U. S. C. § 1536(a)(1); the term

"conservation" in turn is defined to include "the use of all methods and procedures which are

necessary to bring any endangered species or threatened species to the point at which the measures provided [by the ESA] are no longer necessary." 16 U. S. C. § 1532(2); see also *Sierra Club v. Glickman*, 156 F. 3d 606, 617 (5th Cir. 1998) (Section 7(a)(1) "contains a clear statutory directive (it uses the word 'shall') requiring the federal agencies to consult and develop programs for the conservation of listed species"); *Florida Key Deer v. Stickney*, 864 F. Supp. 1222, 1238 (S. D. Fla. 1994).

Section 9 of the ESA and its implementing regulations prohibit any person from "taking" a threatened or endangered species. 16 U. S. C. § 1538(a)(1); 50 C. F. R. § 17.31; 50 C. F. R. § 227.11; 50 C. F. R. § 227.12; 50 C. F. R. § 227.21; 50 C. F. R. § 227.71. A "person" includes private parties as well as local, state, and federal agencies. 16 U. S. C. § 1532(13). "Take" is defined broadly under the ESA to include harming, harassing, trapping, capturing, wounding, or killing a protected species either directly or by degrading its habitat sufficiently to impair essential behavior patterns. 16 U. S. C. § 1532(19). The prohibition against take specifically extends to the high seas. 16 U. S. C. §1538(a)(1)(C). The ESA not only bans the acts of parties directly causing a take, but also bans the acts of third parties whose acts bring about the taking. *Strahan v. Coxe*, 127 F. 3d 155, 163 (1st Cir. 1997), cert. denied, 119 S. Ct. 81 (1998) ("We believe that . . . a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the ESA."). See also *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U. S. 687, 704 (1995)("Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions."); *Palila v. Hawaii Dept. of Land and Natural Resources*, 852 F. 2d 1106, 1108 (9th Cir. 1988), citing S. Rep. No. 93-307, at 7 (1973) ("'Take' is defined... in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any

fish or wildlife."). There are two exceptions to Section 9's take prohibitions. First, Section 10 of

the ESA permits a non-federal entity to "take" listed species incidental to an otherwise lawful

activity only after obtaining an Incidental Take Permit. 16 U. S. C. § 1539. Second, a federal

agency may take listed species only in accordance with an Incidental Take Statement. Pursuant

to Section 7(b)(4) of the ESA, a Biological Opinion which concludes that the agency action will

not jeopardize a listed species must include an Incidental Take Statement which specifies the

impact of any incidental taking, provides reasonable and prudent measures necessary to

minimize impacts, and sets forth terms and conditions that must be followed. 16 U. S. C. §

1536(b)(4). If the terms and conditions of the Incidental Take Statement are followed, the federal

agency and any permittee are exempted from Section 9's take prohibitions. 16 U. S. C. §

1536(o)(2); *Ramsey v. Kantor*, 96 F. 3d 434, 442 (9th Cir. 1996).

### The Preliminary Injunction Motion Meets All the Requirements for the Court to Grant Strahan's Request Interlocutory Injunctive Relief

Strahan has convincingly demonstrated that the Defendants' current ship operations have

recently killed and injured listed species of endangered whales in violation of the Section 9 take

prohibitions of the ESA. He has also demonstrated that the Defendants' ship operations pose a

significant threat to further kill, injure and otherwise take listed species of whales in violation of

the Section 9 take prohibitions of the ESA in the immediate future. The striking of listed species

of whales by U. S. Navy ships in the immediate future is expected and foreseeable. The

Defendants do not possess and have not applied for any authorization from NMFS to take the

listed species of endangered whales pursuant to its ship operations. *Tennessee Valley Authority v.*

*Hill*, 437 U.S. 153, 98 S. Ct. 2279 (1978); *U. S. Public Interest research Group v. Atlantic*

*Salomon of Maine*, 257 F. Supp. 2d 407 (D. Me. 2003); *National Wildlife Federation v.*

*Burlington Northern Railroad, Inc.*, 23 F. 3d 1508, 1512 (9th 1994); *American Bald Eagle v.*

*Bhatti*, 9 F. 3d 163 (1ˢᵗ 1993): Under the ESA, the Court cannot consider any adverse impact on

the Defendants from enjoining its activities in order to stop their taking of listed species of

whales. There is no question that Strahan is likely to succeed on the merits has he has done in the

past in similar civil actions. *Strahan v. Coxe,* 127 F. 3d 155, 171 (1ˢᵗ Cir. 1997); *Strahan v.*

*Linnon,* 967 F. Supp. 581(D. Mass. 1997).

In *Strahan v. Coxe* at 171 the First Circuit ruled that —

> "Although it is generally true in the preliminary injunction context that the district
> court is required to weigh and balance the relative harms to the non-movant if the
> injunction is granted and to the movant if it is not, see Romero-Barcelo, 456 U.S.
> at 312, 102 S. Ct. at 1803, in the context of ESA litigation, that balancing has
> been answered by Congress' determination that the "balance of hardships and the
> public interest tips heavily in favor of protected species." National Wildlife Fed'n,
> 23 F. 3d at 1510.  The defendants have not cited any authority to the contrary
> and, accordingly, we follow these precedents in deferring to Congress'
> pronouncements regarding the weight to be given the endangered species under
> the ESA and find no error in the district court's order in this respect."

In *Strahan v. Coxe,* 939 F. Supp. 963 (D. Mass. 1996), the Court ruled that —

> "The term 'take' is to be construed liberally . . . . It should be defined in the
> broadest possible manner to include every conceivable way in which a person can
> 'take' or attempt to 'take' any fish or wildlife." (internal quotations and citations
> omitted). *Id.* at 983.

> "On the other hand, because sufficient evidence has been provided to demonstrate
> that endangered whales have been and will continue to be at great risk of
> becoming entangled in 1996, I can no longer wait until the appropriate federal
> agencies decide whether to grant the Defendants any take permit before initiating
> a process needed to resolve the complicated factual questions surrounding the
> protection of endangered whales.  Because I "have no expert knowledge on the
> subject of endangered species", see TVA v. Hill, 437 U.S. at 194, 98 S. Ct. at
> 2301-02, it is appropriate to allow those interested parties with such expertise to
> develop the measures designed to protect endangered whales in the first instance."
> *Id.* at 991 - 992.

There is no question that the Defendants ship operations have killed listed species of

whales in the immediate past and that its killing of listed species of whales in the immediate

future is foreseeable and expected. The Court has the jurisdiction, duty, and abundant precedent

to grant the relief requested in Strahan's Preliminary Injunction Motion.

For the above reasons, Strahan asks the Court to grant the relief requested in his

Preliminary Injunction Motion.

BY:

Richard Max Strahan, Plaintiff
928 Dorchester Avenue, 35
Boston MA 02125
617.233.3854

*Pro Se and Proud!*

CERTIFICATION OF CONSULTATION PURSUANT TO LOCAL RULE 7

I hereby certify that I consulted with the Defendants' attorneys on the issues raised in the
above motion prior to its filing with the Court.

Richard Strahan, Plaintiff

CERTIFICATION OF SERVICE

I hereby certify that a copy of this motion has been served on the U. S. Attorney's office
IN HAND on 31 May 2005.

Richard Strahan, Plaintiff

# Large Whale Ship Strike Database

Aleria S. Jensen and Gregory K. Silber
Office of Protected Resources
National Marine Fisheries Service
Silver Spring, Maryland

Contributors: John Calambokidis, Cathy Campbell, Joe Cordaro, Ray Deiter, Margaret Akamine, Connie Ewald, Dave Flannagan, John Ford, Pat Gerrior, Joseph Green, Frances Gulland, Diana Gutierrez, Michael Henshaw, John E. Heyning, T.E. Lawlor, T.D. Lewis, Jenny Litz, William McClellan, Richard Merrick, Brent Norberg, Daniel K. Odell, D. Jeffrey Passer, Nancy Read, Lloyd Richards, Teri Rowles, Ray Sautter, and Charles D. Woodhouse

U.S. Department of Commerce
National Oceanic and Atmospheric Administration
National Marine Fisheries Service

NOAA Technical Memorandum NMFS-OPR-
January 2004

Figure 1.  The occurrence of ship strikes in eleven whale species.



Figure 2.  The geographic distribution of ship strikes to large whales world-wide.



8

Figure 3. Distribution of vessel strikes to large whales in North America.



Figure 4. Result of ship strike to large whales.



Figure 5.  Types of vessel involved in collisions with large whales (where vessel type is reported).



**Note:** The high occurrence of Navy reports may reflect military and government reporting practice rather than an actual higher frequency of collisions relative to other ship types. Reporting struck or dead whales to NOAA Fisheries is now a part of standard operating practices for Navy and USCG.

Figure 6.  The frequency of occurrence of ship speed in ship strike incidents in which ship speed was known.



10