UNITED STATES DICTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RICHARD MAX STRAHAN | ) | |
| | ) | |
| *Plaintiff* | ) | Civil Action No. |
| | ) | |
| v. | ) | 05 – 10275 - NMG |
| | ) | |
| DONALD RUMSFELD, *et al.* | ) | 18 November 2005 |
| | ) | |
| *Defendants* | ) | |

PLAINTIFF'S OUTLINE OF HIS ORAL ARGUMENT IN SUPPORT OF HIS
MOTION FOR A PRLEIMINARY INJUNCTIONN AND OPPOSITION OF THE
DEFENDANTS RULE 12 MOTION TO DISMISS

1. **Navy Ships. Caused the Last three known Northern Right Whale Killings
   from Ship Strikes.**

On 17 November of 2004 the Navy ship *Iwo Jima* struck and killed a pregnant Northern
Right Whale off the coast of Virginia.. The day of that strike a nearby recreational
fisherman reported a bleeding black whale that was alive, but missing a portion of its
fluke. The Navy waited a week to report the strike. Five days after the date the *Iwo Jima*
reported that it struck a whale, a pregnant Northern Right Whale with half her tail cut off
and severe head wounds was found dead on a beach at Ocean Sands, N.C. She was
identified as #1909 in the New England Aquarium's right whale catalog, born in 1989 and
most recently sighted off the southeastern U.S. in 2003. In December 2004 a dead
Northern Right Whale was sighted in Nantucket sound. In June another Northern Right
Whale beached carcass was discovery on the beach at Chatham MA.

2. **Navy Ships Routinely Strike Whales *Along* the *Atlantic* Coastline**.

The National Marine Fisheries Service published its *Large Whale Database* in January
2004 that cited the U. S. Navy as the #1 source of know ship strikes on large whales. See
attachment #1.

3. **NMFS that its has published a formal notice in the Federal Register of its
   intent to regulate all ship traffic off the Atlantic coastline to stop the killing
   Northern Right Whales**.

Because the killing of a single Northern Right Whale jeopardizes its species survival and
because random ship strikes is such a problem, NMFS is proceeding to regulate ship
traffic to stop strikes on Right Whales. See Attachment #2 1 January 2004 Federal

Register 69 FR 30857-864 NMFS' Advanced Notice of Proposed Rule Making to
Regulate Ship Traffic to Protect Northern Right Whales.

4. **All ESA listed species of endangered large whales are routinely killed and
injured currently from ship strikes.**

Humpback Whales, Fin Whales, Blue Whales and Sei Whales are also listed as
endangered species. These endangered whales are killed far more frequently than Right
Whales from ship strikes.

5. **The Coast Guard's Vessel and Aircraft Operations were Reviewed by NMFS
Pursuant to Formal ESA Section 7 Consultation in 1994 – 1998 as a Result of
a Near Identical Killing of a Right Whale in the Same Geographic Area.**

In July of 1994 the USCG *Cutter Chase* struck a baby Northern Right Whale also at the
mouth of Chesapeake Bay in almost the same location as the *U. S. S. Iwo Jima* did in
November of 2004. Coerce by court orders the USCG entered into formal ESA Section 7
consultation with NMFS and completed a series of consultations on the adverse impact of
their ship and aircraft operations on the endangered species of listed whales. See *Strahan
v. Linnon,* 967 F. Supp. 581 (D. Mass. 1997). It is inconceivable that the Navy would be
allowed to avoid formal Section 7 consultation. The NMFS issued its last Section 7
Biological Opinion on the USCG ship and aircraft operations in 1998. See Attachment
#3.

6. **Strahan was Determined to have Standing by the Court in an Earlier Civil
Action to have Standing to Bring Civil Action to Enforce Wildlife Laws that
Protect Whales.**

In Linnon Strahan was depose by the defendants and the Court made an informed finding
of fact that Strahan had standing to bring suit to protect endangered whales under the
ESA. See *Strahan v. Linnon,* 967 F. Supp. 581 (D. Mass. 1997). During the *Linnon*
proceedings Strahan was deposed by the Defendants and the DOJ specifically to
challenge his standing. The *Linnon* court made a ruling that Strahan had standing to bring
suit under the ESA to protect endangered whales. The doctrine of *stare decisis* demands
that the Court respect and follow the prior court's decision as established precedent. In
*Defenders of Wildlife v. U.S. Environmental Protection Agency,* 420 F.3d 946 (9th Cir.
2005) ("Petitioners who "allege [1] personal injury [2] fairly traceable to the defendant's
allegedly unlawful conduct and [3] likely to be redressed by the requested relief"
establish Article III standing. *Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 82
L.Ed.2d 556 (1984)"). Strahan has standing.

7. The Defendants are Evading Formal ESA Section 7 Consultation Over Its Ship
Operations After NMFS Requested that They Enter Into It.

The Section 7 of the ESA imposes the mandatory and non-discretionary duty on the Navy
to enter into FORMAL Section 7 consultation with NMFS after it strikes with one of its

ships a listed member of a listed endangered species. The Defendants have simply refuse
to do so and they have no defense.

8.    **Strahan Should be Allowed to Conduct Discovery for the Narrow Purpose of
Establishing the Court's Jurisdiction and His Standing.**

If the Court should allow Strahan to conduct discovery on the Defendants in order to
show that the Court has jurisdiction and he has standing if it has any doubts on either of
these two points. The Defendants have been telling the Court falsehoods and making
untrue statements to it. Strahan has the right to produce the facts to establish the Court's
jurisdiction over his claims and his standing if it is in doubt.

8.    **The Court Should Hold an Evidentiary Hearing on Strahan's Motion for a
Preliminary Injunction.**

The Defendants are in possession of all relevant facts necessary for Strahan to prove his
claims. They deliberately hide these facts from the Public to deceive and evade the
enforcement of the ESA. An eveidentiary hearing would allow Strahan to produce the
facts and experts to provide the Court the factual and expert basis in order to grant him
his request for a preliminary injunction against the Defendants.

10.    **Strahan's 1996 Sixty Day Notice to the Navy is Active to the Current Date
and Adequately Services the Presentment Requirement of Section 1540(g) of
the ESA to Commence the Instant Action.**

No court has ever ruled that any ESA sixty day notice that has been served on a
defendant  has become decrepit or is no longer valid. The Defendants cite no such case
law as proof. Strahan's 1996 to the Defendants remains active and valid to the current
day. The instant law suit is proof of this. Strahan bringing suit against the Navy for its
policy and practice of operating hundreds of ships that routinely strike and unlawfully
take listed species of whales. The Navy's ships killed endangered whales in 1996 and
they have continued to do so into the present day. The Navy is in continuing violation of
both the Section 9 violations of the ESA as well as its Section mandates. It will remain in
said violation for the next twenty years UNTIL it cures them and a court rules that they
are cured.

A sixty day notice under the ESA does not have to refer to any specific incident of
unlawful taking or failure to take a specific administrative action. A warning of generic
failure of duty or prohibition concerning specific listed endangered species is sufficient.
See ***Water Keeper Alliance v. U.S. Dept. of Defense*** ,C.A.1 271 F.3d 21 (1st Cir. 2001) –

> ("The district court held that Water Keeper could not bring an ESA claim
> against the FWS for alleged deficiencies in the July 2000 biological
> opinion, without specifically referencing that opinion in its Notice. *Water
> Keeper II* at 173-77. However, the court did not consider the adequacy of
> the notice for purposes of the ESA claim against the Navy. The May 2000
> Notice, sent before the Navy and the FWS entered formal consultations for

the interim period, admittedly does not notify the Navy that Water Keeper disputes its July 2000 determination to bypass a biological assessment in favor of a consultation package. But the letter does take issue with the fact that the Navy has been conducting military activities on Vieques for some years without the benefit of a biological assessment incorporating new scientific evidence. [FN6] To say that the Navy was not on notice that Water Keeper would object to the failure to prepare a biological assessment for its interim activities, when the Notice makes it clear that Water Keeper intended to challenge an ongoing delinquency in the preparation of a biological assessment, would be setting the bar for adequacy of notice too high. We therefore find that notice was sufficient for purposes of the ESA challenge against the Navy.") *Id.*

## 11. **The Court has Jurisdiction to Consider Strahan's ESA Section 7 Claims Pursuant to the Jurisdiction Given It Under the Administrative Procedures Act.**

In *Sierra Club v. Glickman,* 156 F.3d 606 (5th Cir. 1998) the Fifth Circuit Court of Appeals ruled that no final agency action was necessary to use the APA to review an agency's failures of its mandatory duties imposed on it by Section 7 of the ESA. It ruled that review of agency action was not confined to a "final action" and was possible under the APA for a simple failure to comply with mandatory and non-discretionary duty under Section 7 of the ESA. See also *Bennett v. Spear,* 520 U.S. 154, 117 S. Ct. 1154 (1997)

## 12. **Court should Grant Strahan's Request for a Preliminary Injunction.**

There is no question that Navy ships have repeatedly struck members of listed species of Endangered Whales. See *Washington Toxics Coalition v. Environmental Protection Agency*, 413 F.3d 1024, 1030-1031 (9th Cir. 2005) ("In subsequent orders, the district court granted WTC's motion for further, interim relief, holding such injunctive relief necessary to fulfill what we have termed the "institutionalized caution mandate[ ]" of the ESA. *See Sierra Club v. Marsh,* 816 F.2d 1376, 1389 (9th Cir.1987). The district court relied on established law authorizing agency actions to continue during the section 7(a)(2) consultation process only if the actions are non-jeopardizing to the protected species and will not result in a substantive violation of the ESA. *See id.; Thomas v. Peterson,* 753 F.2d 754, 764-65 (9th Cir.1985).") *Id.*

Strahan has only to show a reasonable chance of prevailing to satisfy the requirements of rthe Court issuing him his requested preliminary injunction. See *National Wildlife Federation v. National Marine Fisheries Service*, 422 F.3d 782 (9th Cir. 2005) --

"To establish a substantial likelihood of success on the merits sufficient to pass appellate review of a district court's grant of a preliminary injunction,

the plaintiffs were only obligated to show "a fair chance of success." *Republic of the Philippines v. Marcos,* 862 F.2d 1355, 1362 (9th Cir.1988) (en banc)."

For the above reasons Strahan asks the Court to deny the Defendants Rule 12 motion to dismiss his claims and to GRANT his motion for a preliminary injunction. Alternatively, he asks the Court to allow him to amend his complaint before entering any final judgment dismissing his claims against the Defendants.

Richard max Strahan, PLAINTIFF

I certify a copy of this outline has been served on the Defendants IN HAND this day.

ATTACH I

# Large Whale Ship Strike Database

Aleria S. Jensen and Gregory K. Silber
Office of Protected Resources
National Marine Fisheries Service
Silver Spring, Maryland

Contributors: John Calambokidis, Cathy Campbell, Joe Cordaro, Ray Deiter, Margaret Akamine, Connie Ewald, Dave Flannagan, John Ford, Pat Gerrior, Joseph Green, Frances Gulland, Diana Gutierrez, Michael Henshaw, John E. Heyning, T.E. Lawlor, T.D. Lewis, Jenny Litz, William McClellan, Richard Merrick, Brent Norberg, Daniel K. Odell, D. Jeffrey Passer, Nancy Read, Lloyd Richards, Teri Rowles, Ray Sautter, and Charles D. Woodhouse

U.S. Department of Commerce
National Oceanic and Atmospheric Administration
National Marine Fisheries Service

NOAA Technical Memorandum NMFS-OPR-
January 2004

**Acknowledgments**

We recognize the work of those in the field, notably members of the marine mammal stranding network, some of whom are listed on the first page. Much information on ship strikes to large whales would not be available were it not for the dedication and expertise of those who assess the condition of stranded and floating dead animals and maintain these data. Our appreciation also to the efforts of the many NOAA Fisheries staff who searched out ship strike records in response to a request for data. David Laist and colleagues' Marine Mammal Science paper on collisions between whales and ships was an invaluable source for ship strike records and provided a significant portion of reports in this database, as was the work by Peter Best and others on the same subject. Finally, the authors recognize those conscientious mariners who willingly report strike occurrences and communicate the details of such incidents to marine mammal protection agencies and organizations. Donna Wieting encouraged us to undertake this work and helped provide the time for us to complete it.

**Literature citation should read as follows:**

Jensen, A.S. and G.K. Silber. 2003. Large Whale Ship Strike Database. U.S. Department of Commerce, NOAA Technical Memorandum. NMFS-OPR- , 37 pp.

**Additional copies may be obtained from:**

National Marine Fisheries Service
Office of Protected Resources
1315 East-West Highway, 13th Floor
Silver Spring, MD 20910
301-713-2322

**This document can also be downloaded from NMFS website:**
http://www.nmfs.noaa.gov/pr/overview/publicat.html

## Introduction

Some human-related threats to endangered large whale species are diminishing, and a number of large whale populations are increasing in abundance. However, injuries and deaths resulting from ship collisions with whales remain a significant threat. In North Atlantic right whales, for example, ship strikes are a primary culprit in the slowed recovery of a highly depleted population.

Several papers provide accounts of mortality in large whales due to ship strikes (Laist et al., 2001; Best et al., 2001; Knowlton and Kraus, 2001). These papers review ship strike records through 2000, 1997 and 1999, respectively. We have built on these accounts by assembling a data base of all known ship strikes worldwide through 2002; a number of our records do not appear in previous accounts. Likely, many ship strikes go undetected or unreported as they may occur in remote areas or struck whales may drift out to sea. Thus, the actual number of strikes is undoubtedly much greater than reported here. Nonetheless, the information we provide is, to our knowledge, the most comprehensive set of data to date on this subject. In the geographic scope and in the range of species effected, the data base illustrates the extent of the threat to large whale species.

The intention of this report is to make accessible the known information on ship strikes to large whales world-wide. We have not attempted to provide an extensive analysis of such records herein, as a thorough discussion of a number of these records can be found in Laist et al. (2001). Rather, we have synthesized ship strike reports to large whales into a comprehensive database to

centralize the knowledge base of such incidents. These records indicate that collisions between whales and ships are a world-wide phenomenon which warrants attention.

## Materials and Methods

This database is based on a public request for information that NOAA Fisheries received for large whale ship strike records from 1975 to present (2002). Agency staff from NOAA Fisheries' Northeast, Southeast, Northwest, Southwest, Alaska, and Hawaii Fisheries Science Centers and Regional Offices contributed records to this report. In addition, NOAA Fisheries Office of Law Enforcement regional offices provided records of ship strike based on agency investigations (pending cases excluded). Many agency staff worked to the best of their abilities to fulfill this request, but it is possible that some records were overlooked and thus are not included.

In compiling this database, records of ship strikes were drawn from ship reports, marine mammal stranding reports, and NOAA Office of Law Enforcement reports. Following the initial set of data received, additional ship strike records were sought for the purposes of this synthesis through personal communications and a review of the literature on this issue (in particular, Laist et al., 2001; Best et al., 2001). Our records include information through October 2002.

Direct reports from ships, crew and captains are the most reliable source of information on an actual ship strike incident. In these cases, wherein the ship's crew was aware of

1

the strike, it is often possible to obtain information on ship speed, damage to a ship, and relative degree of severity of the strike to the animal. Ship strike information can also be determined from stranded or floating dead whales in which definitive evidence of a massive internal or external trauma is documented (i.e., lacerations from propellers, fractures, hemorrhaging). However, these data are not always definitive as to whether the strike occurred pre- or post-mortem. In such cases, there generally is no information on how, when, or where the strike actually occurred. A dead stranded whale may drift considerable distance from the site of the actual impact. In the absence of a confirmed location for a ship strike incident, we have listed the site of stranding or site of discovery of the floating animal as the collision location in our database.

Another type of record is the occurrence of a ship entering port with a whale carcass draped across its bow. Generally, in these instances the ship's crew was unaware of the strike. Most often this occurs with large container, tanker and cruise ships, and a collision is only determined after the event when the whale is noticed pinned to a ship's bow by a pilot boarding the vessel or lookouts posted for harbor entry. In 42 of the known or probable cases of ship strike in our database, evidence of a collision was only noticed when a whale was brought into harbor on the bow of a large vessel. In certain rare instances, time and location of impact can be estimated by back-calculating to correlate with a previously unexplained decrease in vessel speed.

Given that crew of large vessels often do not detect the impact of striking a whale, animals may be hit and passed over without observation. Likewise, operators may be aware of a strike but choose not to report it. Therefore, as noted above, it is likely that far

more collisions actually have occurred than the number reported here.

For the purposes of this report, evidence of injury or mortality is defined as blood noted in water; animal seen with cuts, propeller gashes or severed tailstock; animal observed sinking after strike indicating death; fractured skull, jaw, vertebrae; hemorrhaging, massive bruising or other injuries noted during necropsy of animal.

## Results

The data base contains a total of 292 records of confirmed or possible ship strikes to large whales (Table 1). Where available, we have noted ancillary information such as vessel type, extent of injury, and vessel speed at time of impact.

### *Ship Strikes by Species*

Eleven species were confirmed victims of ship strikes: blue, Bryde's, finback, gray, humpback, killer, minke, North Atlantic right, sei, southern right, and sperm whales (Figure 1). Finback whales are the most often reported species hit (75 records of strike), followed by humpback (44 records), North Atlantic right (38 records), gray (24 records), minke (19 records), southern right (15 records), and sperm whales (17 records). Far fewer reports exist of strikes to blue (8 records), Bryde's (3 records), sei (3 records) and killer whales (1 record). Several collision incidents were identified as general balaenopterid (3 records of strike), while a large proportion of reported strikes were not identified to species (42 unknown records). We note that coastal species (e.g., right and humpback whales) may be over represented in our data base, due to a greater likelihood of near-shore detection of a ship struck carcass than individuals that may have died

2

at great distances from shore.

### *Geographic Distribution of Strikes*

Ship strikes to large whales occur world-wide. In our records (and those compiled by others), large whale ship strikes were recorded in waters off Antarctica, Australia, Brazil, Canada, the Canary Islands, France, Japan, Mexico, New Zealand, Panama, Peru, Puerto Rico, and South Africa; in the Caribbean, Mediterranean, and Yellow Seas; and in the Indian and South Pacific Oceans. Our records indicate that ship strikes are most common in North America (Figure 2), but this is almost certainly biased due to sources of data from North American stranding records and enforcement reports. This finding may also be related to the volume of ship traffic along North American coasts. Furthermore, our (the authors) northern hemisphere location increases the likelihood that we learn of reports from North America more readily than elsewhere.

Collision incidents in waters off the United States are recorded from almost every coastal state: Alaska, California, Delaware, Florida, Georgia, Hawaii, Maine, Maryland, Massachusetts, New Jersey, New York, North Carolina, Oregon, Rhode Island, South Carolina, Texas, Virginia, and Washington. Collisions also occurred in three National Marine Sanctuaries (NMS): Stellwagen Bank NMS (humpback, fin, and right whales), Channel Islands NMS (gray and several unidentified whales), and the Hawaiian Islands Humpback Whale NMS (humpback whales).

Records indicate that collisions between vessels and whales in U.S. waters are most common along the east coast, followed by the west coast and Alaska/Hawaii (Figure 3). Collisions were least common in the Gulf of Mexico.

### *Severity of Strike*

Of the total 292 large whale ship strike reports, 48 (16.4%) resulted in injury to the animal and 198 (68.0%) were fatal. Thus, a total of 246 (84.3%) records indicate that whales that were hit or bear evidence of ship strike were in fact injured or killed by the interaction (Figure 4). In most cases the fate of injured whales is not known. Additionally, in 39 collision reports (13.3%), the impact to the whale was unknown, while in 7 reports (2.4%) there appeared to be no sign of injury.

It should be noted that the high injury and mortality figures for all whales in the database include numerous records of stranded or floating animals found dead. Injuries on a whale's dorsal side indicate that the animal was alive when hit, as dead whales generally float belly-up and are thus more likely to be injured ventrally if hit post-mortem. Although strong evidence indicates ship strike in the records included in this database (i.e., propeller marks, bruises, fractures, hemorrhaging, severed flukes), fatalities due to ship strike cannot always be confirmed because it is difficult or impossible to determine in some of these cases whether the strike occurred to the animal pre- or post-mortem. In addition, because many of our records come from dead stranded whales (as opposed to reports from mariners involved in or observing the striking), the database is weighted toward ship strikes resulting in death.

### *Vessel Type*

Collisions between ships and whales are associated with a wide variety of vessel types. From our database, 134 of 292 cases of ship strike include information on vessel type, while in 158 cases the type of ship was

3

unknown. Of the 134 cases of known vessel type, there are 23 reported incidents (17.1%) of Navy vessels hitting whales, 20 reports (14.9%) of ship strike for container/cargo ships/freighters, 19 (14.2%) reports of ship strike for whale-watching vessels, and 17 reports (12.7%) for cruise ships/liners (Figure 5). Sixteen reports of ship strike (11.9%) are attributed to ferries. Nine cases of ship strike (6.7%) are reported for Coast Guard vessels and eight cases (6.0%) for tankers. Recreational vessels and steamships were each responsible for seven collisions (5.2%) in the database, while fishing vessels were responsible for four records (3.0%) of strike. One collision (0.75 %) was reported from each of the following: dredge boat, research vessel, pilot boat, and whaling catcher boat.

Although these data provide valuable information regarding the wide range of vessels involved in collisions, care should be taken in interpreting these numbers. As noted earlier, captains of large ships, such as container ships, tankers, and cruise ships may not be aware that a collision with a whale has occurred and thus do not report the incident. It is also likely that captains of ships of all sizes who are under no obligation to report, in fact, do not, out of apathy or fear of enforcement consequences.

It should be carefully noted that the relatively high incidence of Navy and Coast Guard collision reports may be largely a factor of standardized military and government reporting practice rather than an actual higher frequency of collisions relative to other ship types. These two federal agencies are actively involved in large whale protection programs and reporting struck or dead whales to the National Marine Fisheries Service is now a part of standard operating practices.

## Ship Speed

Vessel speed at the time of strike was reported for 58 (19.8%) of the 292 cases in our database (Figure 6). The range of speeds at which vessels were operating when a whale was hit was 2–51 knots; and the mean speed was 18.1 knots. The mean vessel speed which resulted in injury or mortality to the whale was 18.6 knots. Of the 58 cases, 19 (32.8%) resulted in injury to the whale and 20 (34.5%) resulted in mortality. Thus, a total of 39 incidents of ship strike (67.2%) with speed associated are known to have resulted in injury or mortality to the animal. When all 58 reports are grouped by speed, most vessels were traveling in the ranges of 13–15 knots, followed by speed ranges of 16–18 knots and 22-24 knots.

## Vessel Damage and Mariner Safety

Thirteen records indicate damage to the vessel (as reported by the vessel), ranging from minor to extreme, as a result of impact with a whale. All of the incidents of vessel damage for which speeds were recorded were from collisions at an operating speed equal to or greater than 10 knots.

Many of these ships report cracked hulls or damaged propellers, propeller shafts and rudders. In one case, an 8 m recreational Bayliner traveling at 12 knots cracked its hull when it hit a humpback whale outside Juneau, Alaska. A 126 m Navy vessel sustained a 1.6 m tear in the leading edge of a propeller blade when it struck an undetermined whale species off southern California. By far the most extreme example was that of a 24 m high-speed Navy vessel, which hit an undetermined whale species at a speed over 40 knots off Key West, Florida, and reported severely damaged port and starboard aft strut actuators, broken steering arms, a warped

4

hull, and ruptured seawater piping which
flooded the gas turbine (pers. comm. T.
Tucker in Laist *et al.* 2001).

In addition to vessel damage, ship strikes to
large whales can also pose a hazard to human
safety. In several cases, particularly with
small vessels and fast-moving vessels (e.g.,
ferries), passengers have been knocked off
their feet or even thrown from the boat upon
impact with a whale. Hazards can be even
more severe; Andre *et al.* (1997) in Laist *et
al.* (2001) reports a case in the Canary Islands
in which a high-speed ferry collided with a
sperm whale at 45 knots, killing it and
reportedly killing one passenger as well.

**Discussion**

Many ship strike fatalities almost certainly go
undetected, so our database provides a
minimum count of such occurrences. In fact,
our records may represent only a fraction of
the actual number of strikes. Nonetheless,
they illustrate the scope and magnitude of the
threat of ship strikes to endangered large
whale species.

Ship strikes affect at least ten large whale
species. Given the low abundance of North
Atlantic right whales relative to other species,
the frequency of occurrence of ship strikes to
right whales suggests that the threat of ship
strikes is proportionally greater to this
species.

Ship strikes occur in all oceans and off nearly
all continents. The small number of collision
records from areas outside the United States
is undoubtably due to the much reduced
likelihood that such strikes were made known
to us. The geographic distribution of our
records from North America may, in part, be
attributed to the disproportionate amount of
collision reporting among different regions,

as well as a function of high shipping traffic
volume in some locations. All vessel classes
are represented in our database, but it
appears generally that relatively large and
relatively fast moving vessels are most often
involved.

For a variety of reasons, certain vessel
classes are likely over-represented in our
data. As noted, federal vessels are more
likely to report a strike than commercial
vessels due to their standardized reporting
practice. In addition, awareness that an
animal has been struck may depend upon the
number of people on board. Federal ships
carry substantial crew, a number of whom
are generally on the bridge at any one time
(bridge crew on Navy vessels often consists
of a half dozen individuals or more). Such
crews are more likely to spot a whale and/or
register that a collision has occurred than a
container ship or tanker with only one or two
individuals at the helm. This may also be
true for whale watch vessels that have
passenger witnesses on board, and thus are
more apt to report strikes than those vessels
for which a collision may not be witnessed
by parties other than captain and crew.

Numbers of ship strike reports in our
database that appear high for Navy and
Coast Guard vessels may also be factor of
size and vessel configuration. A ship must
register that a whale has been struck in order
to report the incident. Most federal ships are
smaller than those used for commerce and
thus register impact when large ships may
not (i.e., a 10,000 ton Naval ship has a
greater likelihood of recognizing that a
collision has occurred than does a 40,000
ton container ship). Smaller vessels are also
more likely to notice collisions by nature of
the location of a forward bridge. The
bridges of tankers and container ships are
generally located hundreds of feet aft and are
high above the water; this can result in a line

5

of sight well beyond the bow that obscures the direct view in the immediate path of the vessel.

Finally, reporting may also be a factor of geography. Navy operations, for example, are often conducted along continental shelf areas, in the same regions where large whale species are likely to aggregate in pursuit, for example, of prey concentrated there. Thus, the frequency of these reports may be more a factor of geographic overlap than vessel class or mariner behavior. The same is likely true for whale watching vessels which are generally the only vessel class in the vicinity of whales expressly because the whales are there.

Figures reported here for death and injury to whales as a result of ship strike may not accurately reflect the true results of impact. Death as a result of a strike was much more common than injury in our database, but this could be an artifact of most records originating with dead/stranded whales. Likewise, records may not indicate the final condition or status of an injured whale. As an example, if an animal was seen bleeding after impact, dove and was not re-sighted, it was classified as an 'injury' in our database. The whale, in fact, may have died subsequently from the injury, but a lack of information in such cases prevents a final assessment of collision impact. In any case, death or injury, such impacts are capable of delivering significant trauma to the animal.

The factors that contribute to ship strikes of whales are not clear, nor is it understood why some species appear more vulnerable than others. Nonetheless, the number of known ship strikes indicate that deaths and injuries from ships and shipping activities remain a threat to endangered large whale species, right whales in particular. We believe the compilation and presentation of these data

will help in defining measures to reduce the incidence of such occurrences.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In an effort to use this database as an effective tool in its protection and stewardship of marine mammals, NOAA Fisheries intends to continue adding to the existing information contained in this report as additional ship strike incidents occur. If you have data to contribute relating to a large whale ship collision, please contact:

Large Whale Conservation and Recovery Program *or*
Marine Mammal Health and Stranding Program
Office of Protected Resources
National Marine Fisheries Service
1315 East-West Highway
Silver Spring, MD 20910
301-713-2322

## Literature Cited

Best, P.B., J.L. Bannister, R.L. Brownell Jr. and G.P. Donovan (Eds). 2001. Report of the workshop on the comprehensive assessment of right whales: a worldwide comparison. J. Cetacean Res. Manage. (Special Issue) 2:1-60.

Knowlton, A.R. and S.D. Kraus. 2001. Mortality and serious injury of northern right whales (*Eubalaena glacialis*) in the western North Atlantic Ocean. J. Cetacean Res. Manage. (Special Issue) 2:193-208.

Laist, D.W., A.R. Knowlton, J.G. Mead, A.S. Collet and M. Podesta. 2001. Collisions between ships and whales. Marine Mammal Science, 17(1):35-75.

Figure 1.  The occurrence of ship strikes in eleven whale species.



Figure 2.  The geographic distribution of ship strikes to large whales world-wide.



Figure 1.  The occurrence of ship strikes in eleven whale species.



Figure 2.  The geographic distribution of ship strikes to large whales world-wide.



Figure 3. Distribution of vessel strikes to large whales in North America.



Figure 4. Result of ship strike to large whales.



9

Figure 5. Types of vessel involved in collisions with large whales (where vessel type is reported).



**Note:** The high occurrence of Navy reports may reflect military and government reporting practice rather than an actual higher frequency of collisions relative to other ship types. Reporting struck or dead whales to NOAA Fisheries is now a part of standard operating practices for Navy and USCG.

Figure 6. The frequency of occurrence of ship speed in ship strike incidents in which ship speed was known.



10

## List of Subjects in 47 CFR Part 73

Digital television broadcasting, Television.

For the reasons discussed in the preamble, the Federal Communications Commission proposes to amend 47 CFR part 73 as follows:

## PART 73—RADIO BROADCAST SERVICES

1. The authority citation for part 73 continues to read as follows:

**Authority:** 47 U.S.C. 154, 303, 334 and 336.

### § 73.622  [Amended]

2. Section 73.622(b), the Table of Digital Television Allotments under Alaska is amended by removing DTV channels 18, *24 and 30 and adding DTV channels *8, 10 and 12 at Anchorage.

Federal Communications Commission.

**Barbara A. Kreisman,**

*Chief, Video Division, Media Bureau.*

[FR Doc. 04–12281 Filed 5–28–04; 8:45 am]

**BILLING CODE 6712–01–P**

## FEDERAL COMMUNICATIONS COMMISSION

### 47 CFR Part 73

[DA 04–1346, MB Docket No. 04–187, RM–10967]

## Digital Television Broadcast Service; Greenwood, MS

**AGENCY:** Federal Communications Commission.

**ACTION:** Proposed rule.

**SUMMARY:** The Commission requests comments on a petition filed by Mississippi Broadcasting Partners, licensee of station WABG–TV, Greenwood, Mississippi, proposing the substitution of DTV channel 32 for DTV channel 54 at Greenwood. DTV Channel 32 can be allotted to Greenwood at reference coordinates 33–22–23 N. and 90–32–25 W. with a power of 1000, a height above average terrain HAAT of 610 meters.

**DATES:** Comments must be filed on or before July 12, 2004, and reply comments on or before July 27, 2004.

**ADDRESSES:** The Commission permits the electronic filing of all pleadings and comments in proceeding involving petitions for rule making (except in broadcast allotment proceedings). *See Electronic Filing of Documents in Rule Making Proceedings,* GC Docket No. 97–113 (rel. April 6, 1998). Filings by paper can be sent by hand or messenger delivery, by commercial overnight

courier, or by first-class or overnight U.S. Postal Service mail. The Commission's contractor, Natek, Inc., will receive hand-delivered or messenger-delivered paper filings for the Commission's Secretary at 236 Massachusetts Avenue, NE., Suite 110, Washington, DC 20002. The filing hours at this location are 8 a.m. to 7 p.m. All hand deliveries must be held together with rubber bands or fasteners. Any envelopes must be disposed of before entering the building. Commercial overnight mail (other than U.S. Postal Service Express Mail and Priority Mail) must be sent to 9300 East Hampton Drive, Capitol Heights, MD 20743. U.S. Postal Service first-class mail, Express Mail, and Priority Mail should be addressed to 445 12th Street, SW., Washington, DC 20554. All filings must be addressed to the Commission's Secretary, Office of the Secretary, Federal Communications Commission, Washington, DC 20554. In addition to filing comments with the FCC, interested parties should serve the petitioner, or its counsel or consultant, as follows:

**FOR FURTHER INFORMATION CONTACT:** Pam Blumenthal, Media Bureau, (202) 418–1600.

**SUPPLEMENTARY INFORMATION:** This is a synopsis of the Commission's Notice of Proposed Rule Making, MB Docket No. 04–187, adopted May 13, 2004, and released May 21, 2004. The full text of this document is available for public inspection and copying during regular business hours in the FCC Reference Information Center, Portals II, 445 12th Street, SW., Room CY–A257, Washington, DC, 20554. This document may also be purchased from the Commission's duplicating contractor, Qualex International, Portals II, 445 12th Street, SW., Room CY–B402, Washington, DC, 20554, telephone 202–863–2893, facsimile 202–863–2898, or via e-mail *qualexint@aol.com.*

Provisions of the Regulatory Flexibility Act of 1980 do not apply to this proceeding.

Members of the public should note that from the time a Notice of Proposed Rule Making is issued until the matter is no longer subject to Commission consideration or court review, all *ex parte* contacts are prohibited in Commission proceedings, such as this one, which involve channel allotments. *See* 47 CFR 1.1204(b) for rules governing permissible *ex parte* contacts.

For information regarding proper filing procedures for comments, see 47 CFR 1.415 and 1.420.

## List of Subjects in 47 CFR Part 73

Digital television broadcasting, Television.

For the reasons discussed in the preamble, the Federal Communications Commission proposes to amend 47 CFR part 73 as follows:

## PART 73—RADIO BROADCAST SERVICES

1. The authority citation for part 73 continues to read as follows:

**Authority:** 47 U.S.C. 154, 303, 334 and 336.

### § 73.622  [Amended]

2. Section 73.622(b), the Table of Digital Television Allotments under Mississippi is amended by removing DTV channel 54 and DTV channel 32 at Greenwood.

Federal Communications Commission.

**Barbara A. Kreisman,**

*Chief, Video Division, Media Bureau.*

[FR Doc. 04–12280 Filed 5–28–04; 8:45 am]

**BILLING CODE 6712–01–P**

## DEPARTMENT OF COMMERCE

**National Oceanic and Atmospheric Administration**

### 50 CFR Part 224

[040506143–4143–01; I.D. 052504C]

**RIN 0648–AS36**

## Endangered Fish and Wildlife; Advance Notice of Proposed Rulemaking (ANPR) for Right Whale Ship Strike Reduction

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Advance notice of proposed rulemaking (ANPR); request for comments.

**SUMMARY:** NMFS is considering regulations to implement a strategy to reduce mortalities to North Atlantic right whales as a result of vessel collisions. The strategy addresses the lack of recovery of the endangered North Atlantic right whale by reducing the likelihood and threat of ship strike mortalities to the species. NMFS is soliciting comments on the strategy through this advance notice of proposed rulemaking.

**DATES:** Written and electronic comments must be received (see **ADDRESSES**) no later than 5 p.m. Eastern Standard Time on August 2, 2004.

**ADDRESSES:** Comments should be sent to: Chief, Marine Mammal Conservation

Division, Attn: Right Whale Ship Strike Strategy, Office of Protected Resources, NMFS, 1315 East-West Highway, Silver Spring, MD 20910. Comments may be sent via fax to (301)427–2522, Attn: Right Whale Ship Strike Strategy. Comments may also be sent via email to shipstrike.comments@noaa.gov or to the Federal eRulemaking portal: http:// www.regulations.gov (follow instructions for submitting comments).

**FOR FURTHER INFORMATION CONTACT:** Aleria Jensen, Fishery Biologist, Office of Protected Resources, NMFS, at (301) 713–2322 x169; Pat Gerrior, Fishery Biologist, Northeast Regional Office, NMFS, at (508) 495–2264; or Barb Zoodsma, Fishery Biologist, Southeast Regional Office, NMFS, at (904) 321– 2806.

**SUPPLEMENTARY INFORMATION:**

**Background**

NMFS has been working with state and other Federal agencies, concerned citizens and citizen groups, environmental organizations, and the shipping industry to address the ongoing threat of ship strikes to North Atlantic right whales as part of its responsibilities related to right whale recovery. The North Atlantic right whale was severely depleted by commercial whaling and, despite protection from commercial harvest, has not recovered. The current population is believed to number about 300 animals and is considered one of the most critically endangered large whales in the world. Recent modeling exercises suggest that if current trends continue, the population could go extinct in less than 200 years (Caswell et. al., 1999). These models indicate that the loss of even a single individual may contribute to the extinction of the species; likewise, according to the models, preventing the mortality of even one adult female a year alters the projected outcome.

Mortality due to entanglements in fishing gear and collisions with ships are the two significant human-caused threats to right whales (Knowlton and Kraus, 2001; Jensen and Silber, 2003). Collisions with ships account for more confirmed right whale mortalities than any other human-related activity. Ship strikes are responsible for over 50 percent of known human-related right whale mortalities and are believed to be one of the principal causes for the lack of recovery in this population. Right whales are located in, or are adjacent to, several major shipping corridors on the eastern U.S. and southeastern Canadian coasts.

NMFS has established a right whale ship strike reduction program. Conservation activities in this program include the use of aerial surveys to notify mariners of right whale sighting locations; the operation of Mandatory Ship Reporting systems to provide information to mariners entering right whale habitat; interagency collaboration with the U.S. Coast Guard (USCG), which issues periodic notices to mariners regarding ship strikes; the support of regional Recovery Plan Implementation Teams that provide recommendations to NFMS on recovery activities; the support of shipping industry liaisons; and consultations under section 7 of the Endangered Species Act (ESA).

**Strategy To Reduce Ship Strikes of Right Whales (Strategy)**

Despite these efforts, right whales continue to be killed as a result of collisions with vessels. NMFS has recognized that this complex problem requires additional, more pro-active measures to reduce or eliminate the threat of ship strikes to right whales. Therefore, NMFS contracted a report on recommended ship strike reduction management measures, and used this 2001 report as a baseline to develop a proposed Strategy to Reduce Ship Strikes of Right Whales (Strategy). Measures contained within the Strategy attempt to reduce the overlap between ships and whales in order to reduce the likelihood of ship strikes to the extent practicable, while minimizing the adverse impact on ship operations. The Strategy allows for regional implementation and accommodates differences in oceanography, commercial ship traffic patterns, navigational concerns, and right whale use. Implementation of the Strategy requires research, proposed and final rulemaking and international actions to be taken.

The draft Strategy consists of the following five elements: (1) The establishment of new operational measures for the shipping industry, including consideration of routing and speed restrictions; (2) the negotiation of a Right Whale Conservation Agreement with the Government of Canada; (3) the development and implementation of education and outreach programs; (4) a review of the need for ESA section 7 consultations with all Federal agencies who operate or authorize the use of vessels in waters inhabited by right whales, or whose actions directly or indirectly affect vessel traffic; and (5) the continuation of ongoing research, conservation, and education/outreach activities. Neither the draft Strategy nor

any other conservation measures identified through public comment are intended to replace any conservation and management measures currently in place. NMFS has developed a framework of proposed operational measures for the shipping industry as an element of this Strategy, based on the proposed suite of operational measures in the contracted 2001 report.

Based on information summarized above regarding mortalities attributable to ship strikes and the population size of North Atlantic right whales, NMFS proposes to implement these measures through its broad rulemaking authority pursuant to the MMPA and ESA. Under MMPA section 112(a) (16 U.S.C. 1382(a)), NMFS has authority, in consultation with other Federal agencies to the extent other agencies may be affected, to ''prescribe such regulations as are necessary and appropriate to carry out the purposes of [the MMPA].'' In addition, NMFS proposes to implement these measures as appropriate to promote conservation, implement recovery measures, and enhance enforcement under the ESA. However, NMFS has not made any final decision on these measures or alternatives and is seeking comments through this ANPR on these proposed measures as well as any alternatives.

**Regional Implementation of the Proposed Strategy**

NMFS is proposing to implement the operational measures in the Strategy within each of three broad regions: (a) The southeastern Atlantic coast of the U.S., (b) the Mid-Atlantic region, and (c) the northeastern U.S. The implementation of operational measures, and the specific times and areas (with boundaries) in which the measures would be in effect may vary within each region but all would contain specific elements to reduce the threat of ship strikes to right whales. The operational measures proposed in the Strategy would generally apply to non-sovereign vessels 65 ft (19.8 m) and greater based on information regarding confirmed ship strikes and known vessel size.

*Southeastern United States (SEUS):* The proposed measures in the SEUS focus on the area where and time when the vast majority of right whales have occurred. This area correlates to where survey effort has been concentrated, in recent years.

*Area:* The area influenced by the proposed rulemaking is bounded to the north by the latitudinal line 31° 27′N (coincides with the northernmost boundary of the mandatory ship reporting system) and to the south by

latitudinal line 29° 45′N. The eastern offshore boundary is formed by a longitudinal line at 81° 00′W. and the western boundary is formed by the shoreline. (See Figure 1).

*Time:* December 1st through March 31st

*Proposed Regulatory Measures:* First, if warranted and so indicated by the analysis in the Port Access Route Study called for under Non-regulatory Measures, designated routes would be established with the greatest possibility of reducing the risk of collisions between vessels and whales.

Second, seasonal speed restrictions would be implemented in those lanes during the time period indicated above, unless it is determined that there are no whales present in the area (the criteria for determining 'no whales present' have yet to be developed). Uniform speed restrictions will be determined through public comment and further analyses; however, proposed speed restrictions would likely be in the range of 10–14 knots. The proposed speed measure is expected to protect right whales by potentially allowing the animals time to avoid an oncoming ship. Reduced speeds may also lessen the hydrodynamic forces that cause a whale to be pushed away but then driven back toward a moving ship or propeller. Depending on the circumstances, routing measures alone may not provide sufficient risk reduction; therefore, a proposed speed measure would provide an additional degree of risk reduction.

Third, NMFS would develop an understanding with operators of vessels (e.g., large recreational vessels, tugs and barges, etc.) which primarily transit along the coast locally and between ports. The understanding would be that vessels use the designated traffic lanes or avoid transiting the area to the maximum extent practicable and, for those that do not use the lanes or avoid the area, impose a uniform speed restriction.

*Non-regulatory measures:* First, NMFS would work in partnership with the United States Coast Guard (USCG) to conduct a Port Access Route Study (PARS) for the Ports of Jacksonville, Fernandina, and Brunswick. A PARS is a USCG process whereby a study is performed to determine safe access routes for vessels proceeding to and from U.S. ports, and it would ensure that a full hearing takes place for any routing measure considered and would allow for the integration of views relating to maritime safety, and right whale protection from all entities. The intent of the PARS would be to reduce the confluence of right whales and ships

in this area and allow measures to consider navigational safety while taking into account the necessity of protecting right whales.

*Mid-Atlantic Region of the United States (MAUS):* The MAUS is a principal migratory corridor for right whales that travel between the calving/ nursery areas in the SEUS, and feeding grounds in the northeast U.S. and Canada. Two right whale calves were found dead in the mid-Atlantic region in 2001 and there is a high probability that these deaths were caused by ship strikes. A dead mature female right whale was observed floating off Virginia (subsequently stranded on the coast of North Carolina in 2004) and, although final histopathology results are still pending, preliminary analysis indicated the whale likely died as a result of a vessel collision.

Ship traffic entering ports in this area, or transiting through it, continually crosses the whales' north-south migratory corridor. Satellite tagging data, opportunistic sighting data, and historical records of right whale takes, indicate that right whales often occur within 30 nautical miles (48 kilometers) of the coast and in waters less than 25 fathoms. The following proposed measures reflect this information.

*Area and Time:* The locations and time periods included for the mid-Atlantic measures are closely tied to sighting data as well as available information on vessel traffic in and out of the following ports (See Figure 2). Times for the seasonal management areas are being proposed as "rolling" in order to best account for the whales' migratory presence around particular ports while minimizing unnecessary impact to industry. The precise start and stop dates for this region will be further refined based on comments on this ANPR, and during a series of public meetings. However, the area for proposed operational measures and rolling dates are based on the historical data regarding the occurrence of right whales in this region (possible distances from shore are in brackets) and may include the following:

(a) South and east of Block Island Sound (approximate reference points: Montauk Point and the western end of Martha's Vineyard), (20–30nm): March-April; September-October.

(b) Ports of New York/New Jersey (30nm): February-April; September-October.

(c) Delaware Bay (Ports of Philadelphia and Baltimore)(20–30nm): February-April; October-December.

(d) Entrance to the Chesapeake Bay (Ports of Hampton Roads and

Baltimore)(30nm): February-April; November-December.

(e) Ports of Morehead City and Beaufort, NC (20–25nm): December-April.

(f) Port of Wilmington, NC (20nm): December-April.

(g) Port of Georgetown, SC (20–30nm): October-April.

(h) Port of Charleston (20–25nm): October-April.

(i) Port of Savannah (25nm): November-April.

*Proposed Regulatory Measures:* NMFS, in conjunction with appropriate agencies and through public comment and further analyses, would establish uniform speed restrictions within 20–30 miles in the approaches of the above-named ports and areas. Based on information from confirmed ship strikes and known speeds of ships involved in the strikes, proposed speed restrictions may be in the range of 10–14 knots.

*Northeastern United States (NEUS):* Right whales occupy and forage in four distinct areas in the NEUS: Cape Cod Bay; the area off Race Point at the northern end of Cape Cod (Race Point); the Great South Channel; and the northern Gulf of Maine. Ship strike reduction measures are concentrated in these areas.

*Cape Cod Bay:* Right whales frequent Cape Cod Bay in winter and spring to feed. The following reflects the peak period(s) when right whales are present in this area. The area encompasses the complete Bay and it includes all routes traveled by tug, tow and ship traffic (for descriptions of PARS and speed restriction considerations, see SEUS section above.)

*Area:* The entire Cape Cod Bay including the Cape Cod Bay critical habitat and the area south of a straight line formed from the northeast corner of critical habitat, through the northwest corner of the critical habitat, and continuing to the shoreline (See Figure 3).

*Time:* January 1st - April 30th

*Proposed Regulatory Measures:* First, if warranted and indicated by a PARS, routing measures with the greatest possibility of reducing the risk of collisions between vessels and whales would be established in Cape Cod Bay. Elements to be considered in this PARS are as follows: (1) all efforts would be made to reduce the confluence between right whales and ships in the Bay; (2) routing measures would be considered in right whale critical habitat, as well as the western side of the Bay and areas outside critical habitat from Cape Cod Canal, (3) designated lanes may be established to minimize the travel distance for those ships entering and

Case 1:05-cv-10275-NMG    Document 33-3    Filed 11/18/2005    Page 4 of 8

leaving the Port of Provincetown from Cape Cod Canal or from the north, and (4) such designated lanes would need to be broad enough to allow ships to route around any whales found in the lanes.

Second, NMFS, with appropriate agencies, would establish speed restrictions (determined through public comment and further analyses) within designated ship traffic lanes into Provincetown, Massachusetts (if indicated through a PARS) to reduce the risk of collisions between vessels and whales. Such restrictions would be lifted in those rare years when it is determined that there are no whales present in the area (the criteria for determining 'no whales present' have yet to be developed).

*Non-regulatory Measures:* First, NMFS would work in partnership with the USCG to conduct a PARS for Cape Cod Bay.

Second, NMFS would also work with the U.S. Army Corps of Engineers to provide notices to mariners when they enter Cape Cod Bay from either the south (through Cape Cod Canal) or from the north, and to traffic southbound out of the canal when whales are sighted south of the NEUS area, e.g., off Block Island and Long Island. This would include notices to tug and barge traffic, which comprises the majority of traffic using the Cape Cod Canal.

Duties of the Traffic Controllers would include alerting ships' masters of right whale locations as provided by NMFS when right whales are spotted in areas where Canal traffic may transit. Such alerts to include right whale sightings in Cape Cod Bay and the Stellwagen Bank National Marine Sanctuary should be given to all east bound Canal traffic. Such alerts to include right whale sightings in Rhode Island and Block Island Sounds and off Long Island should be given to west bound Canal traffic. West bound traffic reporting into the Traffic Controllers at the east approach channel (CC Buoy) should also be given alerts for right whale sightings in the southwest quadrant of Cape Cod Bay. In addition, Traffic Controllers would provide alerts to all vessels of 65 ft (19.8 m) and greater, and provide reasonable protection for right whales and separation of vessel traffic from right whales within the Canal and within the east or west approach channels.

*Off Race Point:* Food resources in Cape Cod Bay are significantly reduced in availability by the end of April, causing right whales to leave the area in search of resources elsewhere. At this time, many of these animals travel to the Great South Channel, where they are found in large aggregations during

spring and early summer. To reach the Great South Channel, right whales commonly transit or reside in other nearby areas prior to aggregating in the Great South Channel. These include Stellwagen Bank, areas to the east of Stellwagen Bank, and also the northern end of the Provincetown Slope (the area on the ocean side of Cape Cod which runs down to the Great South Channel). The Boston shipping lanes concentrate ship traffic through this region. Therefore, right whales are potentially vulnerable to ship strikes in this area. As a result, limits on speed in this area would provide a means of reducing collision risk by allowing whales more time to react to oncoming ships. The time and duration of these proposed measures, and their geographic extent, have been tightly defined to take into account the biological data and to minimize potential burden to industry. The time period proposed reflects when whales have historically migrated from Cape Cod Bay through this area.

*Area:* The area proposed has been developed based on right whale sighting data and vessel traffic patterns. This area is a box described (See Figure 3) by latitudes and longitudes (degrees and minutes format) as follows:
42° 30′ N.   70° 30′ W.
42° 30′ N.   69° 54′ W.
42° 00′ N.   69° 54′ W.
42° 00′ N.   70° 01.8′ W.
follow Massachusetts Coast to
42° 04.8′ N.   70° 10.2′ W.
42° 12′ N.   70° 15′ W.
42° 12′ N.   70° 30′ W.
*Time:* April 1st - May 15th

*Proposed Regulatory Measures:* The proposed rule would establish a uniform speed restriction in the described zone, or as an alternative, mariners may route around this area.

*Great South Channel:* The Great South Channel is one of the most important habitats for right whales within the species' range. Right whales aggregate there during spring and early summer to feed on dense patches of prey. In some years more than one third of the remaining population of North Atlantic right whales can be found in this area at any one time, and it is likely that more than half the population feeds in or at least passes through this area during the course of the year. Some individually identified right whales observed in the Great South Channel are seen rarely or not at all in other areas such as the Bay of Fundy, emphasizing the importance of this area to the population. For much of the time in the Great South Channel, the distribution and movements of the whales coincide with those of commercial ship traffic in the region, leading to a serious risk of

collision. The proposed measure seeks to reduce the confluence of ships and whales by minimizing the area and time in which whales would be exposed to ship traffic.

*Area:* The area proposed reflects historical sighting data and recent survey data. This area is delineated by latitudes and longitudes (degrees and minutes format) as follows (See Figure 3):
41° 00′ N.   69° 03′ W.(southern corner)
42° 08.4′ N.   67° 08.4′ W. (southern intersection with Hague Line)
42° 30′ N.   67° 27′ W. (Northern intersection with Hague Line)
42° 30′ N.   69° 00′ W.
42° 00′ N.   69° 00′ W.
42° 00′ N.   69° 43.8′ W. (return to first point)

*Time:* April 1st - July 31st. The time period for the proposed measure reflects the peak period when whales are present.

*Proposed Regulatory Measures:* This area would be subject to several measures. First, an Area to be Avoided (ATBA) would be proposed to the International Maritime Organization (IMO) for adoption adjacent to, and east of, the Boston traffic separation scheme (TSS). This ATBA would be applicable to ships 300 gross tons and above. This measure would require the U.S. to propose an ATBA to, and receive endorsement by, the IMO. Second, all vessels under 300 gross tons and greater than or equal to 65 ft (19.8 m) (including fishing vessels) would be subject to uniform speed restrictions within the ATBA and the critical habitat which lies to the southwest of the TSS.

### Gulf of Maine

*Area:* The Gulf of Maine is considered all waters under U.S. jurisdiction to the north of the other management areas for Cape Cod Bay, Off Race Point, and the Great South Channel.

*Time:* Year-round

*Proposed Regulatory Measures:* All areas in the Gulf of Maine would be subject to dynamic area management (until such time that ongoing broad scale aerial surveys in the Northeast provide additional right whale distributional data to inform seasonal management or other measures). This would require that a mechanism be implemented whereby a precautionary area may be established around the whales, and ships would be directed either to divert around the whales or reduce their speed and proceed through a designated area with caution (keeping in mind navigation safety considerations). If certain concentrations (yet to be completely

specified) of right whales are sighted, then these precautionary area measures would be required for a limited period.

## All Areas

*Proposed Additional Regulatory Measures:* All areas along the Atlantic seaboard within the U.S. Exclusive Economic Zone would be subject to dynamic area management if certain concentrations (yet to be completely specified) of right whales were sighted outside of the time for, or beyond the area of, the operation of the above-described regional measures. As in the Gulf of Maine measure, this would require that a mechanism be developed whereby a precautionary area would be established for a limited period around a certain concentration of right whales, and ships would be directed either to divert around these right whales or reduce their speed and proceed through a designated area with caution (keeping in mind navigation safety considerations).

## Request for Comments

NMFS is requesting comments on the proposed measures in the Strategy and information discussed in this ANPR. In particular, NMFS is soliciting information from the public on the effectiveness of the proposed regulatory measures, or other options that need to be considered in a proposed Federal rulemaking.

## Public Involvement

NMFS invites the public to submit data, new information, and comments

identifying relevant environmental and socioeconomic issues pertinent to the Strategy and proposed regulatory measures contained therein. In addition, NMFS expects to conduct public scoping meetings during or following the comment period on the ANPR, and will continue to work with other agencies, the shipping industry, researchers, environmental groups, and the public throughout this process. The public, as well as Federal, state, and local agencies are encouraged to participate in the meetings.

NMFS intends to convene these scoping meetings at several locations along the U.S. Atlantic coast in each of the three major regions proposed for operational measures: the northeastern U.S.; the mid-Atlantic U.S.; and the southeastern United States. The dates and locations of these meetings will be announced in a future **Federal Register** Notice.

## References

Caswell, H., M. Fujiwara, and S. Brault. 1999. Declining survival probability threatens the North Atlantic right whale. Proc. Nat. Acad. Sci. 96:3308–3313.

Hamilton, P.K., and C.A Mayo. 1990. Population characteristics of right whales (*Eubalaena glacialis*) observed in Cape Cod and Massachusetts bays, 1978–1986. Rep. int. Whal. Commn Special issue 12:203–208.

Jensen, A.S., and G.K. Silber. 2003. Large whale ship strike database. U.S. Dep. Commerce, NOAA Technical Memorandum NMFS-F/OPR–25, 37 p.

Kenney, R.D., C.A. Mayo, and H.E. Winn. 2001. Migration and foraging strategies at varying spatial scales in western North Atlantic right whales: a review of hypotheses. J. Cetacean Res. Manage. (Special Issue) 2:251–260.

Kenney, R.D, H.E. Winn, and M.C. MacAulay. 1995. Cetaceans in the Great South Channel,1979–1989: right whale (*Eubalaena glacialis*). Continental Shelf Research, Vol. 15(4–5):385–414.

Knowlton, A.R., and S.D. Kraus. 2001. Mortality and serious injury of northern right whales(*Eubalaena glacialis*) in the western North Atlantic Ocean. Jour. Cetacean Res. and Manag. (Special Issue) 2:193–208.

Russell, B.A. 2001. Recommended Measures to Reduce Ship Strikes of North Atlantic Right Whales. Submitted to the National Marine Fisheries Service in partial fulfillment of NMFS contract 40EMF9000223. 31 pp. *http://www.nero.noaa.gov/whaletrp/.*

## Related Links

For February 2004 press release on right whale ship strikes, see: *http://www.nefsc.noaa.gov/press_release/advisory04.02.html.*

For information on the Mandatory Ship Reporting system, the Right Whale Sighting Advisory System, Northeast Right Whale Early Warning System, the Northeast Implementation Team, and an economic analysis of proposed ship strike management measures, see: *http:/ /www.nero.noaa.gov/whaletrp/.*
**BILLING CODE 3510–22–S**

Figure 1.    Southeast U.S. Areas for Proposed Measures



Figure 2.   Mid-Atlantic U.S. Areas for Proposed Measures



**30864**      **Federal Register**/Vol. 69, No. 105/Tuesday, June 1, 2004/Proposed Rules

Figure 3. Northeast U.S. Areas for Proposed Measures



Dated: May 25, 2004.
**Rebecca Lent,**
*Deputy Assistant Administrator for*
*Regulatory Programs, National Marine*
*Fisheries Service.*
[FR Doc. 04–12356 Filed 5–28–04; 8:45 am]
**BILLING CODE 3510–22–C**

ATTACH 3

## NATIONAL MARINE FISHERIES SERVICE
## ENDANGERED SPECIES ACT - SECTION 7 CONSULTATION

### BIOLOGICAL OPINION

**Agency:**

United States Coast Guard
(Atlantic Coast Districts)

**Activity:**

Second Reinitiation of Consultation on United States
Coast Guard Vessel and Aircraft Activities along the
Atlantic Coast

**Consultation Conducted By:**

National Marine Fisheries Service
Northeast Region

**Date Issued:**

JUN  8 1998

_Introduction:_  The National Marine Fisheries Service (NMFS) has reviewed the current status of United States Coast Guard (USCG) vessel and aircraft operations along the Atlantic Coast, excluding the Gulf of Mexico, based on a request to reinitiate formal consultation on December 11, 1997. This document represents the NMFS Biological Opinion on the effects of those activities on endangered whales and endangered and threatened sea turtles in accordance with section 7 of the Endangered Species Act of 1973, as amended, (16 U.S.C. 1531 et seq; ESA)

This Biological Opinion is based on information provided in the Final Environmental Impact Statement for the USCG Atlantic Protected Living Marine Resources Initiative (October 31, 1996), the Letter Incident Report (July 23, 1997) describing a take of a humpback whale by a USCG vessel on July 20, 1997, and an assessment of the status of USCG's implementation of the Reasonable and Prudent Alternatives and Conservation Recommendations of Biological Opinions issued September 15, 1995 and July 22, 1996 through a letter provided by Rear Admiral Larabee, Commander, USCG First District on December 11, 1997 and through phone conversations with Lt. Ray Erne, USCG First District. Review of current information on the status of endangered and threatened species that may be affected by USCG Atlantic Coast operations that has become available since the July 1996 consultation has been included in the species status section. Information on species status provided in the earlier opinions was considered in evaluating the USCG's activities for the purposes of this consultation, some of which is only incorporated by reference. Finally, this Biological Opinion has also considered any new information since the biological assessment information provided for the 1995 and 1996 Biological Opinions and the information contained in the Biological Opinions themselves.

1

A.      **Consultation History**

On September 15, 1995, NMFS issued a Biological Opinion to the USCG pursuant to section 7
(a)(2) of the ESA on vessel and aircraft activities along the Atlantic coast. A discussion of
current information on protected species throughout their range along the Atlantic Coast was
included, as well as discussion of the possible impacts from these activities.

Shortly after the 1995 Biological Opinion was issued, the USCG reported that they may have
struck another whale. Based on a tentative identification of the whale as a humpback whale
(*Megaptera noveangliae*), the USCG reinitiated consultation. While the reinitiated consultation
was in progress, NMFS became aware of an unusual number of right whale (*Eubalaena
glacialis*) mortalities in the action area. NMFS concluded this reinitiated consultation on July
22, 1996, when it issued a second Biological Opinion to the USCG which concluded that the
USCG's actions may affect, but were not likely to jeopardize the continued existence of the
humpback whale, fin whale (*Balaenoptera physalus*), and sea turtles, but was likely to jeopardize
the continued existence of the endangered northern right whale; this conclusion was based on the
status of the right whale, the potential for serious injury or mortality to the northern right whale
associated with continued USCG vessel and aircraft operations, and the possibility that the right
whale population was declining. The Biological Opinion also concluded that the USCG's vessel
and aircraft operations were not likely to destroy or adversely modify designated critical habitat.
The Biological Opinion provided the USCG with reasonable and prudent alternatives that would
avoid the likelihood of jeopardizing the continued existence of the northern right whale.

As a result of the two Biological Opinions mentioned above and efforts that had begun prior to
1995, the USCG embarked on development and implementation of an extensive Atlantic
Protected Living Marine Resources Initiative (APLMRI), which included considerable efforts by
the USCG to modify vessel and aircraft operations in order to reduce impacts to the northern
right whale, particularly in its critical habitat off the Georgia/ Florida coastline, and critical
habitats in the Great South Channel and Cape Cod Bay, Massachusetts.

On August 29, 1997, NMFS received a letter from the First District Office which provided
detailed information on the U.S. Coast Guard Cutter (CGC) *Campbell*'s incident (see the
incident description below). Over the next three months, subsequent communications between
NMFS' Northeast Region and the First District staff provided the remainder of material
necessary to prepare this opinion. On December 11, 1997, the USCG submitted a request for
formal consultation.

During the consultation, a juvenile blue whale (*Balaenoptera musculus*) was reportedly struck
and killed by a commercial vessel in March 1998. Blue whales are distributed offshore of the
areas where USCG vessels rarely operate. NMFS evaluated the March 1998 blue whale
mortality to determine if blue whales are likely to be adversely affected by the USCG's vessel
and aircraft operations along the Atlantic Coast. After considering information on the known
distribution of blue whales, the information available on the blue whale that was struck and
killed in March 1998, and the area in which USCG vessels and aircraft operate, NMFS concluded
that the USCG's vessel and aircraft operations were not likely to adversely affect blue whales.

2

On April 30, 1998, NMFS sent a letter to the USCG requesting an extension to the 135-day consultation period prescribed in section 7 of the ESA and its implementing regulations (50 CFR 402.14). That letter asked the USCG to agree to extend the consultation to May 18, 1998, when the final Biological Opinion would be delivered to the USCG.

On May 15, 1998, NMFS sent a letter to the USCG requesting a second extension to the 135-day consultation period that letter asked the USCG to agree to extend the consultation to May 27, 1998, when the final Biological Opinion would be delivered to the USCG.

**Incident Description**

On July 20, 1997, CGC Campbell was en route to Closed Area II (Appendix A) after departing from Provincetown, Massachusetts on a domestic fishery enforcement mission. The ship proceeded around the tip of Cape Cod and transited Cape Cod Bay Critical Habitat (CCBCH) and the southeastern tip of Stellwagen Bank National Marine Sanctuary. While transiting CCBCH between 0956Q and 1143Q and the National Marine Sanctuary between 1143Q and 1215Q, the bridge watch sighted several humpback whales along the ship's track line over a distance of about 15 miles. Key personnel were aware that sighting sheets and voice radio broadcasts related to whale sightings were required.

At 1101Q the Commanding Officer (CO) ordered the watch to increase vessel speed to 18 knots to fulfill an annual engineering requirement for a full power trial, thinking that the ship had cleared the CCBCH. The ship did not actually clear the CCBCH until 42 minutes later. At 1145Q, just after the ship cleared CCBCH, the ship's speed was slowed to 8 knots and the course adjusted to avoid two humpback whales sighted at 4,000 yards. The CO came to the bridge after being notified of the passing whales. The whales passed the ship at 1000 yds swimming in the opposite direction. Once the whales cleared aft of the ship, the ship returned to its original course and speed. The CO's plan was to arrive at Closed Area II in time to conduct boardings prior to sunset, conducting a required full power trial en route (hence the return to 18 knots). A voice radio broadcast was prepared on the sightings, but was not made per CO's orders. He was concerned that a broadcast would encourage other vessels to locate the whales and increase the likelihood of an interaction. Numerous whales were sighted throughout right whale critical habitat, throughout the Stellwagen Bank National Marine Sanctuary, and immediately outside of the sanctuary; these whales were identified as humpback whales.

The ship had been cruising at 18 knots since 1101Q (with the exception as noted above), and the full power trial began at 1214Q. At 1225Q, two humpback whales appeared 300 yds off the starboard bow. The ship maintained its speed of 18 knots and altered its course away from the whales that were traveling in the opposite direction.

Almost 2 hours later (1415Q), a trained marine mammal lookout observed a humpback whale close aboard the starboard bow, 5-10 feet below the surface, and immediately shouted the report into the pilot house door. At the same time various personnel reported a bang or thump emanating from the starboard side and felt the ship shudder. The time was logged and position fixed. The position was 42°09.6'N/069°12.9'W at 1415Q (see chart, Appendix A). Ship's speed was 20 knots. Two expanding search patterns were conducted concluding at 1749Q which did

not produce any evidence of the whale or injury to the whale. Although the evidence surrounding the incident only suggests that the CGC *Campbell may* have interacted with a whale, for the purposes of this Biological Opinion, NMFS will adhere to a precautionary principle by assuming a humpback whale was struck.

The USCG Cutter *Campbell* was equipped with the latest guidance and training material with respect to operations around marine mammals and both CCBCH and SBNMS were highlighted on the ship's charts. Further, after the investigation the USCG instructed that the CO be counseled about "his lack of attention to detail related to the letter and intent of the marine mammal protection program and associated enforcement guidance publications during the transit of the CGC *Campbell*. This would include the necessity to routinely comply with both the letter and intent of the program, the ramifications of not verifying the critical information such as the ship's position before initiating potentially hazardous operations, the fact that the marine mammals may show up in areas other than critical habitat area, the necessity to be aware of all environmental factors and circumstances while underway and the necessity to focus on the overarching ramifications of his decisions versus immediate goals." The USCG also recommended that a summary of this event be provided to all cutters that may operate in First District waters as a training tool to avoid the future occurrence of any similar incidents.

The section 7 regulations require reinitiation of consultation if the allowable incidental take is exceeded (50 CFR 402.16(a)), in this case if an endangered whale is struck or injured by a USCG vessel. In addition, the 1996 Biological Opinion requires the USCG to notify NMFS within 24 hours should such an incident occur. Within 24 hours of the incident, the USCG verbally notified the Assistant Regional Administrator for Protected Resources in the NMFS' Northeast Region that the CGC *Campbell* may have interacted with a whale; when NMFS was notified, the USCG had not confirmed that the CGC *Campbell* had struck a whale because they had to wait for the vessel to return to shore to conduct interviews. Subsequently, the USCG notified NMFS by letter on July 25, 1997, after appropriate investigation with the ship's crew, that the CGC *Campbell* may have struck a whale while underway on July 20, 1997. A summarized report, concluding that a humpback whale had been struck, was provided to NMFS on August 13, 1997 (within 15 days of completion of the mission), also as required by the Biological Opinion.

## B.    Description of the Action Being Considered in This Biological Opinion

This consultation considers USCG vessel and aircraft operations on the Atlantic Coast (except for the Gulf of Mexico) in support of its missions: response to marine pollution events, port safety and security issues, law enforcement issues, search and rescue missions, vessel traffic control, and maintenance of aids to navigation. The action being considered in this Biological Opinion includes a re-evaluation of USCG vessel and aircraft activities on protected species under NMFS' jurisdiction in light of the July 20, 1997, incident and the following changes in vessel and aircraft operations from what was considered in these previous opinions: (1) standard operating procedures now include operational directives which implement the reasonable and prudent alternatives and conservation recommendations of Biological Opinions and the APLMRI, (2) the USCG's proposal for a multi mission upgrade, and (3) a request to change flight altitude restrictions from what had been proposed in the USCG Biological Assessment.

4

*Vessel Activity:* The USCG Atlantic fleet consists of about 242 vessels, ranging from 21 feet to 378 feet in length. Each year the USCG fleet collectively logs over 12,000 vessel-days-at-sea. Table 4-3 in the BA summarizes the USCG's vessel activities (per vessel type) along the U.S. Atlantic Coast. The USCG has issued the following guidance for non-emergency cutter and boat operations in their Law Enforcement Bulletin:

> "To avoid a collision with a whale during the course of normal operations, Coast Guard units transiting critical habitat, migratory routes and high use areas (see 50 CFR Part 227.2 and Part 227.4) shall use extreme caution, be alert and reduce speeds as appropriate. Appropriate reduced speeds should be based on the factors identified in Rule 6 (safe speed) of the International/Inland Navigation Rules (COMDTINST M16672.2C). Additional reductions in speed should be considered when a whale is sighted or known to be in the immediate vicinity or within five nautical miles of the vessel. In these situations, vessels shall use those courses and speeds as appropriate, yet navigationally prudent, to avoid a collision with a whale, and, if necessary, reduce speed to the minimum at which the vessel can be kept on course or come to all stop."

Also, the USCG's Law Enforcement Bulletin provides written guidelines have been given for vessel operations when a whale is sighted in any location to further reduce contact with the whales. Special instructions also have been given to the Seventh District when operating USCG vessels in the southeastern right whale critical habitat during calving season and for informing all mariners of their presence and vulnerability.

The USCG's Law Enforcement Bulletin also provides written approach guidelines for non-emergency operations prevent vessels from approaching whales head-on, approaching right whales within 500 yds, or other whales within 100 yds. The USCG has asked to waive the 500-yard approach limit for northern right whales so that they can contribute to support whale conservation, as requested by NMFS, to photograph or collect other whale related data.

Of the USCG's missions, emergency operations have the greatest potential for impacting whales and turtles on the surface. Emergency missions, such as emergency search and rescue (SAR) operations that involve vessels responding to assist or to save persons and property distressed at sea, are presumed to have the least discretion in determining their operating speeds. In practice, USCG vessels respond to reports of such emergencies at "maximum safe speed." This speed is determined by weighing the response vessel's speed and sea-keeping characteristics against sea and weather conditions — wind, wave height and frequency, visibility, forecasts.

Not all SAR missions are emergency operations. In the large majority of SAR missions, the location of the distressed vessel or person is known (90 percent), and the victim is within 20 miles of the shore (95 percent). About 77 percent of SAR missions are not true emergencies and the vessel would be able to decrease speed and deviate from course to avoid interacting with listed species. Most USCG resources need not respond at "maximum safe speed." Therefore, in most cases, the vessel may reduce speed.

On the Atlantic Coast, the USCG responds to about 18,500 SAR cases each year (Battelle, 1995). There are no documented collisions of USCG vessels with whales or turtles during SAR missions.

*Aircraft Activity:* Along the Atlantic Coast, the USCG operates 17 fixed-wing aircraft and 32 helicopters. In the Biological Assessment the USCG provided for the 1996 Biological Opinion, they proposed to limit aircraft operations to 3,000 ft. over critical habitat, unless engaged in emergency operations. The USCG is now proposing to lower that limit to an altitude of 2,000 ft. over sensitive areas (which includes critical habitat), unless engaged in emergency operations or marine mammal surveys. USCG aircraft are required to avoid approaching northern right whales closer than 1,500 ft., except to conduct marine mammal surveys or to conduct emergency operations. Infrequently, the aircraft perform reconnaissance flights during oil and hazardous material spill response operations, and will fly below 2,000 feet. Most of the fixed-wing operations are within 20 miles of the shore. The helicopters are used frequently in SAR operations. Low-altitude flights and hovers are used to extract victims and to pass rescue supplies. Low-altitude operations can be dangerous and are kept to a minimum.

*Multi-mission station upgrade.* This proposal is to upgrade Atlantic Area command stations to accommodate the home porting of 47-foot motor life boats. New cutters will be replacing the existing 44-foot heavy weather rescue boats and some of the 41-foot utility boats that were considered part of operations in the initial consultation. The new 47-foot lifeboats are expected to provide enhanced search and rescue capabilities due to more efficient operational characteristics. The action also includes modifications to several existing boathouses at the waterfront level to upgrade piers, construct covered mooring facilities, dredging of mooring slips and related shore facility upgrades, with possible pier modifications and shoretie replacement at some locations. Upgrading the boathouses, moorings, and shore support facilities only where existing facilities are unable to homeport the new boats. The specific modifications required are outlined by station in Table 2 of the Environmental Assessment prepared by the USCG (July, 1997). Only a few facilities will require dredging and this is only in boat basins and mooring slips at Stations Watchapreague, Fairport, Georgetown, Brant Point, and Merrimac River. Districts 1, 5, 7, 8, and 9 are scheduled to receive these replacements or already have their prototypes. The overall mission and standard operating procedures of the multi-mission stations will not change. The net affect is more larger, faster vessels than was previously considered in NMFS Biological Opinions. This will be discussed in detail in the "Effects of Action" section. For a complete, detailed description of this proposal, see the USCG Environmental Assessment for this action.

Finally, the action being considered in this Biological Opinion includes the actions the USCG is implementing to comply with the reasonable and prudent alternatives identified in the 1996 Biological Opinion. Specifically, the USCG (a) posts lookouts during all transits within 20 nm of shore, in whale concentration and high-use areas; (b) requires its lookouts and bridge watchstanders to successfully complete a marine mammal lookout training program; (c) provides support for aerial whale surveys; (d) issues speed guidance for its vessels; (e) has issued vessel approach guidance; (f) participates in finding technological solutions to prevent ship strikes; (g) provides information on whales to commercial and recreational vessel operators; and (h) has presented a proposal developed in conjunction with other Federal agencies (primarily NOAA and the Marine Mammal Commission) to the International Maritime Organization that requests two mandatory ship-reporting systems along the east coast of the United States (see Appendix B of this Biological Opinion for a complete listing of the status of the USCG's implementation of the reasonable and prudent alternatives from the 1996 Biological Opinion).

6

*Action Area*

The Action Area for this consultation is the Atlantic Coast of the United States bounded on the north by the border between the State of Maine and News Brunswick, Canada; bounded on the south by Key West, Florida; the seaward boundary extends throughout the Exclusive Economic Zone, which is measured 200 nautical miles from the baseline. The majority of Coast Guard operations occur in coastal waters (less than 20 miles from shore), although some missions are conducted up to 200 miles offshore (USCG 1995).

**C.    Status of the Species Included in This Biological Opinion**

NMFS has determined that the action being considered in this Biological Opinion may adversely affect the following species that are provided protection under the ESA

*Endangered*
Humpback whale                          *Megaptera novaeangliae*
Northern right whale                    *Eubalaena glacialis*
Fin whale                               *Balaenoptera physalus*
Leatherback sea turtle                  *Dermochelys coriacea*
Kemp's ridley sea turtle                *Lepidochelys kempi*
Green sea turtle[1]                      *Chelonia mydas*
Hawksbill sea turtle                    *Eretmochelys imbricata*

([1] Green turtles in U.S. waters are listed as threatened except for the Florida breeding population which is listed as endangered. Due to the inability to distinguish between these populations away from the nesting beach, green turtles are considered endangered wherever they occur in U.S. waters.)

*Threatened*
Loggerhead sea turtle                   *Caretta caretta*

*Critical Habitat Designations*
Northern right whale                    *Eubalaena glacialis*

Complete species accounts, a description of critical habitat, and references can be found in the September 15, 1995 and July 22, 1996 NMFS Biological Opinions and are incorporated herein by reference. This section summarizes information contained in previous Biological Opinions and provides additional information on the three whale species that are the focus of the consultation. This section focuses on whales because the new information is the most relevant to a re-assessment of the conclusions reached in the 1995 and 1996 Biological Opinions on the USCG's Atlantic vessel and aircraft operations. Complete updates of information on sea turtles can be found in the *Status Reviews of Sea Turtles Listed Under the Endangered Species Act of 1973* (NMFS and USFWS, 1995) and the *Synopsis of the Biological Data on the Green Turtle (Chelonia mydas)* (FWS, 1997).

7

(1) *Vessel Operations*  Impacts from vessels in the action area of this consultation include federal vessel operations of the U.S. Navy (USN) and the USCG, which operate the largest fleets, the Environmental Protection Agency, and National Oceanic and Atmospheric Administration (NOAA) and the Army Corps of Engineers. NMFS has conducted formal consultations with the USCG, the USN (described below) and is currently in early phases of consultation with the other federal agencies on their vessel operations. Some of the COE vessel operations are already covered by formal consultation on the dredging portion of their activity. Through the section 7 process, where applicable, NMFS has and intends to continue to establish conservation measures for all these agency vessel operations to avoid impacts to listed species, but at the current time, they represent potential for some level of interaction.

*USCG Vessel operations.*  On September 15, 1995, NMFS issued a Biological Opinion on USCG Vessel and Aircraft Operations. On July 22, 1996, NMFS issued a second Biological Opinion on these operations because of a suspected whale strike by a USCG vessel shortly after the first Biological Opinion was issued. Those Biological Opinions recommended 10 major actions (as either reasonable and prudent alternatives or conservation recommendations) that the USCG could take to avoid the likelihood of its vessel operations jeopardizing the continued existence of the northern right whale. In compliance with the reasonable and prudent alternatives that, if enacted, would avoid the likelihood of jeopardizing the continued existence of the northern right whale, the USCG posts trained, dedicated lookouts on vessels, issues speed guidance for USCG vessels, issues approach guidance for USCG vessels, and provides information on threatened and endangered species to commercial and recreational vessel operators (a detailed review of the USCG's implementation of the reasonable and prudent alternatives and conservation recommendations of the 1995 and 1996 Biological Opinions is provided in Appendix B. Appendix C provides updated guidance criteria for sightings, Early Warning System, and disentanglement for the First District). In addition, as a result of these two Biological Opinions, the USCG developed and implemented an Atlantic Protected Living Marine Resources Initiative (APLMRI) which includes efforts to modify USCG vessel and aircraft operations to reduce possible take of the northern right whale, particularly in its critical habitat off the Georgia/ Florida coastline and critical habitats in the Great South Channel and Cape Cod Bay, Massachusetts. The APLMRI was adopted less than one year ago and its measures extend beyond the reasonable and prudent alternatives of the Biological Opinions issued by NMFS. The USCG provides support for disentanglement efforts, Early Warning System, sighting information, retrieval of floating whale carcasses for necropsy, coordinates an oil spill response network that incorporates important protocols for endangered species, and has been an active participant in working with the shipping community to increase awareness of protected species issues.

*US Navy Vessel Operations, Mayport.*  On May 15, 1997, NMFS issued a Biological Opinion on U.S. Navy Operations out of Mayport, Florida. U.S. Navy operations out of Mayport, Florida and Kings Bay, Georgia, occur in the Action Area, although NMFS does not know the exact number of vessels involved in these operations. Since the July 22, 1996 Biological Opinion that was issued to the USCG, the Navy has initiated a number of mitigation measures with respect to their Mayport operations designed to protect right whales. Because of these mitigation measures, NMFS' May 15, 1997, Biological Opinion on Navy operations out of Mayport, Florida concluded that these operations were not likely to jeopardize the continued existence of

endangered or threatened species under NMFS' jurisdiction (for additional information, see NMFS 1997b).

*Private and Commercial Vessels.* In addition to the federal vessel operations, private and commercial vessels operate in the action area of this consultation and also have the potential to interact with whales and sea turtles. For example, shipping traffic in Massachusetts Bay is estimated at 1,200 ship crossings per year with an average of 3 per day. More than 280 commercial fishing vessels fish on Stellwagen Bank in the Gulf of Maine and sportfishing contributes more than 20 vessels per day from May to September. And this is just one area within the scope of this consultation which is also a high use area for many species of whales. In addition to commercial traffic and recreational pursuits, private vessels participate in high speed marine events that are concentrated in the southeastern US that are a particular threat to sea turtles. The magnitude of these marine events is not currently summarized; NMFS and the USCG have initiated consultation on these events, but that consultation has not been completed.

Education and outreach are considered one of the primary tools to reduce the threat of impact from private and commercial vessels. The USCG has provided education to mariners on whale protection measures and uses their platforms such as radio broadcasts and notice to mariner publications to alert the public to potential whale concentration areas. They are also participating in international activities (discussed later) to decrease the potential for commercial shipping traffic to strike a whale.

In addition to the ESA measures for federal activities mentioned above, numerous recovery activities are being implemented that are aimed at decreasing the level of impacts from private and commercial vessels in the action area and during the time period of this consultation. These include the early warning system (EWS), Northeast Recovery Plan Implementation Team for the Right Whale Recovery Plan (NEIT), Southeast Recovery Plan Implementation Team for the Right Whale Recovery Plan (SEIT), and NMFS regulations.

*Early Warning System.* The existing EWS in the Northeast began surveying the Cape Cod Bay (CCB) and Great South Channel (GSC) critical habitats from January through July 1997 by aerial and surface platforms, with right whale sightings information coordinated and processed by NMFS. Sightings for each survey day were plotted in an ARCINFO-based GIS program, disseminated by an automated fax system immediately after processing to cooperators, and made available to all marine resource users through various media. The coordinates of the right whale sightings were broadcast for 24 hours by USCG via Broadcast Notice to Mariners and NAVTEX, NOAA Weather Radio, and Army Corps of Engineers Traffic Controllers at Cape Cod Canal to both target shipping traffic as well as other marine resource users. Maps with right whale sightings boxes were also posted on Massachusetts and NMFS web pages and linked to other sites. A NMFS Inquiry Line at the Northeast Region provided right whale sighting faxes on demand to all interested callers. During the 1997 EWS season, additional cooperators from the Navy and MASSPORT (the Boston Port Authority) were involved in planning and supporting network operations.

21

E.    **Effects of the Action**

This section of a Biological Opinion assesses the direct and indirect effect of the proposed action on threatened and endangered species or critical habitat, together with the effects of other activities that are interrelated or interdependent (50 CFR 402.02). Indirect effects are those that are caused later in time, but are still reasonably certain to occur. Interrelated actions are those that are part of a larger action and depend upon the larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration (50 CFR 402.02).

*Northern Right Whale*

Previous Biological Opinions on the USCG's vessel and aircraft operations assessed the effects of the USCG operations on the northern right whale population qualitatively by focusing on five items: the combined mortalities associated with an unusual mortality event in 1995-1996; the possibility that the northern right whale might have been experiencing a population decline; the potential biological removal figure for the northern right whale and its small population size; the lack of any measurable recovery progress for the northern right whale; and the cumulative sources of human-induced mortality. Based on these factors, in 1996, NMFS concluded that the USCG's Atlantic coast vessel and aircraft operations were likely to jeopardize the continued existence of the northern right whale.

The 1996 Biological Opinion provided the USCG with reasonable and prudent alternatives that, if implemented, would avoid the likelihood of jeopardizing the continued existence of the right whale. The USCG is either implementing or is in the process of implementing those reasonable and prudent alternatives and, therefore, has avoided the likelihood of jeopardizing the right whale associated with their Atlantic vessel and aircraft operations.

Based on the incident report and other information provided by the USCG, the interaction with the humpback whale in the summer of 1997 does not diminish the effectiveness of the programs the USCG has developed and implemented to significantly reduce the potential for USCG activities to impact large whales. This incident may have been compounded by individual decisions that did not directly follow the intent of the APLMRI which is to increase the degree of caution officers use when operating in an area and at a time when whales are abundant (e.g., not conducting a full power trial during a time of the year when whales are abundant in the Gulf of Maine).

This incident (as described in the *Incident Description* of this Biological Opinion) was a result of individual decisions that did not directly follow APLMRI directives and the USCG has taken appropriate steps to ensure that similar indiscretions will not happen again. USCG personnel are being educated on the importance of following the letter and intent of the APLMRI and being provided an account of this incident to prevent future re-occurrence.

NMFS is reasonably confident that the reasonable and prudent measures and conservation actions the USCG is implementing with their Atlantic operation avoid the likelihood of jeopardizing the northern right whale, as well as other whales. However, based on the operation of USCG vessels

in areas where whales are abundant and the fact that some situations cannot be avoided because of the animal's often unpredictable behavior, USCG vessels may, on occasion, affect large whales. In the past this amounted to an interaction every 2-5 years on various species, not always right whales. This rate of past occurrences were prior to initiation of the APLMRI and all the other recovery activities to which the USCG is a part. Therefore, NMFS expects the chance of future interactions, if any, to be less frequent as education, training and skills realize their full effectiveness among USCG personnel.

*Multi mission upgrade.* The Multi mission upgrade, which will become part of overall vessel operations, requires that aircraft and vessel operations considered in 1995 and 1996 be re-evaluated to assess the impacts of this change on previous determination (summarized above) with respect to USCG operations along the Atlantic Coast. One of the major effects of this upgrade is to replace vessels with cruising speeds between 22 and 13 knots (for 41- foot and 44-foot boats, respectively, that are currently deployed) with vessels rated at cruising speeds in excess of 25 knots. This vessel also provides greater stability and safety features that will allow the USCG to operate in more heavy surf conditions, thus enhancing search and rescue ability. While it is easy to see why these features enhance USCG search and rescue operations, these features may also make them more hazardous to whales. The USCG notes in the environmental assessment prepared for this action that the 47-foot MLB does pose a slightly greater risk to marine mammals and sea turtles where they co-exist along the Atlantic Coast from Florida to Maine. However, the USCG refers to internal District guidance on operational restrictions around endangered and threatened species as adequate to keep any additional impact to a minimum.

Deploying a larger number of vessels with 12 and 50% greater speed capacities will increase the potential for collisions of vessels with large whales, regardless of operational directives because most of these directives cannot be applied during search and rescue missions. The EA notes that 12 stations from Massachusetts and Maine, 7 stations in New York and New Jersey, 7 stations from Virginia, Maryland, and North Carolina, 13 stations in Florida, South Carolina, and Puerto Rico, and 8 stations in Texas, Mississippi, and Alabama will receive these upgrades. In the draft environmental impact statement on the APLMRI the USCG notes that it deploys 104 cutter class vessels ($\geq 65$ feet), but more than 240 total vessels. The USCG's Biological Assessment for the 1995 consultation describes the fleet as consisting of about 150 vessels that are in the range of 21-55 feet, under way 400 hr/v/yr--a relatively small component of operations compared to the patrol boats that see 1500-1800 hr/v/yr. Specifically, in Districts 1-8, there are 117/ 41-foot boats, 35/ 44- foot boats and 6/47- foot boats, which is a net change of 152 vessels that may be upgraded to the faster 47- footers.

The dredging associated with the multi-mission upgrade is minimal, occurring mostly in existing slips or under existing piers (see Table 2 of the EA) with bucket type dredges, and is consequently not likely to impact any endangered or threatened species under NMFS jurisdiction.

Considering potential additional effects of this action relative to what was evaluated in previous Biological Opinions, this action should not appreciably increase the overall effect of USCG vessel operations on northern right whales in the Action Area provided that COs adhere to current USCG guidance during non-emergency missions (i.e. not operating these vessels at maximum capacity (excess of 25 knots) during non-emergency transits). For this consultation,

NMFS assumes that the USCG will assure that all COs adhere to this directive; the USCG's response to the CGC *Campbell* incident is evidence of their intent to fully enforce this directive and supports this assumption. The change these vessels represent in hours of operation for search and rescue is a small component of overall operation when compared to the larger cutter class vessels. With this directive in place, the additional potential for impact does not change NMFS' overall conclusion on the effects of vessel and aircraft operations of the 1996 Biological Opinion.

*Accommodating low flights and close approach by vessels for right whale sighting and surveillance work.* The 1995 Biological Opinion assessed the effects of USCG aircraft traffic over critical habitat designated for the northern right whale based on an assumption that overflights of this critical habitat would occur at altitudes greater than 3,000 ft., which was provided in the USCG's Biological Assessment. Because of the 1995 Biological Opinion, USCG vessels were prohibited from approaching whales head-on during non-emergency operations, and from approaching right whales within 500 yds and all other whales within 100 yds.

On the other hand, the regulations that control approaching North Atlantic right whales (50 CFR Part 222.32) place no restrictions on aircraft unless the aircraft is conducting whale watch activities (although this regulation was meant to apply to commercial whale watching operations). NMFS asked the USCG to (a) provide sightings of whales, including photos and videos if possible, (b) participate in surveillance for the EWS, (c) assist in investigations of entangled animals, and (d) support disentanglement efforts, all of which require flights below 3,000 ft and vessel approaches within 500 yds. The rule does not prohibit approaches closer than 500 yard for "approaching to investigate a right whale entanglement or injury, or to assist in disentanglement or rescue of a right whale, provided that permission is received from NMFS or a NMFS designee prior to the approach." Therefore, even for this response, the USCG technically needs prior authorization. The USCG First District is currently authorized under the NEFSC scientific research permit for close approach to whales while conducting EWS surveys (NMFS letter, January 6, 1997).

In an August 21, 1997, letter to Dr. Andrew A. Rosenberg (Regional Administrator, Northeast Region, NMFS), the USCG noted that their law enforcement patrols are restricted from effectively sighting whales by these operational restrictions. Aircrews tend to avoid critical habitat areas so as not to be bound by its restrictions. This conflicts with the need for sighting information. They requested a waiver of minimum altitude requirements in New England waters, including critical habitat. USCG First District is currently authorized by NMFS to conduct surveillance flights at lower altitudes, the permission did not extend to other USCG flights.

Aircraft noise may startle whales and possibly result in short-term changes in whale behavior. Based on the information available, the benefits of receiving timely and accurate reports of right whales in New England to prevent ship collisions far outweighs the potential effects of aircraft flying below 3,000 feet. Therefore, it is reasonable that the USCG First District be allowed to fly below 3,000 ft to enable them to collect accurate whale sighting information in New England, including in critical habitat. This determination supersedes the restriction issued in the 1995 Biological Opinion.

30

The close approach by vessels is more problematic since the injuries that could be sustained by the whale could be much more severe. A trained observer should be able to identify a whale at 500 yds, although the observer's height of eye, weather, conditions, sea conditions, and species of whale can make identifications difficult. Assessing entanglements cannot be done beyond 500 yds. NMFS recognizes the importance of providing the USCG with prior authorization to approach right whales within 500 yds to investigate perceived whale entanglements or assisting disentanglement efforts. However, the inherent danger close approaches pose to whales does not support a blanket authorization for non-emergency operations. Therefore, NMFS does not propose to change the 1995 Biological Opinion's requirements that prohibit the USCG vessels from approaching whales head-on during non-emergency operations, not approaching right whales within 500 yds, and all other whales within 100 yds, except to investigate potentially entangled whales and assisting disentanglement teams.

*Summary*. Although the 1996 Biological Opinion concluded that the USCG's vessel and aircraft operations along the Atlantic Coast were likely to jeopardize the continued existence of the northern right whale, that Biological Opinion identified reasonable and prudent alternatives that would, in NMFS' opinion, avoid the likelihood of jeopardizing the whale. While the USCG implemented those reasonable and prudent alternatives, their action would avoid the likelihood of jeopardizing the continued existence of the northern right whale. Based on the best information available to NMFS, the USCG is implementing the reasonable and prudent alternatives from the 1996 Biological Opinion; therefore, the actions that were considered in the 1996 Biological Opinion are not likely to jeopardize the continued existence of the northern right whale.

Since the 1996 Biological Opinion was issued, new information (presented in the *Status of the Species*) suggests that the declining trend of northern right whale population that was presented in the 1996 Biological Opinion may be erroneous; based on the new information, the northern right whale's population trend is uncertain — it may be increasing, stable, *or* decreasing. Since the 1996 Biological Opinion was issued, additional actions necessary to recover the northern right whale have been implemented, which include (a) USCG's contributions to the EWS and surveillance systems, disentanglement support, operational directives, (b) the Atlantic Large Whale Take Reduction Plan, (c) part of the Atlantic Ocean Cetacean Take Reduction Plan, (d) the reasonable and prudent alternatives from four previous, un-related Biological Opinions, (e) the conservation program in the Navy Biological Opinion, and (f) recovery activities to reduce ship strikes associated with the two implementation teams. (for further information, refer to the *Environmental Baseline* section of this Biological Opinion). Although those actions have not been in place long enough for the northern right whale population to respond, those actions are expected to benefit the northern right whale in the foreseeable future. These actions should not only improve conditions for the northern right whale, they are expected to reduce sources of human-induced mortality to this population.

The effects of the new activities and events being considered (a whale/vessel interaction, multi mission upgrade, flight altitude relief) do not change the basis for that conclusion, and since analysis of the environmental baseline does not indicate any further impacts from past, present or future State, Federal or private activities, or significant changes in the status of threatened and endangered species in the Action Area since the 1996 Biological Opinion, then the overall effects

of the action have not changed since the 1996 determination that provided reasonable and prudent alternatives to the action that resulted in " no jeopardy."

*Humpback and Fin Whale*

*The CGC* Campbell *Incident.* Based on the incident report and other information provided by the USCG, the interaction with the humpback whale in the summer of 1997 does not indicate that the effectiveness of the programs the USCG has developed and implemented are not effectively reducing the potential for USCG activities to impact large whales. The CGC *Campbell* incident (as described earlier) involved individual decisions that did not directly follow the intent of the APLMRI (which is to increase the degree of caution officers use when operating in an area and at a time when whales are abundant) and the USCG has taken appropriate steps to ensure that this will not recur (see the discussion in the northern right whale, above).

The 1997 humpback whale strike by the CGC *Campbell* appears to have been caused by an unusual event. Because the USCG took immediate action to make certain that all USCG vessel operators adhere to the letter and spirit of the USCG protected species conservation program (see description of the incident provided earlier), this incident does not change the basis for NMFS previous determination that these operations do not appreciably reduce the likelihood of either the survival or recovery of the humpback or fin whale in the Action Area.

NMFS is reasonably confident that the protective measures developed in consultation with the USCG, while designed to remove the threat of jeopardy to northern right whales, also reduces the likelihood of adversely effecting to the humpback and fin whale from USCG vessel and aircraft operations. However, based on the operation of USCG vessels in areas where whales are abundant and the fact that some situations cannot be avoided because of an animal 's often unpredictable behavior, USCG vessels may, on occasion, affect large whales. However, these adverse effects are not likely to appreciably reduce the survival and recovery of the humpback or fin whales.

*Multi-mission upgrade.* Considering potential additional effects of the proposed multi-mission upgrade relative to what was evaluated in previous Biological Opinions, this action should not appreciably increase the overall effect of USCG vessel operations on humpback or fin whales in the Action Area provided that COs adhere to current USCG guidance during non-emergency missions. For this consultation, NMFS assumes that the USCG will assure that all COs adhere to APLMRI directives; the USCG's response to the CGC *Campbell* incident is evidence of their intent to fully enforce the APLMRI directives and supports this assumption. The change these vessels represent in hours of operation for search and rescue is a small component of overall operation when compared to the larger cutter class vessels. With the APLMRI directives in place, the additional potential for impact does not change NMFS' overall conclusion on the effects of vessel and aircraft operations of the 1996 Biological Opinion.

*Sea Turtles*

The previous Biological Opinion on the USCG Vessel and Aircraft Operations (1995) noted that boat and propellor related injuries are frequently documented for sea turtles. Turtles appear to

32